**JUDGE DANIELS**

# 08 CV 3579

**KILPATRICK STOCKTON LLP**
Lisa Pearson (LP 4916)
31 West 52nd Street, 14th Floor
New York, NY 10019
Telephone: (212) 775-8700
Facsimile: (212) 775-8815

James F. Bogan III
(Application for admission *pro hac vice* to be filed)
Suite 2800, 1100 Peachtree Street
Atlanta, Georgia 30309
Telephone: (404) 815-6467
Facsimile: (404) 541-3133

APR 1 4 2008
U.S.D.C. S.D. N.Y.
CASHIERS

*Counsel for Plaintiff EyeWonder, Inc.*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------x

EYEWONDER, INC.,

                Plaintiff,

     v.

JOHN ABRAHAM,

                Defendant.

---------------------------------------------------x

08 _____

**VERIFIED COMPLAINT FOR
INJUNCTIVE RELIEF IN AID
OF ARBITRATION**

Plaintiff EyeWonder, Inc. ("EyeWonder"), for its Verified Complaint against Defendant

John Abraham ("Abraham"), alleges as follows:

    1.    EyeWonder and its former employee Abraham are parties to an Employment

Agreement containing covenants by Mr. Abraham not to compete, not to solicit EyeWonder's

customers, and not to disclose EyeWonder's confidential business information for set periods of

time, among others. Upon information and belief, Abraham has recently accepted employment

from one of EyeWonder's direct competitors and has breached, or threatens to breach, these and other covenants, causing irreparable harm to EyeWonder. The Employment Agreement provides for binding arbitration in Atlanta, Georgia of any contractual disputes, but expressly exempts any action for injunctive or other preliminary relief to prevent violation of Mr. Abraham's covenants or to maintain the status quo until final resolution of the dispute. Accordingly, EyeWonder brings this action to obtain equitable relief in aid of arbitration, to prevent Abraham from breaching his covenants, and to maintain the status quo until this dispute is resolved.

## PARTIES, JURISDICTION, AND VENUE

2.      Plaintiff EyeWonder is a privately-held corporation organized and existing under the laws of Delaware. EyeWonder maintains its principal place of business at 233 Peachtree Street, Suite 500, Atlanta, Fulton County, Georgia 30303. EyeWonder also maintains an office at 19 West 44th Street, Suite 1410, New York, NY 10036.

3.      Defendant Abraham is an individual residing at 8328 Stewart Avenue, Los Angeles, California 90045. Pursuant to paragraph 9 of the Employment Agreement between the parties, a copy of which is attached as **Exhibit A** (the "Employment Agreement"), Mr. Abraham has consented to both the jurisdiction and venue of this Court.

4.      This Court has diversity jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332, because the matter in controversy (including, without limitation, EyeWonder's requests for injunctive relief herein), exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

US2000 10770359.3

## FACTS

**EyeWonder**

5.      EyeWonder began doing business in Atlanta, Georgia in 1999.  EyeWonder's

business consists almost exclusively of providing services for creating and delivering video and

other rich media advertisements over the Internet and wireless networks.

**Mr. Abraham's employment with EyeWonder**

6.      On June 1, 2007, Mr. Abraham transmitted to EyeWonder via facsimile a letter

signed by him (a copy of which is attached as **Exhibit B**), accepting EyeWonder's offer of

employment to be the director of sales for its southwest sales region, consisting of Arizona, New

Mexico, California – south of Big Sur, and the southern halves of Utah and Colorado (the

"Region").  Soon thereafter, EyeWonder and Mr. Abraham entered into the Employment

Agreement (**Exhibit A**), which is dated as of June 1, 2007, in which he was formally appointed

Regional Vice President of Sales for the Region.

7.      In his capacity as Regional Vice President, Mr. Abraham's primary

responsibilities were to (i) offer and sell EyeWonder's services to customers and prospective

customers, and (ii) supervise EyeWonder's account executives and other supporting sales

personnel in EyeWonder's Los Angeles office.  At all times during his employment with

EyeWonder, Mr. Abraham reported directly to its Senior Vice President of Global Sales, Michael

Rosner, who is based in EyeWonder's principal sales office in New York City.  During such

employment, Mr. Abraham communicated with Mr. Rosner on an almost daily basis, and the

account executives in EyeWonder's Los Angeles sales office worked closely, and collaborated

frequently on sales efforts, with the account executives based in the main sales office in NY.

US2000 10770359.3

8.    As Regional Vice President, Mr. Abraham became intimately familiar with trade secrets and other Confidential Information of EyeWonder, including business and sales strategies and plans, new product and services development efforts, and strategies relative to EyeWonder's competitors. This information derives economic value from not being generally known, and is and remains the subject of reasonable efforts to maintain its confidentiality.

**Terms of the Employment Agreement**

**Non-Competition**

9.    Section 6(f) of the Employment Agreement provides that, during his employment with EyeWonder and for a period of 12 months after such employment, Mr. Abraham

> shall not, for or on behalf of any person, firm or entity located within, or within 20 miles of, the city limits of Los Angeles or San Diego, CA sell or solicit for sale services to deliver video or other rich media advertisements over the Internet or over wireless networks.

10.    The covenant not to compete is reasonably limited to a 12-month period after Mr. Abraham's employment with EyeWonder ends. Such a time period is reasonable and necessary to protect EyeWonder's legitimate business interests.

11.    The covenant not to compete is reasonably limited as to subject matter because it prohibits Mr. Abraham from performing only duties that he specifically performed for and on behalf of EyeWonder during his employment. Such a prohibition is reasonable and necessary to protect EyeWonder's legitimate business interests.

12.    The covenant not to compete is reasonably limited as to territory because it applies to only a 20-mile radius surrounding and including Los Angeles and San Diego, California, the two major cities in southern California where Mr. Abraham and the rest of EyeWonder's Los Angeles sales staff primarily focus their sales efforts (the "Prohibited

- 4 -

Territory"). In Section 6(f) of the Employment Agreement, Mr. Abraham expressly acknowledged that "these areas are the primary locations in which [he] performs services for [EyeWonder], and thus the areas in which [his] provision of services in violation of the provisions of this Section 6(f) would cause significant harm to [EyeWonder]." Accordingly, such a restriction is reasonable and necessary to protect EyeWonder's legitimate business interests.

