UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

EYEWONDER, INC.,                                  :

                              Plaintiff,          :    Index No. 08 CV 3579 (GBD)

                                                  :

        v.                                        :

                                                  :    **DECLARATION OF**
JOHN ABRAHAM,                                     :    **JOHN ABRAHAM**

                                                  :
                              Defendant.          :

                                                  :

                                                  :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

JOHN ABRAHAM, pursuant to 28 U.S.C. § 1746, declares:

1.      I am the defendant in this action. I make this declaration in opposition to plaintiff EyeWonder, Inc.'s ("EWI") motion for a preliminary injunction seeking to impose anti-competitive restrictions on my ability to pursue my livelihood in California, some of which exceed even the restrictive covenants contained in my employment contract with EWI, which I believe, as confirmed by EWI's General Counsel, are unenforceable under California law.

2.      In early 2007, when I was employed in Los Angeles as publisher of National Lampoon's on-line magazine, I was personally solicited by Michael Rosner ("Rosner"), Vice President of Global Sales for EWI, to become director of sales for EWI's Southwest region, which included Southern California. Rosner told me the EWI needed someone to replace its current sales director in the Los Angeles market.

3.      Rosner and I had known each other previously and had both been in the Internet sales business for some time. In early 2007, I had over ten (10) years' experience in Internet

advertising and sales, having worked for a number of different companies in the Internet advertising industry in the State of California. Over the course of my career to that point, I had worked with, nurtured and maintained relationships with a great number of Internet advertising agencies, major studios (such as Sony and Universal) and Internet publishers.

4.      EWI is one of a number of companies engaged in the business of providing video streaming and "rich media" services to advertisers.  Rich media technology adds video streaming, animation, interactive features and other enhancements to Internet advertising to increase and improve advertisers' brand awareness and connection to Internet users and consumers.

5.      Upon information and belief, Rosner sought to hire me to supervise EWI's sales force in Southern California because of my prior experience and expertise, including my relationships and contacts with advertising agencies, studios and Internet publishers, all of whom were clients or potential clients of EWI.  EWI wanted to benefit from my reputation, contacts and relationships.

6.      There are a number of companies in addition to EWI that sell video streaming and rich media services.  The vast majority of the potential customers for such services -- advertising agencies, studios and smaller creative shops -- use a number of different companies to provide such services to them, depending on price, service, project goals and other variables.  In my experience, very few of the customers for such services use just one rich media provider exclusively.

7.      I am a lifelong California resident. I was a resident of California throughout my pre-employment discussions with Rosner and my subsequent 8½-month employment with EWI.

8.      Rosner and I discussed the terms of my employment with EWI over the telephone and in person in May 2007. When we spoke on the telephone, I was always in California. Upon information and belief, during these telephone conversations Rosner was in New York or another of EWI's sales offices. In May 2007, Rosner flew to California and met me in Marina del Rey, near Los Angeles, to negotiate the final details of my employment and compensation. I never traveled to New York to negotiate the terms of my employment with EWI. All the terms of my employment with EWI were negotiated with me while I was in California.

9.      On or about June 1, 2007, I received via e-mail in California an offer letter (the "offer letter") from Jerome Connell ("Connell"), the General Counsel of EWI. Upon information and belief, Connell signed the offer letter in and sent it from EWI's headquarters in Atlanta, Georgia.

10.     The offer letter set forth the terms of my employment and compensation as EWI's Sales Director for the Southwest Region, as per my negotiations with Rosner. The offer letter also stated that I would have to sign EWI's "standard form of employment agreement" as a condition of my employment. The offer letter did not mention that I would be required to agree to any restrictive covenants or non-competition agreements as a condition of employment. A copy of the offer letter is appended to plaintiff's Verified Complaint ("Complaint") as Exhibit B.

11.     On or about June 1, 2007, I signed the offer letter in Los Angeles, California and e-mailed it back to Connell. I thereupon commenced employment with EWI.

12.     In or around June 2007, after I had accepted EWI's job offer and started employment, EWI flew me to Atlanta to meet its executive officers, including Connell. I was presented with EWI's "standard form of employment agreement," which included broad

covenants not to compete or solicit customers within 20 miles of Los Angeles or San Diego, which is where the great bulk of the Internet industry is located.

