**KILPATRICK STOCKTON LLP**
Lisa Pearson (LP 4916)
31 West 52nd Street, 14th Floor
New York, NY 10019
Telephone: (212) 775-8700
Facsimile: (212) 775-8815

James F. Bogan III
(Application for admission *pro hac vice* filed)
Suite 2800, 1100 Peachtree Street
Atlanta, Georgia 30309
Telephone: (404) 815-6467
Facsimile: (404) 541-3133

*Counsel for Plaintiff EyeWonder, Inc.*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| EYEWONDER, INC., | | ) |
| | Plaintiff, | ) |
| | | ) 08 CV 3579 |
| v. | | ) |
| | | ) |
| | | ) **MEMORANDUM OF LAW IN** |
| JOHN ABRAHAM, | | ) **SUPPORT OF PLAINTIFF'S** |
| | | ) **MOTION FOR A TEMPORARY** |
| | Defendant. | ) **RESTRAINING ORDER AND** |
| | | ) **PRELIMINARY INJUNCTION** |

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS.................................................................................................i

TABLE OF AUTHORITIES .........................................................................................ii

STATEMENT OF FACTS ............................................................................................2

    A.      Abraham's Employment with EyeWonder...........................................................2

    B.      Abraham Leaves EyeWonder and Joins Its Direct Competitor Eyeblaster .............3

    C.      The Agreement Authorizes The Injunctive Relief Eyewonder Seeks ....................4

ARGUMENT .................................................................................................................5

I.       EYEWONDER IS ENTITLED TO A TEMPORARY RESTRAINING ORDER

AND PRELIMINARY INJUCTION.............................................................................5

    A.      EyeWonder Will Suffer Irreparable Harm Absent an Injunction ...........................6

    B.      EyeWonder Will Likely Succeed on the Merits ....................................................12

    C.      The Balance of Hardships Tips Decidedly in Favor of an Injunction ...................16

CONCLUSION.............................................................................................................18

US2000 10792462.10

## TABLE OF AUTHORITIES

### CASES

*BDO Seidman v. Hirshberg,*
  712 N.E.2d 1220 (N.Y. 1999)................................................................12

*Bates Chevrolet Corp. v. Haven Chevrolet,*
  213 N.Y.S.2d 577 (N.Y. App. Div. 1961) ...............................................15

*Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.,*
  973 F.2d 1033 (2d Cir. 1992)..................................................................6

*Computer Assocs. Int'l, Inc. v. Bryan,*
  784 F. Supp. 982 (E.D.N.Y. 1992) .........................................................17

*Ecolab, Inc. v. K.P. Laundry Mach., Inc.,*
  656 F. Supp. 894 (S.D.N.Y. 1987) ............................................. *passim*

*Estee Lauder Co. v. Batra,*
  430 F. Supp. 2d 158 (S.D.N.Y. 2006)....................................................12

*FMC Corp. v. Tiawan Tainan Giant Indus. Co.,*
  730 F.2d 61 (2d Cir. 1984)....................................................................11

*Global Telesys., Inc. v. KPNQwest, N.V.,*
  151 F. Supp. 2d 478 (S.D.N.Y. 2001).......................................11, 12, 16

*Innovative Networks, Inc. v. Satellite Airlines Ctrs., Inc.,*
  871 F. Supp. 709 (S.D.N.Y. 1995).........................................................13

*Johnson Controls, Inc. v. A.P.T. Critical Sys. Inc.,*
  323 F. Supp. 2d 525 (S.D.N.Y. 2004)..................................................9, 17

*Laro Maint. Corp. v. Culkin,*
  681 N.Y.S.2d 79 (N.Y. App. Div. 1998) ................................................14

*Local 1814, Int'l Longshoremen's Ass'n v. N.Y. Shipping Ass'n, Inc.,*
  965 F.2d 1224 (2d Cir. 1992)..................................................................6

*Lumex, Inc. v. Highsmith,*
  919 F. Supp. 624 (E.D.N.Y. 1996) ..........................................................6

*N. Atl. Instruments, Inc. v. Haber,*

US2000 10792462.10

   188 F.3d 38 (2d Cir. 1999)................................................................................9, 11

*Natsource LLC v. Paribello*,
   151 F. Supp. 2d 465 (S.D.N.Y. 2001).........................................................7, 8, 15

*Silipos, Inc. v. Bickel*,
   2006 WL 2265055 (S.D.N.Y. Aug. 8, 2006).....................................................13

*Ticor Title Ins. Co. v. Cohen*,
   173 F.3d 63 (2d Cir. 1999)..........................................................................6, 9, 11

