KILPATRICK STOCKTON LLP
Lisa Pearson (LP 4916)
31 West 52nd Street, 14th Floor
New York, NY 10019
Telephone: (212) 775-8700
Facsimile: (212) 775-8815

James F. Bogan III
(Application for admission *pro hac vice* filed)
Suite 2800, 1100 Peachtree Street
Atlanta, Georgia 30309
Telephone: (404) 815-6467
Facsimile: (404) 541-3133

*Counsel for Plaintiff EyeWonder, Inc.*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| EYEWONDER, INC.,<br>    Plaintiff,<br><br>v.<br><br>JOHN ABRAHAM,<br>    Defendant. | )<br>)<br>)<br>) 08 CV 3579<br>)<br>)<br>)<br>)<br>)<br>) |

**DECLARATION OF JAMES F. BOGAN III IN SUPPORT OF**
**PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND**
**PRELIMINARY INJUNCTION**

  I, JAMES F. BOGAN III, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

  1. I am a member of the firm of Kilpatrick Stockton LLP, counsel for plaintiff EyeWonder, Inc. ("EyeWonder") in the above-entitled action. I make this declaration in support of EyeWonder's motion for a temporary restraining order and preliminary injunction.

2. In this action, EyeWonder seeks a TRO and preliminary injunctive relief to enforce the terms of an Employment Agreement that Defendant John Abraham ("Abraham") signed with EyeWonder. Specifically, EyeWonder seeks a TRO and preliminary injunction to enjoin Abraham from breaching the non-solicitation of customers, non-solicitation of employees, and non-disclosure clauses in the Employment Agreement dated June 1, 2007 between the parties (the "Agreement"). The relevant facts are set forth in EyeWonder's Verified Complaint ("Complaint").

3. The following is a summary of the facts set forth in the Verified Complaint and the other evidence presented by EyeWonder in support of its motion:

4. EyeWonder is a technology company. It is a leading provider of video and rich media advertising products and services. In June, 2007, Mr. Abraham was hired by EyeWonder as Regional Vice President of Sales for its Southwest Sales Region, consisting of Arizona, New Mexico, California – south of Big Sur, and the southern halves of Utah and Colorado. In January, 2008, Abraham's territory was expanded to include EyeWonder's Northwest Sales Region as well, consisting of Washington, Oregon, Northern California, Nevada and the northern halves of Utah and Colorado. In his position, Abraham was responsible for overseeing the offer and sale of EyeWonder's products and services in the Southwest and Northwest Sales Regions, and for directly supervising EyeWonder's sales staff, which was engaged in offering and selling EyeWonder's products and services in those Regions.

5. When Abraham joined EyeWonder, he entered into the Agreement, a true and correct copy of which is attached to the Complaint as Exhibit A. The Agreement contains a

US2008 53733.1

number of covenants, three of which are relevant here, and all of which are reasonably limited in scope.

6. First, the non-solicitation of employees clause (Section 6(d)) provides that, for a period of one year, Abraham "shall not, for him/herself on for or on behalf of any other party, employ or solicit for employment anyone who Company [EyeWonder] employed during the shorter of the (i) period Employee was employed by Company, or (ii) six-month period immediately before Employee's employment expired or terminated."

7. Second, the non-solicitation of customers clause (Section 6(e)) provides that for the same 12-month period, Abraham "shall not solicit, directly or by assisting others, any Customer for the purpose of selling or otherwise providing to such Customer services for delivering video or other rich media advertisements over the Internet or over wireless networks." Section 6(a)(ii) of the Agreement defines the term "Customer" as "a customer of Company [EyeWonder] that during the one-year period before the termination of employment, (i) was solicited or serviced by Employee [Mr. Abraham] or another (Company) employee supervised by Employee [Abraham] or (ii) about whom Employee [Abraham] had Confidential Information."

8. Third, Section 6(b) of the Agreement prohibits Mr. Abraham from using confidential information of EyeWonder except in connection with work for EyeWonder, and prohibits the disclosure of such confidential information during his employment and for two years following such employment.

9. Eyeblaster competes with EyeWonder and is one of a small handful of providers in the world that compete with EyeWonder by offering and selling directly competitive services for delivering video and other rich media advertisements. Eyeblaster is

headquartered in New York City (where EyeWonder's main sales office is located), and also maintains a sales office in Los Angeles, California.

10. In a telephone conversation on March 21, 2008, Abraham told Jerome Connell, EyeWonder's General Counsel and COO, that he had been offered a position with "a wireless startup" and was giving his two weeks notice to terminate his employment with EyeWonder. This statement was false. EyeWonder has since learned that Abraham had accepted employment with Eyeblaster, a direct competitor that definitely is not "a wireless startup."