**Non-Solicitation**

13.    Section 6(e) of the Employment Agreement provides that during his employment with EyeWonder and for a period of 12 months after such employment, Mr. Abraham

> shall not solicit, directly or by assisting others, any Customer for the purpose of selling or otherwise providing to such Customer services for delivering video or other rich media advertisements over the Internet or over wireless networks.

Section 6(a)(ii) of the Employment Agreement specifically defines the term "Customer" as "a customer of [EyeWonder] that [Mr. Abraham], during the one-year period before the termination of employment, (i) was solicited or serviced by [Mr. Abraham] or another [EyeWonder] employee supervised by [Mr. Abraham] or (ii) about whom [Mr. Abraham] had Confidential Information."

**Non-Use and Non-Disclosure of Confidential Information**

14.    Section 6(b) of the Employment Agreement prohibits Mr. Abraham from using Confidential Information of EyeWonder except in connection with work for EyeWonder, and prohibits the disclosure of such Confidential Information during his employment and for two years following such employment.

15.    Section 6(a)(i) of the Employment Agreement defines "Confidential Information"

- 5 -

as

information relating to Company's customers, operations, finances, and business in any form that derives value from not being generally known to other persons or entities, including without limitation technical or nontechnical data, formulas, patterns, customer purchasing practices and preferences, compilations (including compilations of customer information), programs (including computer programs and models), devices (including equipment used to manufacture Company's products), methods (including aesthetic and functional design and manufacturing methods), techniques (including style and design technology and plans), drawings (including product or equipment drawings), processes, financial data (including sales forecasts, sales histories, business plans, budgets and other forecasts), or lists of actual or potential Customers or suppliers (including identifying information about those Customers or suppliers), whether or not reduced to writing.

**Authorization of Injunctive Relief**

16.     Pursuant to Section 8 of the Employment Agreement, EyeWonder intends to commence an arbitration proceeding in Atlanta, Georgia to adjudicate the merits of this dispute. EyeWonder has filed this action in aid of arbitration, however, pursuant to Sections 7, 8(c) and 9 of the Agreement.  Section 8(c) of the Agreement expressly authorizes the filing of an action "for injunctive or other preliminary relief to maintain the status quo until a dispute can be finally resolved, or any action to prevent any violation or threatened violation of the covenants in **Section 6**."

17.     EyeWonder and Mr. Abraham have expressly agreed that injunctive relief is necessary in the event of a breach or threatened breach of Section 6 of the Employment Agreement.  In addition to Section 8(c) quoted above, Section 7 of the Employment Agreement provides that:

Employee acknowledges that any breach of the terms of **Section 6** would result in material damage to Company, although it might be difficult to establish the monetary value of the damage.  Employee therefore agrees that Company, in addition to any other rights and remedies available to it, shall be entitled to obtain an immediate injunction (whether temporary or permanent) from any court of appropriate jurisdiction if any such breach, or a threat thereof, occurs which Company in good faith believes will or is likely to result in irreparable harm to Company.

18.     Regarding the forum for resolving claims for injunctive relief, Section 9 of the

Employment Agreement provides that:

> This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of New York, without regard to its conflict of laws rules. Employee hereby consents to the exclusive jurisdiction of the U.S. District Court or the court of the State of New York for the district or circuit in which New York, NY is located, and hereby waives any objection Employee might otherwise have to jurisdiction and venue in such court if an action is brought in such court to resolve a dispute between the parties related to Employee's employment which is not subject to the arbitration provisions of Section 8.

**Mr. Abraham's Departure from EyeWonder**

19.     On March 21, 2008, Mr. Abraham phoned Jerome Connell, EyeWonder's General

Counsel and COO, and stated during the conversation that he had been offered a position with "a

wireless startup" and was giving his two weeks notice to terminate his employment with

EyeWonder.  Shortly thereafter, Mr. Abraham sent an e-mail communication to Mr. Connell

which provided, in part, "As I mention. I am going on vacation and have offer for a another

play. So I am giving my two weeks." (Typographical and grammatical errors in original.)

Attached hereto as **Exhibit C** is a copy of a March 26, 2008 e-mail communication sent by Mr.

Connell to Mr. Abraham in response, which includes the text of Mr. Abraham's March 21 e-mail

communication described above.

20.     Mr. Abraham, however, has not informed EyeWonder of the identity of the party

with which Mr. Abraham has accepted employment, notwithstanding a clear contractual

obligation to do so.  In this regard, Section 6(h) of the Employment Agreement provides that:

> At any time before, and for 12 months after, the termination or expiration of Employee's employment, Employee shall provide any prospective employer with a copy of this Agreement, and upon accepting any employment with another company, shall provide Company with such company's name and a description of the services Employee will provide to such company.

21.     EyeWonder has learned that Mr. Abraham has accepted, or imminently intends to accept, employment with Eyeblaster, Inc. ("Eyeblaster"). Eyeblaster is a Delaware corporation that maintains its headquarters at 135 West 18th Street, 5th Floor, New York, NY 10011. Eyeblaster is one of a small handful of providers in the world that compete with EyeWonder by offering and selling directly competitive services for delivering video and other rich media advertisements.

22.     Upon information and belief, Mr. Abraham has accepted, or intends to accept an employment position with Eyeblaster in which he will (i) offer and sell to customers and prospective customers Eyeblaster's services for delivering video and other rich media advertisements over the Internet or over wireless networks, and (ii) supervise the sales staff based in Eyeblaster's Los Angeles office, which staff is engaged in offering and selling on behalf of Eyeblaster services for delivering video and other rich media advertisements over the Internet or over wireless networks, all in direct competition with EyeWonder.

23.     Mr. Abraham's acceptance of employment with Eyeblaster clearly would violate Section 6(f) of the Employment Agreement.

24.     In his position as Regional Vice President of sales for the Region, Mr. Abraham's primary responsibilities were to call on and maintain high-level relationships with customers and prospective customers in the Region, which has a primary focus on customers in Southern California, and managing and supervising EyeWonder's account managers for the Region. The services he provided to EyeWonder were unique. When he joined EyeWonder in June 2007, the Region was assigned billing goals of $1,150,000 for the period ending September 30, 2007 and $1,350,000 for the period of October 1 – December 31, 2007. Under his supervision, the Region exceeded its goals during both periods, generating a total of $4,059,712 during the combined

- 8 -

period (as compared to $978,360 for the Region during the same period in the prior year). In

addition to his monthly base salary of $10,000, Mr. Abraham also received over $70,000 in

bonus compensation for the June-December 2007 period, due to the performance of the Region.