13.    While in Atlanta, I discussed EWI's "standard form of employment agreement" with Connell.  Before signing EWI's "standard form" agreement, I expressed my concern to Connell that the restrictive covenants, including the non-compete provisions, appeared to be very one-sided in EWI's favor.  Connell replied to me, "Don't worry, you're in California. It's a right-to-work state."

14.    I am not a lawyer and did not have a lawyer to advise me in regard to my hiring by EWI or the "standard form of employment agreement" that I was required to sign as a condition of employment.   It was and remains my understanding as a lifelong resident of California who has always been employed in California that non-competes and restrictive covenants such as those contained in EWI's "standard form" agreement are unenforceable under California law. Connell's statement to me that I should not worry about the restrictive covenants because I was working in California, a "right-to-work state," confirmed to me the correctness of my understanding of California law and EWI's concurrence.

15.    I did not negotiate the terms of EWI's "standard form of employment agreement" with Rosner, Connell or anyone else at EWI. I signed the "standard form" agreement in Atlanta in June 2007 after I had already commenced employment with EWI.  A copy of the "standard form of employment agreement" is appended to the Complaint as Exhibit A.

16.    In or around June 2007, after meeting EWI's executive officers in Atlanta, I was flown from Atlanta to New York to visit EWI's sales office in New York City, where Rosner's office was located.  That visit was the only time I was in New York on EWI business during the

whole 9 months of my employment with EWI.  I did not negotiate any of the terms of my employment, which has already commenced, while in New York.  After leaving New York, I returned to California.

17.     In late 2007, I was given additional responsibility for EWI's rich media sales in the Northwest as well as the Southwest regions and the new title of Regional Vice President, West Region. In November 2007, EWI issued a press release announcing my hiring as Regional Vice President, West Region.  In its press release, EWI touted me as an "Internet veteran" with "more than a decade of experience in the industry" and as possessing significant "advertising, media and publisher expertise" based upon my pre-EWI experience.  A copy of EWI's press release dated November 19, 2007 is attached hereto as Exhibit A.

18.     As Regional VP, West Region, my primary responsibility was to sell EWI's rich media services to advertising agencies, studios and smaller creative shops. I supervised four sales assistants in Los Angeles and two in San Francisco, as well as three secretaries.

19.     Although I had the title of Regional Vice President for the final few months of my employment, I was not considered part of EWI's executive management.  Rosner told me that I was not part of EWI's executive management and that I was not part of EWI's strategic team.

20.     I had no ownership interest in EWI, was not a partner or shareholder, and had no options or other interest in EWI.  I was considered by EWI to be part of its West Coast middle management.

21.     I performed virtually all of my duties for EWI in California.  Occasionally, I traveled to other states on the West Coast for business purposes, but almost all of my duties were

performed from EWI's Los Angeles and San Francisco sales offices. I never traveled to New York on EWI business, with the sole exception of my initial visit there in June 2007.

22.    During the course of my employment with EWI, I reported to Rosner and spoke with him by telephone from California once or twice a week to update him on West Coast sales activities and related matters. I never traveled to New York to meet with Rosner, with the sole exception of my initial visit in June 2007.

23.    I also compiled and maintained a list of West Coast sales targets ("target list"), which I updated and e-mailed to Rosner from Los Angeles on a monthly basis. Some of the companies on the target list were not customers of EWI but from which I had hoped to obtain business; others were current EWI customers, as well as customers of other rich media companies, from which I hoped to develop more business for EWI. My decision to place a company on the target list did not indicate that the company necessarily had a significant, potential or any relationship with EWI; only that I thought we should direct some of our sales efforts at that company. I never prepared any business plans during my employment with EWI.

24.    I had no involvement in the technological side of EWI's business. I did not develop any new products, was not involved in software engineering, and did not write or have access to EWI's computer codes or programs.

25.    In early 2008, Rosner presented me with a new compensation plan for 2008, which unilaterally set higher sales and billing targets and offered lower payouts. In effect, I was expected to work harder for less money under EWI's 2008 compensation plan. I was required to sign the new 2008 compensation plan as a condition of continued employment with EWI, but I declined to do so.