*Webcraft Tech., Inc. v. McCaw*,
   674 F. Supp. 1039 (S.D.N.Y. 1987).............................................................11, 14

**MISCELLANEOUS**

Federal Rule of Civil Procedure 65 ..............................................................................1

*Restatement (Second) of Conflict of Law* § 187 ........................................................12

iii

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| EYEWONDER, INC., | ) | |
| Plaintiff, | ) | |
| | ) | 08 CV 3579 |
| v. | ) | |
| | ) | |
| | ) | **MEMORANDUM OF LAW IN** |
| JOHN ABRAHAM, | ) | **SUPPORT OF PLAINTIFF'S** |
| | ) | **MOTION FOR A TEMPORARY** |
| Defendant. | ) | **RESTRAINING ORDER AND** |
| | ) | **PRELIMINARY INJUNCTION** |

Plaintiff EyeWonder, Inc. ("EyeWonder") respectfully submits this Memorandum of Law in support of its motion, pursuant to Federal Rule of Civil Procedure 65, for a temporary restraining order and preliminary injunction to enjoin Defendant John Abraham ("Abraham") from breaching the non-solicitation of customers (Section 6(e)), non-solicitation of employees (Section 6(d)), and non-disclosure clauses (Section 6(b)) in the Employment Agreement dated June 1, 2007 between the parties (the "Agreement").

Abraham has accepted employment with EyeWonder's direct competitor Eyeblaster, Inc. ("Eyeblaster") and is actively soliciting EyeWonder employees and possibly customers on behalf of Eyeblaster, in violation of the Agreement's non-solicitation clauses. Because EyeWonder faces a threat of irreparable harm, it respectfully asks that the Court enter an order preliminarily enjoining Abraham from violating Sections 6(e), (d) and (b) of the Agreement, until such time as the parties' dispute can be submitted to an arbitrator. The injunction EyeWonder seeks here is limited and narrowly-tailored to protect its legitimate business interests: EyeWonder seeks an injunction to prohibit Abraham from soliciting or assisting others in the solicitation of fifty-two specifically-identified customers that Abraham had direct responsibility for as EyeWonder's

US2000 10792462.10

Regional Vice President of Sales for its Southwest and Northwest Sales Regions, and also an injunction preventing Abraham from trying to recruit EyeWonder employees to join Eyeblaster.

## STATEMENT OF FACTS

The facts are more fully set forth in the Verified Complaint dated April 14, 2008 ("Complaint") and the accompanying declarations of Jerome F. Connell ("Connell Decl."), Michael Rosner ("Rosner Decl."), and James F. Bogan III ("Bogan Decl."). The Agreement is attached to the Complaint as Exhibit A.

**A.    Abraham's Employment with EyeWonder**

EyeWonder is a leading provider of video and rich media advertising products and services. Compl. ¶ 5.

In June, 2007, Mr. Abraham was hired by EyeWonder as Regional Vice President of Sales for its Southwest Sales Region, consisting of Arizona, New Mexico, California – south of Big Sur– and the southern halves of Utah and Colorado. Compl. ¶ 5. In late 2007, Abraham's territory was expanded to include EyeWonder's Northwest Sales Region as well, consisting of Washington, Oregon, Wyoming, Montana, Idaho, Northern California, and the northern halves of Utah and Colorado. Rosner Decl. ¶ 3. In his position, Abraham was responsible for overseeing the offer and sale of EyeWonder's products and services in much of the western United States, and for directly supervising EyeWonder's sales staff, which was engaged in offering and selling EyeWonder's products and services throughout this territory. Compl. ¶ 7; Rosner Decl. ¶ 4.

When Abraham joined EyeWonder, he entered into the Agreement (Compl. Ex. A), which contains a number of covenants, three of which are centrally relevant here.

2

(1)  The non-solicitation of customers clause (Section 6(e)) provides that for a period of

12-months, Abraham

> shall not solicit, directly or by assisting others, any Customer[1] for
> the purpose of selling or otherwise providing to such Customer
> services for delivering video or other rich media advertisements
> over the Internet or over wireless networks.

(2)  The non-solicitation of employees clause (Section 6(d)) provides that,

> [f]or 12 months after [Abraham's] employment expires or
> terminates for any reason, [Abraham] shall not, for him/herself or
> for or on behalf of any other party, employ or solicit for
> employment anyone who [EyeWonder] employed during the
> shorter of the (i) period [Abraham] was employed by
> [EyeWonder], or (ii) six-month period immediately before
> [Abraham's] employment expired or terminated.