11. Pursuant to Section 8 of the Agreement, EyeWonder has commenced an arbitration proceeding in Atlanta, Georgia to adjudicate the merits of this dispute. EyeWonder has filed this action in aid of arbitration, however, pursuant to Sections 7, 8(c) and 9 of the Agreement. Section 8(c) of the Agreement expressly authorizes the filing of an action "for injunctive or other preliminary relief to maintain the status quo until a dispute can be finally resolved, or any action to prevent any violation or threatened violation of the covenants in Section 6."

12. In fact, in Section 7 of the Agreement, EyeWonder and Mr. Abraham have expressly agreed that injunctive relief is necessary in the event of a breach or threatened breach of the Agreement. Additionally, Section 9 of the Agreement provides that the Agreement is governed by New York law and that any claims not subject to mandatory arbitration – including claims for injunctive relief to preserve the status quo – shall be resolved exclusively in New York.

13. As Regional Vice President for EyeWonder, Abraham developed significant relationships with EyeWonder's customers, especially in Los Angeles, where EyeWonder's

sales office for the Southwest Region is located. Thus, his decision to resign abruptly from EyeWonder and join one of its direct competitors presents EyeWonder with much more than the mere threat of lost sales. Abraham is uniquely positioned to induce EyeWonder's customers to discontinue their relationships with EyeWonder and to begin purchasing services from Eyeblaster. Abraham will have every incentive to procure additional business for Eyeblaster, and it would be unrealistic to assume that he would not tap into the vast customer base that he and his staff developed and maintained during his tenure at EyeWonder. As an employee at Eyeblaster, EyeWonder fears that Abraham has solicited EyeWonder's customers – the same customers that he and his staff constantly interacted with on behalf of EyeWonder. It is quite possible that at least some of those customers would follow, leaving EyeWonder with no adequate monetary remedy. Abraham's solicitation of EyeWonder's customers for the benefit of a direct competitor would strip EyeWonder of an intended benefit and protectable interest under the covenants: the ability to maintain relationships with its customers free of improper interference from a former employee.

14. Indeed, on May 1, 2008, I sent to Abraham's counsel, Ann McDonald, a list of 52 EyeWonder customers for which Abraham was responsible as an EyeWonder Regional Vice President. This e-mail stated as follows:

"Ann –

The customer list is attached. As we discussed, this list is confidential. You can share this with your client (he already knows about these customers) on the express understanding that he is only to review this for purpose of evaluating a resolution of a motion for emergency equitable relief, and that he cannot under any circumstances use this

US2008 53733.1

in connection with Eyeblaster's business or otherwise to compete against EyeWonder. You can likewise share this with Sharon Katz [counsel for Eyeblaster] (and Sharon may share this with one and only one Eyeblaster representative) on the same terms.

Please let me know as soon as you can (and in no event by COB tomorrow) whether Abraham will agree not to be involved in soliciting these customers on behalf of Eyeblaster for the 1-year term specified in his agreement with EyeWonder. If your client is agreeable to this, we will be in a position to discuss other issues, such as employee non-solicitation."

15. The next day, I spoke with Ms. McDonald, who informed me that Abraham was not in a position to agree not to solicit all of the 52 companies on the list I sent to her. Accordingly, because Abraham will not agree to refrain from soliciting the 52 companies on behalf of Eyeblaster, EyeWonder has a legitimate fear that Mr. Abraham has already solicited those 52 companies on behalf of Eyeblaster, or intends to solicit those companies on Eyeblaster's behalf in the near future.

16. Furthermore, while employed with EyeWonder, Abraham became intimately familiar with EyeWonder's trade secrets and confidential information, including its business and pricing plans and strategies, national and regional sales plans (including client assignments, and quarterly and annual sales goals, for each EyeWonder sales employee in the Regions) hiring strategies, product developments and rollouts that are underway and under consideration, and strategic plans for developing advantages over its competitors, both in terms of product/service offerings and sales strategies. As a consequence of his employment with a direct competitor, EyeWonder fears that Abraham will disclose this confidential information in the course of his new duties, thereby causing EyeWonder irreparable harm. Under New York law, information such as customer lists constitute trade

secrets because the information is not "readily ascertainable" from sources outside of EyeWonder.

17. Even assuming Abraham has no specific intent to divulge confidential information, that would not eliminate the threat of inadvertent disclosures, which could definitely happen when an employee such as Abraham accepts employment to perform essentially identical duties for a direct competitor.

18. EyeWonder has not petitioned this or any other court for similar relief in the past.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed in Atlanta, Georgia on May 8, 2008.

_____
JAMES F. BOGAN III

US2008 53733.1