Also, during 2007, EyeWonder's net income was approximately 12% of its total revenues, which

translates to billings from the Region having generated profits of approximately $500,000 during

June through December 2007 alone. Mr. Abraham accepting employment with Eyeblaster would

jeopardize these profits, especially given his unique position with the company as the supervisor

of the Region; his relationships with EyeWonder's customers and prospective customers in the

Region, and the account managers that he supervised; and the nature and quality of the

Confidential Information to which he was exposed. Therefore, the amount in controversy clearly

exceeds the sum or value of $75,000.00, as measured from EyeWonder's perspective.

## FIRST CLAIM FOR RELIEF
### Breach of Contractual Duty to Disclose Identity of Prospective Employer

25.    EyeWonder incorporates by reference, as if fully set forth herein, the allegations

contained in paragraphs 1-24 of this Verified Complaint.

26.    Section 6(h) of the Employment Agreement clearly obligates Mr. Abraham to (a)

"provide any prospective employer with a copy of this [Employment] Agreement," and (b)

"provide [EyeWonder] with such company's name and a description of the services [Mr.

Abraham] will provide to such company."

27.    Upon information and belief, Mr. Abraham has, in fact, accepted employment

with Eyeblaster. In such event, Mr. Abraham, by telling Mr. Connell that he would be accepting

employment with "a wireless startup" and not disclosing the actual identity of his new employer,

has violated his contractual obligation to disclose the identity of his prospective employer to

EyeWonder and describe the nature of the services he will provide to such employer. EyeWonder also fears that Mr. Abraham has violated his contractual obligation to provide such prospective employer with a copy of the Employment Agreement.

28.    Under the circumstances of this case, EyeWonder is entitled to an order requiring Mr. Abraham to specifically perform his contractual obligations under Section 6(h) of the Employment Agreement, including without limitation an order requiring Mr. Abraham to disclose the identity of his prospective (or current) employer and describe the nature of the services he will provide to that employer.

## SECOND CLAIM FOR RELIEF
### Breach of Non-Competition Provision

29.    EyeWonder incorporates by reference, as if fully set forth herein, the allegations contained in paragraphs 1-28 of this Verified Complaint.

30.    Under Section 6(f) of the Employment Agreement (the "Non-Competition Provision"), Mr. Abraham agreed not to, in the Prohibited Territory, sell or solicit for sale services to deliver video or other rich media advertisements over the Internet or over wireless networks for a period of 12 months after his employment with EyeWonder came to an end.

31.    The Non-Competition Provision protects EyeWonder's legitimate business interests, including, but not limited to, trade secrets and proprietary business information, relationships with prospective or existing customers and clients, customer goodwill associated with ongoing business or professional practice, and specialized training provided at EyeWonder's expense.

32.    The Non-Competition Provision is reasonably limited in time, territorial effect

and scope of prohibited activities, and it is narrowly tailored to protect EyeWonder's legitimate business interests.

33.    Upon information and belief, Mr. Abraham has already materially breached, or imminently will materially breach, the Non-Competition Provision by competing with EyeWonder in the Prohibited Territory.  Given Mr. Abraham's concealment of information from EyeWonder, notwithstanding a clear contractual obligation to do so, a factual inference can be made that Mr. Abraham has, in fact, accepted employment with a competitor of EyeWonder.  If Mr. Abraham is allowed to offer or sell on behalf of another party in the Prohibited Territory services for delivering video or other rich media advertisements over the Internet or wireless networks, such action will constitute a material breach of Section 6(f) of the Employment Agreement and will cause immediate and irreparable injury to EyeWonder.

34.    EyeWonder has suffered or imminently will suffer irreparable harm as a result of Mr. Abraham's breach of the Employment Agreement, and therefore is entitled to injunctive relief under Sections 6 and 9 thereof.

35.    Under these circumstances, a temporary restraining order and preliminary injunction in aid of arbitration is a necessary and appropriate remedy that will allow EyeWonder to maintain the *status quo* pending a resolution of the merits of the case.  Such injunctive relief will also prevent Mr. Abraham from causing irreparable harm to EyeWonder by performing services for Eyeblaster, one of EyeWonder's direct competitors.

### THIRD CLAIM FOR RELIEF
### Breach of Non-Solicitation Provision

36.    EyeWonder incorporates by reference, as if fully set forth herein, the allegations contained in paragraphs 1-35 of this Verified Complaint.

- 11 -

37.     Under Section 6(f) of the Employment Agreement (the "Non-Solicitation Provision"), Mr. Abraham agreed not to solicit, directly or by assisting others, any Customer (as defined in the Employment Agreement) for the purpose of selling or otherwise providing to such Customer services for delivering video or other rich media advertisements over the Internet or over wireless networks.

38.     The Non-Solicitation Provision is narrowly tailored, prohibiting the solicitation of only those EyeWonder customers with which Mr. Abraham or an individual under his direct supervision had specific contact and dealings, and protects EyeWonder's legitimate business interests, including EyeWonder's goodwill and customer relationships, in which EyeWonder has invested substantial time, money and resources, as well as future transactions and business relationships with existing and former customers.

39.     Upon information and belief, Mr. Abraham has either materially violated or will imminently materially violate the Non-Solicitation Provision. In particular, if Mr. Abraham is allowed to solicit EyeWonder's Customers, whether directly or through staff acting under his direction, to purchase from another party services for delivering video or other rich media advertisements over the Internet or wireless networks, it will constitute a material breach of Section 6(e) of the Employment Agreement and will cause immediate and irreparable injury to EyeWonder.

40.     Under these circumstances, a temporary restraining order and preliminary injunction in aid of arbitration is a necessary and appropriate remedy that will allow EyeWonder to maintain the *status quo* pending a resolution of the merits of the case and to prevent Mr. Abraham from causing irreparable harm to EyeWonder by soliciting its customers.

US2000 10770359.3

## FOURTH CLAIM FOR RELIEF
### Breach of Non-Disclosure Provision

41.     EyeWonder incorporates by reference, as if fully set forth herein, the allegations contained in paragraphs 1-40 of this Verified Complaint.

42.     Under Section 6(b) of the Employment Agreement (the "Non-Disclosure Provision"), Mr. Abraham agreed not to use or disclose to others any of EyeWonder's Confidential Information (as defined in the Employment Agreement) for a period of two years after his employment terminated.