26.    Instead, I looked for other employment where I could use the skills, expertise, knowledge and contacts I had developed over the decade prior to my nine (9) months' employment with EWI.  Ultimately, I accepted an offer with Eyeblaster, Inc. ("Eyeblaster"), a competitor of EWI, in March 2008 and tendered my resignation to EWI.

27.    I am employed by Eyeblaster as director of sales in Los Angeles, where I utilize my skills, expertise, knowledge and contacts developed over the years prior to my employment with EWI.

28.    I am not in possession of any of EWI's documents, files, lists or records, or any proprietary or confidential information of EWI, and I have not and do not intend to use or disclose any proprietary or confidential information to any third party.  I am not in possession of any trade secrets of EWI.

29.    I have not solicited and do not intend to solicit on Eyeblaster's behalf any customers I first met or had contact with while employed by EWI which are not customers of Eyeblaster.

30.    I also do not intend to solicit any employees of EWI to work for Eyeblaster or any other third party.

31.    Subsequent to the commencement of this action against me by EWI, my prior counsel contacted me and informed me that EWI's attorney, James Bogan, had provided her with a list of 52 studios, advertising agencies, and smaller creative shops that EWI contended were its customers and with which EWI wanted me to agree not to have any contact (the "Bogan list"). She read the list to me over the telephone; I did not obtain or make a copy.

-7-

32.    It is my understanding that Bogan had represented to my former counsel that the list was "confidential."  The identities of many of EWI's clients are neither confidential nor a trade secret and are commonly known in the industry.  Indeed, many of the names on the Bogan list have been disclosed by EWI to its competitors and the general public by means of press releases, articles and trade publications, including many that are reproduced and linked on EWI's own website (*www.eyewonder.com*).

33.    About half of the companies on the Bogan list were already customers of Eyeblaster prior to my employment with Eyeblaster.  Thus, they were not exclusive customers of either Eyeblaster or EWI, as is typical in the Internet industry.

34.    Other companies on the Bogan list were companies with which I have had relationships and contact, pre-dating my employment with EWI.

35.    I see no reason to agree to cease any contact with existing Eyeblaster customers or with companies with which I have maintained relationships before my relatively brief period of employment with EWI.  Such demands by EWI are unreasonable, unnecessary to protect any possible legitimate concern it might have regarding the termination of my employment, and exceed even the restrictions contained in EWI's "standard form" agreement that I was required to sign.

36.     I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: DALLAS , Texas
        May 13, 2008

_____
John Abraham

**EXHIBIT A**



**FOR IMMEDIATE RELEASE**

## CONTACT:

**For EyeWonder:**
Kathleen Zakrzewski or Scott Gleeson Blue
Zer0 to 5ive
Phone: 610.934.7563 or 610.934.7560
Mobile: 215.939.5709 or 215.356.7423
Email: kathleen@0to5.com or scott@0to5.com

### EyeWonder Announces Appointment of Three Regional Vice Presidents, and Opens New Office in Dallas

*Driven by increased demand for its offerings nationwide, EyeWonder expands its sales coverage and leadership team*

**ATLANTA – November 19, 2007 –** EyeWonder, Inc., rich media and digital video advertising's fastest-growing innovator, today announced that it has appointed regional sales executives throughout the United States and opened a new office in Dallas as a result of the nationwide increased demand for its offerings. It also follows EyeWonder's recent growth in Europe, with its acquisition of Cologne, Germany-based vendi interactive, and its expansion of its existing presence in the UK and Ireland.

"Our remarkable and consistent growth is a result of our strong leadership and innovation in the rich media and digital video advertising arena," said John Vincent, CEO, EyeWonder. "Our new Dallas office and team of new regional vice presidents represent two more exciting milestones in our continuing growth. They will allow us to better serve our customers capitalizing on the limitless creative and richer results that only EyeWonder can deliver."