(3)  Finally, Section 6(b) of the Agreement provides that "[Abraham] shall not

use, except in connection with work for [EyeWonder], and will not disclose during or two

years following [Abraham's] employment, [EyeWonder's] Confidential Information."[2]

## B.    Abraham Leaves EyeWonder and Joins Its Direct Competitor Eyeblaster

Eyeblaster is headquartered in New York City (where EyeWonder's main sales office is

located), and also maintains a sales office in Los Angeles, California.  Compl. ¶¶ 21-22.

Eyeblaster is one of a small handful of providers in the world that compete with EyeWonder by

offering and selling directly competitive services for delivering video and other rich media

advertisements.  Compl. ¶ 21.  Indeed, Eyeblaster itself considers EyeWonder as a direct,

---

[1] Section 6(a)(ii) of the Agreement defines the term "Customer" as "a customer of [EyeWonder] that, during the one-year period before the termination of employment, (i) was solicited or serviced by [Abraham] or another [EyeWonder] employee supervised by [Abraham], or (ii) about which [Abraham] had Confidential Information."

[2] Section 6(a)(i) of the Agreement defines "Confidential Information" as "information relating to [EyeWonder's] customers, operations, finances, and business in any form that derives value from not being generally known to other persons or entities."

3

"niche" competitor. In a filing with the Securities and Exchange Commission on April 18, 2008,

Eyeblaster stated:

> The markets in which we operate are rapidly evolving and ***highly competitive***. We expect this competitive environment to continue. We believe that the principal competitive factors affecting the market for digital advertising services and tools are ***existing strategic relationships with customers*** . . . . Our main competitors in the stand-alone rich media category are ***niche players***, such as PointRoll, ***EyeWonder*** and FlashTalking.

Connell Decl. ¶ 7 (emphasis added).

In a telephone conversation on March 21, 2008, Abraham told Jerome Connell,

EyeWonder's General Counsel and COO, that he had been offered a position with "a wireless

startup" and was giving his two weeks notice to terminate his employment with EyeWonder.

Compl. ¶ 19; Connell Decl. ¶3. This statement was false. EyeWonder has since learned that

Abraham had accepted employment with Eyeblaster, a direct competitor that definitely is ***not*** "a

wireless startup." Rosner Decl. ¶¶ 8, 9; Connell Decl. ¶3.

**C.    The Agreement Expressly Authorizes The Injunctive Relief EyeWonder Seeks**

Pursuant to Section 8 of the Agreement, EyeWonder has commenced an arbitration

proceeding in Atlanta, Georgia to adjudicate the merits of this dispute. Bogan Decl. ¶ 11.

EyeWonder has filed this action in aid of arbitration, however, pursuant to Sections 7, 8(c), and 9

of the Agreement. Section 8(c) of the Agreement expressly authorizes the filing of an action "for

injunctive or other preliminary relief to maintain the status quo until a dispute can be finally

resolved, or any action to prevent any violation or threatened violation of the covenants in

Section 6."

US2000 10792462.10

In fact, EyeWonder and Abraham have expressly agreed that injunctive relief is necessary in the event of a breach or threatened breach of the Agreement.  In addition to Section 8(c) quoted above, Section 7 of the Agreement provides that:

> Employee acknowledges that any breach of the terms of Section 6 would result in material damage to Company, although it might be difficult to establish the monetary value of the damage.  Employee therefore agrees that Company, in addition to any other rights and remedies available to it, shall be entitled to obtain an immediate injunction (whether temporary or permanent) from any court of appropriate jurisdiction if any such breach, or a threat thereof, occurs which Company in good faith believes will or is likely to result in irreparable harm to Company.

Regarding the forum for resolving claims for injunctive relief, Section 9 of the Employment Agreement provides that:

> This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of New York, without regard to its conflict of laws rules.  Employee hereby consents to the exclusive jurisdiction of the U.S. District Court or the court of the State of New York for the district or circuit in which New York, NY is located, and hereby waives any objection Employee might otherwise have to jurisdiction and venue in such court if an action is brought in such court to resolve a dispute between the parties related to Employee's employment which is not subject to the arbitration provisions of Section 8.