43.     Mr. Abraham has been exposed to extensive EyeWonder Confidential Information, including that relating to EyeWonder's business and pricing plans and strategies, national and regional sales plans (including client assignments, and quarterly and annual sales goals, for each EyeWonder sales employee in the Region), hiring strategies, product developments and rollouts that are underway and under consideration, and strategic plans for developing advantages over its competitors, both in terms of product/service offerings and sales strategies.

44.     EyeWonder's confidentiality policy protects its legitimate business interest in the economic value derived from its Confidential Information.  Any disclosure or use of EyeWonder's Confidential Information outside of the restrictions set in place by EyeWonder will irreparably reduce the value of that information by diminishing the competitive advantages it provides.

45.     Upon information and belief, Mr. Abraham has either materially breached or will imminently materially breach the Non-Disclosure Provision by using or disclosing EyeWonder's Confidential Information and trade secrets.  In particular, if Mr. Abraham is allowed to offer on

- 13 -

behalf of another party services for delivering video or other rich media advertisements over the Internet or over wireless networks, or to direct and supervise others who do so, he will inevitably use or disclose EyeWonder's Confidential Information. Such use and disclosure will constitute a material breach of Section 6(b) of the Employment Agreement and a misappropriation of EyeWonder's Confidential Information and trade secrets, and will cause immediate and irreparable harm to EyeWonder in the form of irrecoverable economic loss in the value of EyeWonder's Confidential Information.

46. Under these circumstances, a temporary restraining order and preliminary injunction in aid of arbitration is a necessary and appropriate remedy that will allow EyeWonder to maintain the *status quo* pending a resolution of the merits of the case and to prevent Mr. Abraham from causing irreparable harm to EyeWonder by using or disclosing its Confidential Information.

WHEREFORE, Plaintiff EyeWonder, Inc. respectfully prays that this Court ORDER and ADJUDGE as follows:

(a) enter an order directing Mr. Abraham to specifically perform his obligations under Section 6(h) of the Employment Agreement by providing his prospective or current employer with a copy of that agreement and to disclose to EyeWonder such company's name and a description of the services he will provide to such company;

(b) enter an order directing Mr. Abraham to comply with Section 6(f) of the Employment Agreement and thereby preliminarily and permanently enjoin him for a period of twelve (12) months from offering or selling on behalf of any third party within the Prohibited Territory services for delivering video or other rich media advertisements over the Internet or over wireless networks;

- 14 -

(c) enter an order directing Mr. Abraham to comply with Section 6(e) of the Employment Agreement and thereby preliminarily and permanently enjoin him for a period of twelve (12) months from soliciting EyeWonder's Customers, as defined in the Employment Agreement, to procure such services from any other party;

(d) enter an order directing Mr. Abraham to comply with Section 6(b) of the Employment Agreement and thereby preliminarily and permanently enjoin him for a period of two (2) years from using on behalf of, or disclosing to any other party, EyeWonder's Confidential Information; and

(e) awarding such other and further relief as this Court may deem just and proper.

Dated April 11, 2008.

KILPATRICK STOCKTON LLP

Lisa Pearson (LP 1916)
31 West 52nd Street, 14th Floor
New York, NY 10019
Tel: (212) 775-8700
Fax: (212) 775-8800
(lpearson@kilpatrickstockton.com)

James F. Bogan III
Georgia Bar No.: 065220
1100 Peachtree Street, Suite 2800
Atlanta, GA 30309
(404) 815-6500
(jbogan@kilpatrickstockton.com)

## **VERIFICATION**

I declare under penalty of perjury that the foregoing is true and correct.

This 11th day of April, 2008.

Jerome F. Connell, Jr.
EyeWonder, Inc. General Counsel and COO

# EXHIBIT A

## EMPLOYMENT AGREEMENT

**THIS AGREEMENT** is made and entered into as of June 1, 2007 between **EYEWONDER, INC.**, a Delaware corporation (**"Company"**), and the employee executing this Agreement below (**"Employee"**).

**WHEREAS**, Company is engaged in the business of creating and delivering rich media advertisements over the Internet and over wireless networks, and providing related services (the **"Company Business"**);

**WHEREAS**, Employee desires to offer and sell Company's products and services on behalf of Company; and

**WHEREAS**, the parties hereto desire to enter into an agreement for Company's employment of Employee on the terms and conditions contained herein.

**THEREFORE**, for and in consideration of the premises and the mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1. **Employment**. Subject to the terms and conditions of this Agreement, Employee shall be employed by Company as Regional Vice President of Sales for the region designated by the Company from time to time as its southwest region (Arizona, New Mexico, California – south of Big Sur, and the southern halves of Utah and Colorado). Employee's title and duties may be changed, and Employee may be promoted to a higher position within Company. Employee acknowledges that he has been informed of and had an opportunity to discuss with Company the specific activities Employee will perform as services, and that Employee understands the scope of the activities constituting services. Employee hereby accepts such employment and agrees to perform such duties as may be assigned to Employee. Employee represents to Company that he: (a) is under no contractual or other restriction or obligation inconsistent with the execution of this Agreement, the performance of duties hereunder, or any other rights of Company hereunder; and (b) is under no physical or mental disability that would hinder Employee's performance of duties hereunder.

2. **Time Commitment**. Employee shall devote his full business related time and best efforts to accomplishing Employee's duties, at such locations as may be reasonably requested by Company.

3. **Conflict of Interest**. While employed by Company, Employee shall not engage in any business activities with any other business enterprise without the Company's prior written consent. Without limiting the foregoing, Employee shall not serve as principal, partner, employee, officer or director of, or consultant to, any other business or entity conducting business for profit without the Company's prior written approval. In addition, under no circumstances will Employee have any financial interest in any competitor of Company during the term of employment; provided, that Employee may invest in no more than one percent of the outstanding stock or securities of any competitor, the stock or securities of which are traded on a national stock exchange of any country.

4. **Term and Termination**. Employee's employment with Company shall continue unless and until terminated by either party in accordance with this **Section 4**.

(a)     Either party may terminate this Agreement immediately by giving written notice to the other at any time, with or without Cause (defined below).  For purposes of this Agreement, **"Cause"** means: (i) Employee's conviction of a felony under state or federal law, or Employee's commission of an act of employment discrimination or sexual harassment under state or federal law; (ii) Employee's continued breach of any provision of this Agreement for a period of 30 days after written notice of such breach is given by Company; (iii) Employee's failure to comply with any directive of Company's Vice President of North American Sales (or any successor position with authority for managing Company's sales force) that continues for 10 days after written notice thereof is given to Employee; (iv) Employee's violation of any provision of **Section 6**; (v) Employee taking actions in conflict of interest with the Company or any of its subsidiaries or affiliates, given Employee's position with the Company; (vi) Employee's usurpation of a corporate opportunity of the Company or any of its subsidiaries or affiliates; (vii) Employee's failure to perform any of his/her duties or responsibilities hereunder; or (viii) Employee's voluntary cessation of employment before the Expiration Date.