**EyeWonder Opens Dallas Office**
EyeWonder recently opened a new office in Dallas, Texas, as a result of increased client demand in the region. Ryan Manchee, who has held several positions within EyeWonder since 2003, most recently as Director of Creative Services, will act as the office's Director of Sales to lead business development initiatives and advance existing advertiser and agency relationships in this region.

**Additional Leadership Added Throughout U.S.**
EyeWonder has recently named three new regional vice presidents of sales who will be responsible for leading sales growth and management of the sales expansion in their respective regions:

- The Regional Vice President, Southeast/Midwest position will be held by former Director of Sales, Ali Ruyan. Since joining EyeWonder in 2005, Ruyan has assisted in overseeing and managing U.S. operations as well as playing a key role in establishing the company's campaign management team, which has been instrumental in strengthening client relationships and fueling EyeWonder's growth through unparalleled experience, service and support. Ruyan's strong agency experience will continue to create value for clients throughout the Southeast and Midwest region.
- The Regional Vice President, West Region position will be held by Internet veteran John Abraham. Bringing more than a decade of experience in the industry, including co-founding Perfect Circle Media, later acquired by Interop Interactive, and more recently re-launching sites for National Lampoon and the Humor Network, Abraham will use his advertising, media and publisher expertise to further enhance sales in these regions.
- The Regional Vice President, Northeast Region is now led by former founder and president of Endemic Media, Frank Morgano. With more than 15 years of advertising experience with global



**FOR IMMEDIATE RELEASE**

brands and top interactive Internet companies, including playing an integral role in advertising sales at Cox Interactive Sales, New York Times Digital and DoubleClick (where he co-managed sales relationships with Ogilvy, Ameritrade and IBM), Morgano brings strategic insight and experience that will be a tremendous asset to the region.

Since 2005, EyeWonder has experienced more than 140 percent in compounding revenue growth annually, which represents 575 percent total revenue growth during the period – doubling industry growth. EyeWonder's innovative technology solutions have ignited this expansion, as the company continues to serve 80 of the top 100 global advertising agencies, work with every top publisher and partner with industry leading technology companies including Adobe, Akamai and Mediaplex.

**About EyeWonder, Inc.**
EyeWonder, Inc. is rich media and video advertising's fastest-growing innovator, empowering brands and advertisers to leverage the industry's most comprehensive creative capabilities for online campaigns that are proven to deliver richer results. Headquartered in Atlanta, the company's pioneering technology enables advertisers and agencies to focus their time and energy on producing the strongest interactive ad campaigns that reach across more of today's top browsers and operating systems while eliminating inefficiencies that limit creativity and slow workflow and purchasing processes. Moreover, EyeWonder delivers results. A 2006 Dynamic Logic study found that the EyeWonder-powered campaigns generate a 65 percent increase in aided brand awareness and a 34 percent increase in message association, and that EyeWonder leads all other top rich media providers in generating increased lift in three out of four core brand metrics.

EyeWonder services the world's top agencies and brands, and its rich media and video ad products are accepted by more than a thousand online publishers, including Yahoo!, AOL, and MSN. For more information on Richer Media and Richer Results, please visit http://www.eyewonder.com.

# # #

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

EYEWONDER, INC.,                               :
                                               :
                              Plaintiff,       :    No. 08 CV 3579 (GBD)
                                               :
                                               :    ECF Case
                    v.                         :
                                               :    **CERTIFICATE OF**
JOHN ABRAHAM,                                  :    **SERVICE**
                                               :
                              Defendant.       :
                                               :
                                               :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

        I hereby certify that on May 13, 2008, I served the foregoing Declaration of John
Abraham by filing it electronically with the Clerk of the above-captioned Court using its
CM/ECF systems, upon:

Lisa Pearson
Kilpatrick Stockton LLP
31 West 52nd Street, 14th Floor
New York, NY 10019

and

James F. Bogan, III
Kilpatrick Stockton LLP (GA)
1100 Peachtree Street, Suite 2800
Atlanta, GA 30309

Attorneys for Plaintiff.

        I declare under penalty of perjury under the laws of the United States of America that the
foregoing is true and correct.

        Executed this 13th day of May 2008, in New York, New York

                                    /s/ Anna Maria Loiacono
                                    Anna Maria Loiacono