## ARGUMENT

### I.    EYEWONDER IS ENTITLED TO A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

To prevail on a motion for a preliminary injunction in the Second Circuit, a plaintiff must demonstrate both (1) irreparable harm in the absence of the injunction, and (2) either (a) a likelihood that it will succeed on the merits of the action, or (b) a sufficiently serious question going to the merits combined with a balance of hardships that tips decidedly in the former

5

employer's favor. *Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.*, 973 F.2d 1033, 1038 (2d Cir. 1992). Motions for a TRO are subject to the same analysis: the "standards which govern consideration of an application for a temporary restraining order . . . are the same standards as those which govern a preliminary injunction." *Local 1814, Int'l Longshoremen's Ass'n v. N.Y. Shipping Ass'n, Inc.*, 965 F.2d 1224, 1228 (2d Cir. 1992). The restrictive covenants at issue are valid, narrowly-tailored, and reasonably necessary to protect EyeWonder's legitimate business interests. The injunction EyeWonder seeks here, an injunction directed to prevent Abraham from soliciting or assisting others in the solicitation of fifty-two specifically-identified customers that Abraham had direct responsibility for as EyeWonder's Regional Vice President of Sales for its Southwest and Northwest Sales Regions, as well as an injunction preventing Abraham from recruiting EyeWonder's employees, is even more narrowly-tailored to protect EyeWonder's legitimate business interests until this dispute can be finally resolved in arbitration.

**A.    EyeWonder Will Suffer Irreparable Harm Absent an Injunction**

The hallmark of irreparable harm is the unavailability or inadequacy of monetary damages to compensate a former employer for a breach of contract. *Lumex, Inc. v. Highsmith*, 919 F. Supp. 624, 627 (E.D.N.Y. 1996). Where a former employer establishes that an ex-employee is well-positioned to sever relationships between the former employer and its customers, irreparable harm is shown because "it would be very difficult to calculate monetary damages that would successfully redress the loss of a relationship with a client that would produce an indeterminate amount of business in years to come." *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 68-69 (2d Cir. 1999) (finding irreparable harm). Similarly, where an ex-employee is in a position to recruit other employees to leave the employer and join a direct competitor, this

6

court has found irreparable harm exists.  *See Natsource LLC v. Paribello*, 151 F. Supp. 2d 465, 469 (S.D.N.Y. 2001).

As Regional Vice President for EyeWonder, Abraham developed significant relationships with EyeWonder's customers, especially in Los Angeles, where EyeWonder's sales office for the Southwest Sales Region is located.  Rosner Decl. ¶¶ 4,5.  Thus, his decision to resign abruptly from EyeWonder and join one of its direct competitors in the same region and city—and to begin potentially servicing the same customers that he serviced at EyeWonder— presents EyeWonder with much more than the mere threat of lost sales.  Abraham is uniquely positioned to induce EyeWonder's customers to discontinue their relationships with EyeWonder and to begin purchasing services from Eyeblaster.  Indeed, Abraham will have every incentive to procure additional business for Eyeblaster, and it would be unrealistic to assume that he would not tap into the vast customer base that he and his staff developed and maintained during his tenure at EyeWonder.  Under these circumstances, this Court has held that irreparable harm exists.  *See Natsource*, 151 F. Supp. 2d at 469 ("If [defendant] is allowed to . . . solicit [plaintiff's] customers within the 120 day period, [plaintiff] will be irreparably harmed."); *Ecolab, Inc. v. K.P. Laundry Mach., Inc.*, 656 F. Supp. 894, 899-900 (S.D.N.Y. 1987) (finding that declining to enforce a one year non-solicitation of customers provision would result in irreparable harm because "the extent of [plaintiff's] loss may be very difficult to measure to the point that [it] might not be fairly compensated if left to a damage remedy").

In *Ecolab*, this Court granted injunctive relief to an employer and enforced a one-year non-solicitation of customers provision, prohibiting two former employees from contacting or soliciting customers that they had dealt with during their employment with the plaintiff.  656 F. Supp. at 896, 899-900.  In granting the injunction, the court found that the employer stood to

7

"lose a great deal of business and profits if it [was] not accorded enforcement of its contractual covenant with its employees." *Id.* at 899-900. This Court also concluded that the loss would be "very difficult to measure to the point that [plaintiff] might not be fairly compensated if left to a damage remedy." *Id.* at 900. The Court's finding of harm was based in part on the fact that the ex-employees, like Abraham, had willingly signed the non-solicitation clauses, only to then join a direct competitor and begin actively soliciting both customers and current employees of the plaintiff. *Id.* at 896-97. The court also found that the concomitant harm to the ex-employees by *enforcing* the one-year non-solicitation clause was not severe, since, as in this case, the clause barred the defendants only "from soliciting the handful of clients that they serviced" when they worked for the plaintiff. *Id.* at 899.