(b)     Termination upon Death or Disability.  Employee's employment shall terminate upon Employee's death or Disability.  For purposes of this Agreement, **"Disability"** means that Employee, because of illness, incapacity or other physical or mental disability, is unable to perform a substantial portion of Employee's duties pursuant to this Agreement and either (i) Company has made a reasonable determination that such circumstances will continue for at least 90 days, considering Employee's physical or mental condition, or (ii) Employee has not performed such duties for a period of 90 consecutive days during any 12-month period during the term of this Agreement.

(c)     Survival of Provisions.  Upon termination of Employee's employment for any reason whatsoever (whether by Employee or by Company), the obligations of Employee pursuant to **Section 6** shall survive and remain in effect.

5.     **Compensation and Benefits.**  During the term of Employee's employment with Company hereunder:

(a)     Salary.  Company shall pay to Employee base salary for services rendered during the term of this Agreement at the annual rate of $120,000, to be earned and payable in accordance with Company's normal payroll practices for similarly situated employees.

(b)     Bonus.  Employee shall be entitled to receive bonuses in accordance with Company's Sales Compensation Plan (the "Plan") then in effect from time to time, based on the total billings credited to the Employee and to the account executives in Employee's sales region.  Attached at Exhibit A are the target billing and bonus amounts for such region for 2007, and a copy of the Plan as in effect as of the date of this Agreement.

(c)     Other Benefits.  Employee shall be entitled to participate in Company's 401(k) savings plan, insurance plans and other benefit plans provided for similarly situated employees in the office where Employee performs services for Company.

(d)     Expenses.  Employee shall be entitled to reimbursement by Company for all reasonable travel, lodging, entertainment and other expenses actually incurred by Employee in connection with performing his/her duties, according to Company policy, such reimbursement to be made against receipts or other appropriate evidence of such expenditures.

(e)     Vacation.  Employee shall be entitled to two weeks of paid vacation annually (with not more than one week being taken consecutively without the prior approval of Company's V.P. North American Sales), subject to and in accordance with Company's standard vacation policy in effect from time to time, as well as specified paid legally recognized holidays pursuant to and in accordance with Company's employee handbook.

(f)     Withholding.  All amounts payable to Employee pursuant to this **Section 5** shall be subject to required withholdings for taxes and other amounts as well as all deductions authorized or approved by Employee.

6.    **Restrictive Covenants.**

(a)     Definitions.  As used in this **Section 6**, the following terms shall have the meanings ascribed to such terms as set forth below.

(i) **"Confidential Information"** - information relating to Company's customers, operations, finances, and business in any form that derives value from not being generally known to other persons or entities, including without limitation technical or non-technical data, formulas, patterns, customer purchasing practices and preferences, compilations (including compilations of customer information), programs (including computer programs and models), devices (including equipment used to manufacture Company's products), methods (including aesthetic and functional design and manufacturing methods), techniques (including style and design technology and plans), drawings (including product or equipment drawings), processes, financial data (including sales forecasts, sales histories, business plans, budgets and other forecasts), or lists of actual or potential Customers or suppliers (including identifying information about those Customers or suppliers), whether or not reduced to writing.  Confidential Information does not include information that: was known to or in the possession of Employee before Employee's employment with Company; before or after the time of disclosure becomes a part of the public knowledge or literature other than as a result of any improper action or inaction of Employee; or is independently developed by Employee without any use of the Confidential Information.  Confidential Information not constituting a trade secret under applicable law shall be treated as Confidential Information under this Agreement for two years after the expiration or termination of Employee's employment.

(ii) **"Customer"** - a customer of Company that, during the one-year period before the termination of employment, (i) was solicited or serviced by Employee or another Company employee supervised by Employee, or (ii) about which Employee had Confidential Information.

(b)     Non-disclosure and Restricted Use.  Employee shall to use his best efforts to protect Confidential Information.  Employee shall not use, except in connection with work for Company, and will not disclose during or two years following Employee's employment, Company's Confidential Information.

(c)     Return of Materials.  Upon the termination for any reason of Employee's employment, or at any time at Company's request, Employee shall deliver promptly to Company all materials, documents, plans, records, notes, computer programs, disks, tapes and codes, other papers or materials, and any copies thereof (in any form) in Employee's possession or control relating in any way to Company's Business, which at all times shall be Company's property.

(d)     Non-solicitation of Company Employees.  During employment, Employee shall not, for him/herself or for or on behalf of any other party, employ or solicit for employment any Company employee.  For 12 months after Employee's employment expires or terminates for any reason,

3

Employee shall not, for him/herself or for or on behalf of any other party, employ or solicit for employment anyone who Company employed during the shorter of the (i) period Employee was employed by Company, or (ii) six-month period immediately before Employee's employment expired or terminated.

(e)     <u>Limitations on Post-Termination Customer Solicitation</u>.  During employment and for 12 months after Employee's employment expires or terminates for any reason, Employee shall not solicit, directly or by assisting others, any Customer for the purpose of selling or otherwise providing to such Customer services for delivering video or other rich media advertisements over the Internet or over wireless networks.

(f)     <u>Limitations on Post-Termination Competition</u>.  During employment and for 12 months after the expiration or termination for any reason (unless Employee is terminated by Company without Cause before the Expiration Date) of Employee's employment, Employee shall not, for or on behalf of any person, firm or entity located within, or within 20 miles of, the city limits of Los Angeles or San Diego, CA sell or solicit for sale services to deliver video or other rich media advertisements over the Internet or over wireless networks.  Employee acknowledges that these areas are the primary locations in which Employee performs services for Company, and thus the areas in which Employee's provision of services in violation of the provisions of this Section 6(f) would cause significant harm to Company

(g)     <u>Disparagement</u>.  Employee shall not at any time make false or misleading statements about Company, including its products, management, employees, customers or suppliers.

(h)     <u>Future Employment Opportunities</u>.  At any time before, and for 12 months after, the termination or expiration of Employee's employment, Employee shall provide any prospective employer with a copy of this Agreement, and upon accepting any employment with another company, shall provide Company with such company's name and a description of the services Employee will provide to such company.