Similarly, in *Natsource*, this Court found that an employer would be irreparably harmed if its employee were able to leave to work for a competitor and solicit the former employer's clients. 151 F. Supp. 2d at 469. The Court reasoned that because the former employee, like Abraham, had developed strong relationships with his customers during his employment with the plaintiff, the customers were likely to follow the former employee to the competitor, causing immeasurable and, thus, irreparable loss to the plaintiff. *See id.* at 470 (stating that defendant-employer "would be irreparably harmed if it did not receive the benefit of its bargain and its customers left [defendant] to follow [plaintiff]").

In this case, Abraham was introduced to, and developed strong relationships with, some of EyeWonder's most significant clients during his tenure at EyeWonder. Rosner Decl. ¶¶ 4, 5. EyeWonder fears that, as an employee at Eyeblaster, Abraham has solicited and will solicit the customers that he and his staff constantly interacted with on behalf of EyeWonder. Indeed, EyeWonder has submitted the list of the fifty-two EyeWonder customers at issue here to

Abraham's counsel and inquired whether Abraham would agree, pending arbitration, not to solicit those fifty-two customers.  Bogan Decl. ¶ 14.  Abraham's counsel stated that, while it was possible that the parties could reach an agreement as to some of the identified customers, Abraham was not in a position to agree not solicit all of those customers on an interim basis. Bogan Decl. ¶ 15.  EyeWonder thus has a legitimate fear that Abraham will seek to exploit the information he learned at EyeWonder to assist Eyeblaster in soliciting those customers.  This would leave EyeWonder with no adequate monetary remedy to "successfully redress the loss of a relationship with a client that would produce an indeterminate amount of business in years to come."  *Ticor*, 173 F.3d at 69.

Abraham's solicitation of EyeWonder's customers for the benefit of a direct competitor would strip EyeWonder of an intended benefit and protectable interest under the covenants:  the ability to maintain relationships with its customers free of improper interference from a former employee.  As this Court stated in *Ecolab*:

> [T]he goodwill of the salesman's relationship with the customer is to a degree an asset of the employer.  In many instances the goodwill has been created by the employer and is passed on to the salesman by introductions and support.  If it is developed by the salesman, that is done for the benefit of the employer under a duty of loyalty and in return for compensation paid to the salesman by the employer.  These aspects of goodwill can be reasonably viewed as legitimate property interests of the employer which are entitled to contractual protection so long as the protective covenants are of reasonable scope.

656 F. Supp. at 899.  *See Johnson Controls, Inc. v. A.P.T. Critical Sys. Inc.*, 323 F. Supp. 2d 525, 532 (S.D.N.Y. 2004) (stating that without enforcement of a restrictive covenant, the employer risks losing "not only the indeterminate future billings that these clients would generate, but also the significant good will built up during [the employer's] long term service of these clients"); *see also N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 46 (2d Cir. 1999) (affirming injunction

9

based on evidence that "in the technology business, the most expensive thing to replicate is your relationship with your customers.  That's the value of a company, the collective relationships and good will and reputation that you have garnered in the industry.").

Furthermore, while employed with EyeWonder, Abraham became intimately familiar with EyeWonder's trade secrets and confidential information, including its business and pricing plans and strategies, national and regional sales plans (including client assignments, and quarterly and annual sales goals, for each EyeWonder sales employee in the Southwest and Northwest Sales Regions), hiring strategies, product developments and rollouts that are underway and under consideration, and strategic plans for developing advantages over its competitors, both in terms of product/service offerings and sales strategies.  Rosner Decl. ¶ 7. As this court has observed, "[a] salesman who services an account necessarily becomes familiar with a great deal of confidential information about the relationship between seller and buyer, including the pricing and service being offered by the seller."  *See Ecolab*, 656 F. Supp. at 898-99.  In this case, such information took enormous time and effort for EyeWonder to develop, and was not otherwise available to Eyeblaster or other competitors in the industry.  Rosner Decl. ¶ 7. As a consequence of his employment with a direct competitor, EyeWonder has a legitimate fear that Abraham will disclose this confidential information in the course of his new duties, thereby causing EyeWonder irreparable harm.

Under New York law, information such as customer lists, customer contacts, customer preferences, and information about the buyer-seller relationship constitute trade secrets, because the information is not generally known or otherwise readily ascertainable.   In *North Atlantic Instruments*, for example, the Second Circuit concluded that the identities of customers with whom a former employee had dealt closely while working for the plaintiff constituted

10

protectable trade secrets.  188 F.3d at 45, 47.  The court found that the information in the

employee's possession—such as customer preferences and specific client contacts—was

confidential, and that it had been obtained as a result of the former employee's "direct exposure

to the information resulting from his employment relationship with [plaintiff]." *Id.* at  45-46.