(i)     <u>Work For Hire Acknowledgment; Assignment</u>.  Employee acknowledges that Employee's work on and contributions to documents, programs, and other expressions in any tangible medium (collectively, **"Works"**) are within the scope of Employee's employment and part of Employee's duties and responsibilities.  Employee's work on and contributions to the Works will be rendered and made by Employee for, at the instigation of, and under the overall direction of, Company, and are and at all times shall be regarded, together with the Works, as "work made for hire" as that term is used in the United States copyright laws.  Without limiting this acknowledgment, Employee hereby assigns, grants, and delivers exclusively to Company all rights, titles, and interests in and to any such Works, and all copies and versions, including all copyrights and renewals.  Employee shall execute and deliver to Company, its successors and assigns, any assignments and documents Company requests for the purpose of establishing, evidencing, and enforcing or defending its complete, exclusive, perpetual and worldwide ownership of all rights, titles and interests of every kind and nature, including all copyrights, in and to the Works, and Employee constitutes and appoints Company as Employee's agent to execute and deliver any assignments or documents Employee fails or refuses promptly to execute and deliver, this power and agency being coupled with an interest and being irrevocable.

(j)     <u>Inventions, Ideas and Patents</u>.  Employee shall disclose promptly to Company (which shall receive it in confidence), and only to Company, any invention or idea of Employee (developed alone or with others) conceived or made during Employee's employment by Company, and within six months of the date of termination of employment for whatever reason if such invention or idea

relates to the Company Business. Employee hereby assigns to Company any such invention or idea in any way connected with Employee's employment with Company or related to the Company Business, research or development, or demonstrably anticipated research or development, and shall cooperate with Company and sign all documents deemed necessary by Company to enable it to obtain, maintain, protect and defend patents covering such inventions and idea, and to confirm Company's exclusive ownership of all rights in such inventions, ideas and patents. Employee irrevocably appoints Company as Employee's agent to execute and deliver any assignments or documents Employee fails or refuses to execute and deliver promptly, this power and agency being coupled with an interest and being irrevocable. This constitutes Company's written notification that this assignment does not apply to an invention for which no equipment, supplies, facility or trade secret information of Company was used and which was developed entirely on Employee's own time, unless (i) the invention relates (A) directly to the Company Business, or (B) to Company's actual or demonstrably anticipated research or development, or (ii) the invention results from any work performed by Employee for Company.

7.    **Injunctive Relief.**  Employee acknowledges that any breach of the terms of **Section 6** would result in material damage to Company, although it might be difficult to establish the monetary value of the damage. Employee therefore agrees that Company, in addition to any other rights and remedies available to it, shall be entitled to obtain an immediate injunction (whether temporary or permanent) from any court of appropriate jurisdiction if any such breach, or a threat thereof, occurs which Company in good faith believes will or is likely to result in irreparable harm to Company.

8.    **Dispute Resolution.**  (a) Any controversy or claim arising out of or relating to this Agreement, or the breach thereof, including but not limited to a claim based on or arising from an alleged tort, shall be settled by binding arbitration held in Atlanta, Georgia in accordance with the Commercial Arbitration Rules of the American Arbitration Association (the "**AAA**") then in effect, and following the law of the State specified in Section 9, and the award rendered by the arbitrator shall be binding between the parties and judgment on such award may be entered in any court having jurisdiction thereof. One arbitrator familiar with commercial contracts shall be appointed by the AAA to conduct such proceeding. Notice of a demand for arbitration of any dispute subject to arbitration by one party shall be filed in writing with the other party and with the AAA. A stenographic record shall be made of all arbitration hearings. The parties shall share all costs of arbitration, but each party shall be responsible for its respective attorneys' costs, fees and expenses, unless the arbitrators otherwise determine. All claims shall be arbitrated individually, and there shall be no consolidation or class treatment of any claim. All statutes of limitation which would otherwise be applicable in a judicial action brought by a party shall apply to any arbitration and shall be given effect by the arbitrators. The arbitrator shall have no authority to award punitive damages or any other damages not measured by the prevailing party's actual damages, nor shall any party seek punitive damages relating to any matter arising from this Agreement in any other forum.

(b) The United States Arbitration Act and federal arbitration law shall govern the interpretation, enforcement and proceedings pursuant to the arbitration clause set forth in this **Section 8**. Judgment on the award rendered by the arbitrators may be entered in any court having jurisdiction thereof, and by signing and delivering this Agreement, each party accepts for itself and in respect to its property, the jurisdiction of any court having jurisdiction.

(c) Notwithstanding the foregoing, the provisions of this **Section 8** shall not apply to any action for injunctive or other preliminary relief to maintain the *status quo* until a dispute can be finally resolved, or any action to prevent any violation or threatened violation of the covenants in **Section 6**.

9.  **Governing Law**.  This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of New York, without regard to its conflict of laws rules. Employee hereby consents to the exclusive jurisdiction of the U.S. District Court or the court of the State of New York for the district or circuit in which New York, NY is located, and hereby waives any objection Employee might otherwise have to jurisdiction and venue in such court if an action is brought in such court to resolve a dispute between the parties related to Employee's employment which is not subject to the arbitration provisions of **Section 8**.

10.  **Notices**.  All notices, consents and other communications required or authorized to be given by either party to the other under this Agreement shall be in writing and shall be deemed to have been given or submitted (i) upon actual receipt if delivered in person or by facsimile transmission, (ii) upon the earlier of actual receipt or the expiration of three business days after sending by express courier (such as UPS or Federal Express), and (iii) upon the earlier of actual receipt or the expiration of five days after mailing if sent by registered or certified express mail, postage prepaid, to the parties at the addresses on the signature page to this Agreement.  Employee shall be responsible for providing Company with a current address.  Either party may change its address or facsimile number for purposes of notices under this Agreement by providing notice to the other party as provided in this **Section 10**.

11.  **Failure to Enforce**.  The failure of either party hereto at any time, or for any period of time, to enforce any provision of this Agreement shall not be construed as a waiver of such provision or of the right of such party thereafter to enforce each and every such provision.

12.  **Binding Effect**.  This Agreement shall inure to the benefit of, and be binding upon, Company and its successors and assigns, and Employee and his heirs and personal representatives.  Any business entity or person succeeding to substantially all of the business of Company by purchase, merger, consolidation, sale of assets or otherwise shall be bound by and shall adopt and assume this Agreement, and Company shall obtain the assumption of this Agreement by such successor if such is not accomplished by operation of law.