The court concluded that "customer lists . . . in which customers are not readily ascertainable and

in which patronage has been secured only through the expenditure of considerable time and

money [] are protectable trade secrets." *Id.* at 47 (citations omitted); *see also Webcraft Tech.,*

*Inc. v. McCaw*, 674 F. Supp. 1039, 1046 (S.D.N.Y. 1987) (finding that a "list of useful and

influential contacts among customers and prospects" that had been developed  "at the expense of

[defendant's] employer" constituted a trade secret because it was not generally available and was

"valuable to a competitor").  It is clear that the disclosure of such confidential information

constitutes irreparable harm, because "the loss of trade secrets cannot be measured in money

damages." *FMC Corp. v. Tiawan Tainan Giant Indus. Co.*, 730 F.2d 61, 63 (2d Cir. 1984).

     Finally, and significantly, Abraham has expressly acknowledged and agreed that

monetary remedies are inadequate and that EyeWonder is entitled to injunctive relief in the event

of a breach or threatened breach of his non-solicitation covenants.  Agreement § 7.  Such

contractual acknowledgments further support a finding of irreparable harm.  *See Global Telesys.,*

*Inc. v. KPNQwest, N.V.*, 151 F. Supp. 2d 478, 482 (S.D.N.Y. 2001) (basing finding of irreparable

harm in part "on explicit provision of the agreement in which [defendant] specifically

acknowledged that [plaintiff] could not be adequately compensated by money damages for

breach"); *see also N. Atl. Instruments*, 188 F.3d at 49 (finding irreparable harm where the

defendant "acknowledged in his Employment Agreement that a breach of the confidentiality

clause would cause 'irreparable injury' to [plaintiff]"); *Ticor*, 173 F.3d at 69 (contractual

acknowledgment "might arguably be viewed as an admission by [defendant] that plaintiff will suffer irreparable harm were he to breach the contract's non-compete provision").

**B.    EyeWonder Will Likely Succeed on the Merits**

As a preliminary matter, the contractual choice-of-law provision is valid and should be enforced by this Court.  New York follows the "substantial relationship" test under the *Restatement (Second) of Conflict of Law* § 187.  Under this test, a contractual choice-of-law clause will be enforced unless either "(a) the chosen state has no substantial relationship to the parties . . . or (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest that the chosen state."  *Estee Lauder Co. v. Batra*, 430 F. Supp. 2d 158, 170 (S.D.N.Y. 2006) (quoting Resta*tement (Second) of Conflict of Law* § 187).  Here, New York certainly has a substantial relationship between the parties, given that EyeWonder's primary sales office is located in New York, Abraham was directly supervised by EyeWonder's Senior Vice President of Sales (Michael Rosner) based in New York, and especially given that Abraham now works for a direct competitor that is headquartered in New York (where Eyeblaster's main sales office is located).  Additionally, given New York's "strong interest in protecting companies doing business here," no other state has a "materially greater interest" in this dispute than does New York.  *See Batra*, 430 F. Supp. 2d at 173-74.

Under New York law, restrictive covenants will be enforced by the courts where the restrictions are reasonably limited in terms of geography and time and the enforcement is necessary to protect a legitimate interest of the employer, such as the protection of trade secrets, the protection of confidential customer information, or the protection of an employer's client base.  *See BDO Seidman v. Hirshberg*, 712 N.E.2d 1220, 1223 (N.Y. 1999).  Additionally, "New York recognizes the enforceability of covenants not to solicit employees."  *Global Telesys.*, 151

12

F. Supp. 2d at 482. In this case, injunctive relief is necessary to prevent the loss of EyeWonder's good will and long-term customer and employee relationships, as well as the disclosure of its confidential information.

Abraham has accepted employment with a direct competitor of EyeWonder, and has said (through counsel) that he cannot agree not to solicit on Eyeblaster's behalf all of the fifty-two specific customers identified by EyeWonder (and for which Abraham was directly responsible as an EyeWonder Regional Vice President of Sales). Such solicitation would be a direct violation of the non-solicitation of customers clause set out in Section 6(e) of the Agreement. This Court has declared that customer goodwill and relationships with long-term clients, both of which are threatened by Abraham's new employment, are legitimate covenant-protectable interests. *See Silipos, Inc. v. Bickel*, 2006 WL 2265055, at *5 (S.D.N.Y. Aug. 8, 2006) (finding that the "protection of customer relationships" is a legitimate employer interest where former employee "had extensive , regular communications with many of [plaintiff's] customers" and negotiated customer accounts that were "central to [plaintiff's] business," and the employer "shouldered all of the monetary expenses of these interactions").