13.  **Entire Agreement**.  This Agreement supersedes all prior discussions and agreements between the parties, and constitutes the sole and entire agreement between Company and Employee with respect to the subject matter hereof.  This Agreement shall not be modified or amended except pursuant to a written document signed by the parties hereto, which specifically refers to this Agreement.

14.  **Severability**.  The rights and remedies of Company referenced in this Agreement are cumulative and nonexclusive of one another, and Employee's covenants and agreements contained herein are severable and independent of one another.  The existence of any claim by Employee against Company, whether predicated on this Agreement or otherwise, shall not constitute a defense to enforcement by Company of any or all of such covenants or agreements of Employee hereunder.  If any provision of this Agreement is held to be illegal, invalid or unenforceable by a court of competent jurisdiction, it is the intention of the parties that the remaining provisions shall constitute their agreement with respect to the subject matter hereof, and all such remaining provisions shall continue in full force and effect.  Without limiting the foregoing, although the parties hereto have, in good faith, used their best efforts to make the covenants in **Section 6** reasonable in all respects and do not anticipate or intend that any court of competent jurisdiction would conclude otherwise or would find it necessary or appropriate to reform any such covenant, if any such covenant is held by a court of competent jurisdiction to be unreasonable, arbitrary or against public policy, such covenant will be considered to be divisible with respect to scope, time and geographic area, and such lesser scope, time, and geographic area, or all of them, as a court of competent jurisdiction may determine to be reasonable, not arbitrary, and not against public policy, will be effective, binding and enforceable against Employee.

15.    **Counterparts.**  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

**IN WITNESS WHEREOF,** Company and Employee have executed this Agreement as of the date first above written.

_____

**JOHN ABRAHAM**

8328 Stewart Avenue
Los Angeles, California 90045

**EYEWONDER, INC.**

By_____
      Jerome F. Connell, Jr.
      General Counsel and COO

233 Peachtree Street
Suite 500
Atlanta, Georgia 30303
Fax: (678) 891-2017
Attention: General Counsel

7

**EXHIBIT A**

|               | Q1   | Q2   | Q3*         | Q4          |
|---------------|------|------|-------------|-------------|
| **Target Billings** | N/A  | N/A  | $1,150,000  | $1,350,000  |
| **Target Bonus**    | N/A  | N/A  | $30,000     | $40,000     |

*Including June billings

## EYEWONDER, INC. SALES COMPENSATION PLAN
### (Effective March 1, 2007)

This Sales Compensation Plan (the "Plan") is effective March 1, 2007 for salespersons (each, a "Salesperson") employed by EyeWonder, Inc. ("EW") and continues in effect until modified or replaced. EW will use its best efforts to provide Salespersons at least 30 days notice of any Plan modification or replacement, and no modification or replacement will affect the computation of any bonus or commission earned before the effective date of the change.

**Bonus Amount**. In addition to any base salary payable under his or her employment agreement, each Salesperson in good standing will be entitled to bonus based on the amount of billings for which s/he is credited ("Billings") in each calendar quarter according to the Plan. Unless provided otherwise in the applicable employment agreement, a Salesperson will be assigned a target Billing amount for each quarter and a target bonus amount. If the Salesperson's Billings for the quarter equal his or her target Billing amount for such quarter, s/he will be eligible to receive the full target bonus amount for such quarter. If the Salesperson's Billings equal 85% of his or her target Billing amount, s/he will be eligible to receive 75% of the target bonus amount. If the Salesperson's Billings equal 75% of his or her target Billing amount for such quarter, s/he will be eligible to receive 50% of the target bonus amount for such quarter. Unless provided otherwise in the applicable employment agreement, if a Salesperson is credited for Billings in excess of his or her target amount for any quarter, s/he will be eligible to receive an override equal to 5% of the amount of such excess; if the excess amount is 25% or more of the Salesperson's target amount, the override percentage for that quarter will be 7.5%; if the excess amount is 50% or more of the Salesperson's target amount, the override percentage for that quarter will be 10%.

**Payment**. Each Salesperson who is an EW employee in good standing on the 15th day of a particular calendar month will receive advances equal to 2% of the Billings for which that Salesperson was credited during the preceding calendar month. Each Salesperson who is an EW employee in good standing 30 days after the end of any calendar quarter also will receive (i) any bonus payment attained for his or her Billings for such quarter, less any advances previously made to that Salesperson for Billings during that quarter, and (ii) any override attained for such quarter

**Example**. Assume that for Q1, a Salesperson has a target Billing amount of $25,000 and a target bonus amount of $1,500. Assume that the Salesperson is in good standing at all times through May 1, and that s/he is credited with $10,000 in Billings for each January, February and March. On each of February 15, March 15 and April 15, the Salesperson would receive an advance of $200 (2% of the Billings for the preceding month). On April 30, the Salesperson would receive a bonus payment of $900 (the target amount of $1,500 less the $600 in advances) plus $250 in override (5% of the $5,000 excess of Billings over the target Billing amount).

i

**Uncollected Billings**. If any Billing for which a Salesperson has been credited is not collected by EW within 180 days after the date of invoice, the uncollected amount will be subtracted from the total Billings credited to such Salesperson for the month in which the invoice became 180 days past due, except where, in management's reasonable opinion, nonpayment was due to a bona fide service failure.

**Non-Standard Terms**. Amounts received by EW for services will be credited as Billings only where the rates and charges equal or exceed EW's minimum rate then in effect for the particular service provided. This applies to CPM rates as well as per-campaign minimums. EW's standard rate card and the "no-below" rate card that includes the minimum acceptable rates will be available to all Salespersons at all times and they will be notified in advance of any impending changes. Two exceptions apply: 1) a Salesperson will be given full credit for Billings to an advertising agency at rates below the then-current minimum if such rates are set forth in an approved (by EW's CFO) agreement that has been signed by the paying agency before the launch of the campaign to which such Billings relate, and 2) where Billings to a publisher are at rates below the then-current minimum under an approved (by EW's CFO) agreement that has been signed by the publisher before the launch of the campaign, the Salesperson will be credited for Billings in an amount equal to 50% of the amount billed to that publisher.