Moreover, the non-solicitation clause in the Agreement is reasonably limited in time and scope. The twelve-month duration is reasonable under New York law. This Court has itself stated that "New York courts routinely find one-year restrictions to be reasonable." *See id.* at *6; *see also Innovative Networks, Inc. v. Satellite Airlines Ctrs., Inc.*, 871 F. Supp. 709, 728 (S.D.N.Y. 1995) (describing a twelve-month restriction as being "of relatively short duration"). In *Ecolab*, this Court enforced a non-solicitation of customers provision that was nearly identical to the one in this case, implicitly recognizing that a twelve-month limitation on soliciting former customers was reasonable in duration. 656 F. Supp. at 898. Indeed, in restrictive covenants

13

Eyeblaster has required its own employees to sign, Eyeblaster has insisted on an even longer

duration (eighteen months) than the twelve-month duration in the Agreement between Abraham

and EyeWonder.  Connell Decl. ¶ 8.

Moreover, as in *Ecolab*, the non-solicitation clause in Abraham's agreement is not

subject to any geographical limitation (as is typically the case with non-solicitation of customer

clauses).  EyeWonder does not here seek an injunction prohibiting Abraham from working in the

industry.  EyeWonder only seeks an injunction prohibiting him from soliciting – pending a final

ruling in arbitration – fifty-two companies that he personally serviced, or the solicitation of

which he directly supervised, during the time he was employed by EyeWonder.  656 F. Supp. at

898.  This request is narrowly tailored to protect EyeWonder's legitimate business interests.

This Court has explicitly found that such narrowly tailored non-solicitation clauses are

reasonable.  In *Ecolab*, this court held that one such provision was valid under New York law

because

> the covenants apply only to customers serviced by the particular
> employee within the last twelve months . . . .  The employees are not
> subject to a geographical restriction.  They may solicit business in
> direct competition with Ecolab in the same region they have
> previously worked.  They are barred only from soliciting for a year
> the tiny fraction of the New York market that they *personally*
> solicited in their last year at Ecolab.

*Id.* at 898 (emphasis in original).  *See also Webcraft*, 674 F. Supp. at 1048 (enforcing injunction

prohibiting employee from soliciting any customers that the defendant serviced while she was in

plaintiff's employment, and noting that the injunction "leaves her free to solicit the remainder of

the universe of customers"); *Laro Maint. Corp. v. Culkin*, 681 N.Y.S.2d 79, 80 (N.Y. App. Div.

1998) (*per curiam*) ("The preliminary injunction is reasonably limited in scope, since it

temporarily prohibits the defendants from contacting or soliciting those customers of the

14

plaintiffs who previously were served by the individual defendants when they were employed by the plaintiffs."); *Bates Chevrolet Corp. v. Haven Chevrolet*, 213 N.Y.S.2d 577, 581 (N.Y. App. Div. 1961) ("[P]laintiff . . . properly confined its request for injunctive relief to include only those of its customers with whom [Defendant] personally dealt during the last two years of his employment with plaintiff.").[3]

Finally, the provisions in the Agreement restricting Abraham from soliciting current employees of EyeWonder and from disclosing any confidential obtained from EyeWonder are reasonable.   As to the former provision, the non-solicitation of employees clause is narrowly tailored to prohibit solicitation of any EyeWonder employee employed only during the "six-month period immediately before Employee's employment expired or terminated."   Agreement § 6(d).  Like the non-solicitation of customers provision, this provision is reasonable in scope and should be enforced.  *See, e.g.*, *Natsource*, 151 F. Supp. 2d at 469 (granting injunction prohibiting ex-employee from soliciting current employees of the plaintiff for a period of one year, based on a finding that the plaintiff would be "irreparably harmed if [defendant] were allowed to encourage other [] employees to leave . . . to work for [plaintiff's] competitors within the next year").

Similarly, the non-disclosure provision in the Agreement is reasonable, and EyeWonder is likely to suffer irreparable harm if it is not enforced.  This Court has acknowledged that "[a] salesman who services an account necessarily becomes familiar with a great deal of confidential information about the relationship between seller and buyer."  *Ecolab*, 656 F. Supp. at 898-99.