**Direct to EW Campaigns**. Billings on campaigns submitted to EW directly from a publisher or advertising network with no meaningful involvement from a Salesperson will not be credited to any Salesperson. For purposes of computing Billing credit, the primary factor in determining whether a Salesperson was meaningfully involved will be the properties on which the campaign is running. If it runs on only properties owned by/included in the submitting publisher or network, the assumption is that there was no Salesperson played a meaningful part in procuring the campaign for EW. A Salesperson is urged to contact his/her supervisor if s/he believes that s/he played a significant part in procuring for EW a campaign submitted to EW by a publisher or network and which is running only on properties owned by/included in the submitting publisher or network. If a campaign submitted by a particular publisher or network also runs on other properties, the Salesperson (if any) responsible for procuring such campaign for EW will receive credit for the Billings for such campaign.

**Departure**. If a Salesperson voluntarily leaves EW's employ or is terminated by EW with cause (as defined in such Salesperson's employment agreement with EW), then such Salesperson will not be entitled to receive any bonus or commission payment that otherwise would have been made to such Salesperson after the date of departure/termination. If a Salesperson is terminated by EW without such cause, then any bonus payment to which such Salesperson would have been entitled to receive had s/he been employed by EW on the date of payment will be made as if employment had not ceased until after the date of payment.

**Interpretation; Administration**. It is not possible to describe here all scenarios where multiple parties may be entitled to, or may claim entitlement to, credit for Billings made with respect to a particular agreement, arrangement or campaign, or whether amounts will be treated as a Salesperson's Billings in the context of a particular transaction. The Vice President of North American Sales will use his/her best efforts to fairly and equitably assign and apportion responsibility (including client responsibility), evaluate entitlement to commissions, and apportion credit or Billings where appropriate. Except in unusual circumstances, determinations ordinarily will be made based upon client assignments, and a review of entries in EW's sales management software program and any status reports required to be submitted by Salespersons. If any dispute or conflict arises regarding interpretation or administration of the Plan, including without limitation account responsibility, or entitlement to or payment of bonus, determinations by the Vice President of North American Sales are final and binding.

# EXHIBIT B

MAY-1-2005  02:43A FROM:                                    TO:16788912055        P.2/2



**(YCWONDER**

June 1, 2007

Mr. John Abraham
8328 Stewart Avenue
Los Angeles, California 90045

            Re: Offer of Employment by EyeWonder, Inc.

Dear John:

        By this letter, we would like to formally extend to you an offer to become the Sales Director for
EyeWonder, Inc. in the Southwest sales region (currently Arizona, New Mexico, California – south of Big Sur, and
the southern halves of Utah and Colorado), with your employment beginning immediately.

        Your annual base salary will be $120,000 and you will be entitled to bonuses based on the billings
generated by your region (i.e., by you and by the account executives under your supervision). Billing targets will be
$1,150,000 through the end of Q3 '07 and $1,350,000 for Q4 '07, and your bonuses if those targets are met will be
$30,000 and $40,000 respectively. A partial bonus will be paid if at least a minimum percentage of the quarterly
target is met – 50% of the full bonus amount for reaching 75% of your target, and 75% of the full bonus amount for
reaching 85% of your target. If the target is exceeded for a quarter, you will be entitled to an override equal to 5%
of the excess amount. In order to alleviate some of the concern about ramp-up, if the aggregate revenue target for
both quarters combined is achieved, then you will be able to recoup any quarterly bonus amount not previously
received due to the failure to have met the revenue target for the applicable quarter. Payment of any recouped bonus
will be made along with payment of the bonus for billings in Q4 '07.

        You will be entitled to health and dental benefits provided under EyeWonder's group plan under the same
terms as similarly situated employees, effective July 1, 2007. We have two plans to choose from -- under our
standard plan (the ANA plan), EyeWonder covers the full cost for the Employee; under the other (the ANC plan --
benefits are a bit upgraded), the employee covers the additional cost that we incur (about $30 for an individual).
Employees are responsible for the cost of dependent coverage.

        The offer is contingent upon you completing and signing EyeWonder's standard form of employment
agreement, and acknowledging that you have received and reviewed EyeWonder's Policies and Procedures
handbook. We will get a draft of the employment agreement out to you promptly for your review, and we also will
get a copy of the handbook to you.

        We believe that EyeWonder is building an outstanding reputation for exciting, innovative and quality
products and service. Credit for this goes to every one of our employees, John, and we look forward to you
accepting our offer.

                                        Sincerely,

                                        Jerome F. Connell, Jr.
                                        General Counsel and COO

Accepted and agreed to:

**JOHN ABRAHAM**

# EXHIBIT C

## Jerome Connell

| | |
|---|---|
| **From:** | Jerome Connell |
| **Sent:** | Wednesday, March 26, 2008 3:56 PM |
| **To:** | John Abraham |
| **Cc:** | Mike Rosner; Felicia Crawford |
| **Subject:** | RE: Thank you for the time on the phone. |

John, I didn't want to wait too long to reply. I know Roz has been trying to get with you to discuss some details. Apparently, there hasn't been a whole lot of progress on that. When you can get around to it, call me or him when you have a chance to discuss the details of the wind-up. I forwarded your notice to Felicia and Kimberly, so they are aware of the notice and when the two weeks is up. We'll figure out the final check, COBRA and other stuff, and a way to get your stuff from the office to you and our stuff (BB, laptop, keys, etc.) back to us. No need to come back to the office at this point; probably more of a distraction going forward, so just stay on your vacay. Sorry it turned out this way, but I do wish you the best of luck in your new gig.

Romey

Romey Connell | General Counsel and COO
Phone 678.891.2041 | Fax 678.891.2017
romey@eyewonder.com
**EyeWonder**
**Richer Media.  Richer Results.**
www.eyewonder.com

---

**From:** John Abraham
**Sent:** Friday, March 21, 2008 2:11 PM
**To:** Jerome Connell
**Subject:** Thank you for the time on the phone.

Per our conversation.

Matt and Maria.   Need to have there comp plan address.

As I mention.   I am going on vacation, and have offer for a another play.   So I am giving my two weeks.   I mention my unhappiness
regarding the comp plan as well.

I will let you speak to Mike Rosner.   I called you first – per our agreement I would always call you if I am not happy.

I am on Vacation till Thursday.   I will be on Blackberry.   We can see if there is a work around.

I do believe the job I have done here has been appreciated.   Thank you for all the support.
**John Abraham** | Regional Vice President | EyeWonder
**Office** 310-907-5951 | **Mobile** 310-713-5362 | **Fax** 310-305-8515
jabraham@eyewonder.com | **aim-** ewabraham
**EyeWonder**
**Richer Media. Richer Results.**
www.eyewonder.com