---

[3] Indeed, the non-solicitation clause that EyeWonder seeks to enforce in this case is much more narrow in scope than a traditional covenant not to compete.  *See, e.g.*, *Bates Chevrolet Corp. v. Haven Chevrolet,* 213 N.Y.S.2d 577,  581 (N.Y. App. Div. 1961) (observing that a non-solicitation clause does not prohibit an ex-employee "from performing the same type of services for plaintiff's competitors, wherever they might be located," and, as such, it is a "limited" form of relief).

15

In *Global Telesystems*, this Court granted an injunction prohibiting violation of a confidentiality agreement based on the conclusion that an ex-employee "carrie[d] with him intimate knowledge regarding [plaintiff's] business" and "there [was] a continuing danger that [defendant] may unintentionally transmit information he gained through his association with [plaintiff]." 151 F. Supp. 2d at 482-83. In granting the injunction, this Court found that the ex-employee would simply not be able to "effectively screen that part of his brain containing information which he acquired" while employed by the plaintiff—and that, absent injunctive relief, there was no way to ensure that such "disclosures, even inadvertent, [could] be prevented." *Id.* at 482. As in *Global Telesystems*, without injunctive relief against Abraham, there is no way to ensure that he will not disclose—whether intentionally or inadvertently—the confidential information that he gleaned while working for EyeWonder.

In summary, Abraham's solicitation of customers and employees on behalf of Eyeblaster—a direct competitor of EyeWonder—and his violation of the confidentiality clause in his Agreement would directly breach the restrictive covenants that Abraham agreed to, all of which are reasonably limited in scope. Because those covenants are necessary to protect EyeWonder's legitimate business interests, including its trade secrets, customer lists, customer good-will and long-term customer and employee relationships, EyeWonder will likely succeed on the merits of its claims against Abraham.

## C.    The Balance of Hardships Tips Decidedly in Favor of an Injunction

The irreparable harm that EyeWonder will suffer if Abraham is permitted to breach the covenants contained in the Agreement weighs heavily in favor of the issuance of a preliminary injunction. Abraham was one of EyeWonder's Regional Vice Presidents and developed and maintained significant relationships with many of EyeWonder's largest customers. By resigning

16

his position at EyeWonder and moving immediately to a direct competitor to offer on behalf of Eyeblaster the *very same* services that he and his staff have offered and sold on behalf of EyeWonder, Abraham seeks to divert EyeWonder's revenues and customer base. This competitive employment further puts EyeWonder's confidential and proprietary information at risk of disclosure to Eyeblaster. *See Computer Assocs. Int'l, Inc. v. Bryan*, 784 F. Supp. 982, 986 (E.D.N.Y. 1992) (for purposes of motion for preliminary injunction, loss of trade secrets is not measurable in terms of money damages and, thus, is considered irreparable harm).

Marketplace injuries such as lost clients and business opportunities, and disclosure of confidential information are difficult, if not impossible, to undo. *See Johnson Controls*, 323 F. Supp. 2d at 532 ("Once [clients are] lost to [former employees], there is little guarantee that, should [plaintiff] ultimately prevail in this action, these clients would return to [plaintiff]."). Indeed, Abraham has expressly acknowledged that injunctive relief might be necessary in the event of a breach or threatened breach of his non-solicitation clauses, and has agreed to the issuance of such relief in that event. In contrast, briefly restraining Abraham from directly competing with EyeWonder and soliciting its clients and employees imposes only a minimal and slight burden on him. *See Ecolab*, 656 F. Supp at 898 ("Barring these employees for one year from soliciting the handful of clients they serviced while at Ecolab would not be an unreasonable hardship."). Thus, the balance of conveniences weighs strongly in favor of granting a preliminary injunction.

US2000 10792462.10

## CONCLUSION

For the foregoing reasons, EyeWonder respectfully submits that it is entitled to a temporary restraining order and preliminary injunction enjoining Abraham from soliciting or assisting others in the solicitation of fifty-two specifically-identified customers that Abraham had direct responsibility for as EyeWonder's Regional Vice President of Sales for its Southwest and Northwest Sales Regions, and further to prevent him from recruiting EyeWonder's employees, until this dispute can be finally resolved in arbitration.

Dated: May 9, 2008, New York, New York.

KILPATRICK STOCKTON LLP

By: _____
Lisa Pearson (LP 4916)
31 West 52nd Street, 14th Floor
New York, NY 10019
(212) 775-8700

James F. Bogan III
Georgia Bar No. 065220
*Admitted pro hac vice*
1100 Peachtree Street, Suite 2800
Atlanta, GA 30309
(404) 815-6500

*Counsel for Plaintiff EyeWonder, Inc.*

US2000 10792462.10