**KILPATRICK STOCKTON LLP**
Lisa Pearson (LP 4916)
31 West 52nd Street, 14th Floor
New York, NY 10019
Telephone: (212) 775-8700
Facsimile: (212) 775-8800

James F. Bogan III
(Application for admission *pro hac vice* filed)
Suite 2800, 1100 Peachtree Street
Atlanta, Georgia 30309
Telephone: (404) 815-6467
Facsimile: (404) 541-3133

*Attorneys for Plaintiff EyeWonder, Inc.*

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| EYEWONDER, INC., a Delaware corporation,<br><br>                          Plaintiff,<br><br>          v.<br><br>JOHN ABRAHAM, an individual,<br><br>                    Defendant. | Case No. 08 CV 3579<br><br><br><br><br><br>**DECLARATION OF MICHAEL ROSNER** |

I, MICHAEL ROSNER, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1. I am the Senior Vice President of Sales for EyeWonder, Inc., a Delaware corporation and Plaintiff in this action ("EyeWonder"), and have been based in EyeWonder's main sales office in New York, NY since December 2006.

2. In May 2007, I contacted John Abraham, the Defendant in this action, and discussed with him the prospect of Mr. Abraham joining EyeWonder as the manger of

EyeWonder's Southwest Sales Region, which includes Arizona, New Mexico, California – south of Big Sur, and the southern halves of Utah and Colorado.

3.    I had several telephone discussions with Mr. Abraham, after which he visited EyeWonder's Atlanta office to meet EyeWonder's management team, and then spent several days in EyeWonder's New York sales office, where he and I negotiated the details of his employment arrangement. Mr. Abraham thereafter accepted the position of Vice President of sales for the Southwest Sales Region. At the end of 2007, Mr. Abraham's region was expanded to include EyeWonder's Northwest Sales Region (Oregon, Washington, Wyoming, Montana, Idaho, California – north of Big Sur, and the northern halves of Utah and Colorado).

4.    In his capacity as Regional Vice President, Mr. Abraham's full time duties were to offer and sell EyeWonder's products and services to advertising agencies, Internet publishers and advertisers, through direct meetings with such customers and potential customers, and indirectly through managing EyeWonder's sales staff in its Southwest and Northwest Regions. Overall, Mr. Abraham and his staff were responsible for calling on and maintaining relationships with over 200 agencies, Internet publishers, and advertisers on behalf of EyeWonder.

5.    I have identified 52 specific EyeWonder customers with which Mr. Abraham and his staff had the most frequent and significant contact and relationships with. The vast majority of these 52 customers were specifically identified by Mr. Abraham in writing as those he expected to generate the most significant business for EyeWonder during the second quarter of 2008, and the other customers on the list are those with which EyeWonder maintains a high level of significant and frequent contact. Mr. Abraham was significantly involved, directly and through his staff, in the relationships between EyeWonder and each of these 52 customers.

6.    At all times during his employment with EyeWonder, Mr. Abraham reported directly to me, and we spoke several times weekly about matters regarding staff and customers. Mr. Abraham and his staff also worked closely with myself and the rest of EyeWonder's New York sales staff, and collaborated frequently on advertising campaigns for several advertisers and their agencies, which have offices throughout the U.S. and generally are headquartered in New York City.

7.    Mr. Abraham was intimately involved in setting sales strategy for EyeWonder's Southwest and Northwest Regions and was privy to a vast amount of sensitive information relating to EyeWonder and its customers, including, among other things (a) all special and standard pricing arrangements offered to, and in place with, publishers and agencies, (b) historical and projected sales figures for sales staff and particular customers, (c) marketing plans for agencies and their advertising clients for which EyeWonder performs services, including timelines for current and pending campaigns, (d) the members of EyeWonder's sales and service staff responsible for selling and servicing each EyeWonder customer, (e) the content of, and tactics used in, sales pitches to EyeWonder's customers and prospects, (f) the compensation and incentive plans for EyeWonder's sales staff (including quarterly goals and targets, and customer-specific goals and targets), (g) special product and service modifications and enhancements provided to certain customers, and rollout plans for products and services to be offered by EyeWonder in the future, and (h) service protocols and campaign management processes used by the service team in EyeWonder's Southwest Region office, where Mr. Abraham spent much of his time. This information took enormous time and effort for EyeWonder to develop.

8.    I received an e-mail communication on April 8, 2008 from a recruiting professional who works in the Los Angeles, California market, stating that she had become

aware that Mr. Abraham recently had accepted a position as Vice President of West Coast Sales for Eyeblaster, Inc. ("Eyeblaster").  On April 9, 2008, I had a telephone conversation with a member of the staff in Eyeblaster's Los Angeles office, who confirmed that Mr. Abraham had accepted a position as the leader of Eyeblaster's sales force in that office.

9.    I have had communications with Mr. Abraham since his resignation from EyeWonder and have inquired with him about the identity of his new employer.  He was unwilling to divulge the name of that new employer to me, but has stated only in an e-mail communication: "yes we will bump into each other in this industry."

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed in New York, New York on May 8, 2008.

Michael Rosner

EXHIBIT A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

x------------------------------------------------ x

EYEBLASTER, INC.,                              :    Index No. _____

                    Plaintiff,      :

                          :    **SUMMONS**

          v.                          :

WALTER GEER,                                   :

                 Defendant.        :         0 5 6 0 1 4 6 2

x------------------------------------------------ x

TO THE ABOVE-NAMED DEFENDANT:

      You are hereby summoned and required to serve upon plaintiff's attorney an answer to the complaint in this action within twenty days after the service of this Summons, exclusive of the day of service, or within thirty (30) days after service is complete if this summons is not personally delivered to you within the State of New York.  In case of your failure to answer, judgment will be taken against you by default for the relief demanded in the complaint.

      The basis of the venue designated is defendant has his principal place of business in this County and State, and/or the acts by defendant giving rise to plaintiffs' claims occurred in this County and State.

Dated: New York, New York
      April 22, 2005

FILED
APR 22 2005
NEW YORK
COUNTY CLERKS OFFICE

                 QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

                 By: _____
                     Michael B. Carlinsky
                     335 Madison Avenue 17th Floor
                     New York, New York  10017
                     (212) 702-8100
                     Attorneys for Plaintiffs Eyeblaster, Inc.

To:
Walter Geer
c/o DoubleClick Inc.
111 Eighth Avenue - 10th Floor
New York, New York 10011

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

x------------------------------------------------------x

EYEBLASTER, INC.,                                 :    Index No. _____

                   Plaintiff,                 :

                  v.                 :    **COMPLAINT**

WALTER GEER,                                       :

                 Defendant.               :

x------------------------------------------------------x

FILED
APR 22 2005
NEW YORK
COUNTY CLERKS OFFICE

05601462

Plaintiff Eyeblaster, Inc. ("Eyeblaster"), by and through its attorneys Quinn

Emanuel Urquhart Oliver & Hedges, LLP, brings this action seeking to enjoin Defendant Walter

Geer ("Mr. Geer") from breaching provisions of his Non-Competition and Non-Disclosure and

Developments Agreement, from breaching his fiduciary duty and duty of loyalty to Eyeblaster,

from misappropriating Eyeblaster's trade secrets and confidential business information, and from

competing unfairly against Eyeblaster, and seeking damages for Mr. Geer's breaches of these

obligations to Eyeblaster.  In support hereof, Eyeblaster alleges the following:

## NATURE OF THE CASE

        1.      Eyeblaster is the world leader in rich media content delivery and

management technology.

        2.      Eyeblaster employed Mr. Geer as an Agency Product Specialist in its New

York City office.

        3.      As an Agency Product Specialist, Mr. Geer gained intimate knowledge of

Eyeblaster's customers and product offering, as well as the development of the software code

and enhancements for the product offering, and otherwise was centrally involved in and had

substantial knowledge of some of Eyeblaster's most sensitive confidential and proprietary business information.

4.    While still employed by Eyeblaster, and in contravention of his Non-Competition and Non-Disclosure and Developments Agreement ("the Non-Competition and Non-Disclosure Agreement" or "Agreement") (attached hereto as Exhibit A), as well as his duties to Eyeblaster, Mr. Geer began negotiating employment with DoubleClick, Inc., a business that recently launched a rich media product offering directly competing with Eyeblaster.  After learning of Mr. Geer's actions, Eyeblaster had cause to, and did, terminate Mr. Geer's employment.

5.    Consistent with his earlier negotiations, Mr. Geer immediately accepted employment with DoubleClick as a Rich Media Project Manager.  Upon information and belief, the responsibilities of a Rich Media Project Manager at DoubleClick are very similar to the responsibilities Mr. Geer performed for Eyeblaster.

6.    Despite the restrictions contained in the Non-Competition and Non-Disclosure Agreement, Mr. Geer is breaching that contract and, upon information and belief, is using and/or disclosing, and will continue to use and/or disclose, the confidential and proprietary information he obtained while employed at Eyeblaster to unfairly complete against, and help DoubleClick unfairly compete against, Eyeblaster.  By this action, Eyeblaster seeks injunctive relief to prevent further irreparable harm flowing from Mr. Geer's wrongdoing, as well as monetary damages.

## JURISDICTION AND VENUE

7.    Eyeblaster is incorporated under the laws of the State of Delaware and has its principal place of business at 135 West 18th Street, Fifth Floor, New York, New York 10011.

8.      Mr. Geer is an individual citizen of the State of New Jersey, domiciled at 62nd Street, Apt. 6, West New York, NJ 07093.

9.      Eyeblaster employed Mr. Geer at its principal place of business in New York City.

10.     Upon information and belief, Mr. Geer is employed by DoubleClick at its principal place of business in New York City.

11.     This Court has jurisdiction pursuant to CPLR § 301.

12.     Venue is proper in New York County under CPLR § 301(b) because Mr. Geer has regular employment in the county of New York, and because Mr. Geer agreed to the "venue of the Courts located in the State of New York, New York County" in the Non-Competition and Non-Disclosure Agreement.

## THE FACTS

13.     Eyeblaster is the global leader in rich media ad technology and the provider of the Eyeblaster Rich Media Platform.  Rich media is an advertising media employing graphic movement, animation, audio, video, innovative formats and interaction to cut through the clutter of common Web advertising.  Eyeblaster's rich media product offering engages the viewer in a richer and immediately compelling experience.

14.     Eyeblaster provides online advertisers, publishers, agencies and creative shops with the first single-technology solution to create, deliver, and manage all rich media formats through one online administrative platform.

15.     More than 500 agencies use the Eyeblaster rich media platform, more than 1,500 web publishers are Eyeblaster-enabled, and more than 4,000 campaigns have run on the Eyeblaster rich media platform for national advertisers.

16.    Mr. Geer was employed by Eyeblaster from February 9, 2004 until March 16, 2005 as an Agency Product Specialist, working in Eyeblaster's corporate headquarters in New York, New York.

17.    In consideration of his employment at Eyeblaster, Mr. Geer executed the Non-Competition and Non-Disclosure Agreement with Eyeblaster on February 9, 2004. In Section 5.6 of the Non-Competition and Non-Disclosure Agreement, the parties expressly agreed that the contract would be "governed by and interpreted in accordance with the laws of the State of New York." Exhibit A at § 5.6.

18.    In the Non-Competition and Non-Disclosure Agreement, Mr. Geer expressly recognized and agreed that Eyeblaster would provide him with trade secret and highly confidential business information:

> Employee understands and agrees that the Company has in the past and will in the future, continue to expend large sums of money, and apply its unique and special "know-how", organization by utilization of unique and effective management, sales, service, marketing, finance, and other corporate techniques. Employee further understands and agrees that the Company has gained a unique reputation for its ability to solicit, market, sell, and service high visibility Internet, Web-commerce and Corporate accounts and that this reputation is a major factor in bringing about the sales of same and accounts for the continued success of the Company in the complex and evolving Business in which the Company engages.
>
> Employee understands, admits, and agrees that he/she will necessarily become privy to relationships with other employees of the Company, the Company's customers, customer lists, advertisers, advertiser lists, confidential plans and structures, and other confidential information and trade secrets, and that to the extent Employee is directly or indirectly involved in the marketing or sales aspect of the Company's Business, he will necessarily establish a unique and strong personal and professional relationship with the Company's customers during the terms of this Agreement, and that the aforesaid information and other information obtained as to customers' and advertisers' methods of

doing business, specifications of customers'/ and advertisers'
advertising requirements and capacities, the time, places and other
details of when, where, and how to contact and best serve
customers and advertisers, customer's and advertisers' bias and
prejudice as to various services, information as to other employees
or third parties who influence decisions, and the extensive and
frequent customer and advertiser contact in the personal
relationship acquired with customer and advertiser, all constitute
legitimate and protectable business interests of the Company.

Exhibit A at §§ 1.1, 1.2.

19.    By entering into the Non-Competition and Non-Disclosure Agreement,

Mr. Geer expressly agreed to be bound by the Agreement's confidentiality and nonsolicitation

provisions, as well as the Agreement's narrow covenant not to compete.  Exhibit A.

20.    Mr. Geer agreed that he would "hold in strictest confidence and not use"

Eyeblaster's confidential business information "for his own benefit, or the benefit of any third

party." *Id.* at § 1.2.

21.    Mr. Geer also agreed, that from February 9, 2004 until "eighteen (18)

months after the effective date of termination of Employee's employment with the Company," he

- "Agree[d] to refrain from, directly or indirectly, soliciting or
enticing the Company's customers or advertisers so as to induce them to reduce,
cease or leave the business relationship with the Company;"

- "Agree[d] that he [would] not directly or indirectly, either for his
own account or for the benefit of any person, firm or corporation, engage in any
business that is competitive with the Business; i.e. in a business involving the
development, solicitation, offering, marketing, sale or service regarding or in
connection with rich media ad serving and management system/platform;"

- Agreed that he would "not discuss or accept any relationship as a
sales or marketing representative, consultant, director, manager, officer, executive, or
other employee, or representative with any person, firm or corporation which during
the term of this Agreement was or is engaged in business activities which are
competitive to the Business, except for any such relationship that would not in any
way involve or relate to such activities or businesses.

*Id.* at § 1.3-1.10.

22.    Eyeblaster, as it had promised in the contract, provided Mr. Geer with proprietary and confidential business and customer information.

23.    Mr. Geer became intimately involved with Eyeblaster's relationships with its clients and customers, routinely accompanying the sales force to sales meetings, as well as to train clients on how to use and repair Eyeblaster's Rich Media Platform.

24.    During his employment with Eyeblaster, Mr. Geer knew, in detail, the features and functions of Eyeblaster's product offering, including how the software product was developed, used, and written; all of the products in Eyeblaster's pipeline; and about planned enhancements to Eyeblaster's product offerings.

25.    In his position as Agency Product Specialist, Mr. Geer was responsible for creative modifications to Eyeblaster's rich media product offering; training advertising agencies and creative shops to use the Eyeblaster rich media interface; developing flash ads for publishers; developing tutorials for agencies and publishers; troubleshooting creative issues dealing with HTML, javascript, flash, and actionscript; leading and facilitating meetings with customers and prospective customers, as part of sales efforts and otherwise, to discuss new features to Eyeblaster's product offerings and how to integrate upcoming projects with the Eyeblaster system; testing new versions of Eyeblaster's system and providing information about the product's strengths and weaknesses to Eyeblaster's technical support group; and recommending additions or modifications to be added to later versions of the Eyeblaster system.

26.    In his position with Eyeblaster, Mr. Geer was privy to information about all of Eyeblaster's product campaigns and client development.

27.    In his position, Mr. Geer was entrusted with Eyeblaster's trade secrets and other highly confidential and proprietary business information.  Indeed, in his position at

Eyeblaster, Mr. Geer knew, and was required to know, almost everything about Eyeblaster's Rich Media Platform.

28.    Notwithstanding the position of trust he held at Eyeblaster, and despite the Non-Competition and Non-Disclosure Agreement, in or around March 2005, Mr. Geer commenced discussions and negotiations with DoubleClick regarding DoubleClick's employment of Mr. Geer in a position substantially identical to, and competitive with, his rich media position with Eyeblaster.

29.    DoubleClick first offered a rich media product in mid-2003, and since that time, DoubleClick has been desperately trying to compete with and catch Eyeblaster, the global leader in rich media product offering.

30.    Eyeblaster learned of Mr. Geer's breach of contract and breach of his fiduciary duties to Eyeblaster, and, as such, terminated his employment for cause on March 16, 2005.

31.    Mr. Geer has accepted employment with DoubleClick in the position of Rich Media Project Manager.  Upon information and belief, the job description maintained by DoubleClick for the position into which Mr. Geer was hired contains responsibilities that include customer contact; training; marketing; and product demonstrations in which the Rich Media Project Manager would highlight the features and comparative advantages of DoubleClick's rich media products to competitive rich media project offerings.

32.    DoubleClick competes directly with Eyeblaster in rich media offering to agencies, advertisers, and creative shops.

33.    Upon information and belief, DoubleClick engaged in employment discussions with Mr. Geer while he was employed by Eyeblaster to continue their efforts to

compete with Eyeblaster, and ultimately, employed Mr. Geer in a Rich Media Project Manager role to compete unfairly against Eyeblaster.

34.    On or about March 23, 2005, Benjamin Strauss, counsel for Eyeblaster, wrote a letter to Mr. Geer informing him that Eyeblaster intended to enforce the restrictive covenants for which it had contracted.

35.    On March 25, 2005, William Zuckerman, counsel for DoubleClick, wrote a letter to Mr. Strauss suggesting that, while DoubleClick and Mr. Geer were fully aware of Mr. Geer's contractual and legal obligations to Eyeblaster, DoubleClick was of the opinion that Mr. Geer's noncompete covenant with Eyeblaster was *per se* unenforceable, despite the fact that DoubleClick placed Mr. Geer into a position where, upon information and belief, the job description maintained for the position by DoubleClick, reveals duties virtually identical to the position Mr. Geer held at Eyeblaster.

### COUNT I
(Breach of Contract)

36.    Eyeblaster re-alleges paragraphs 1-35 as if set forth fully herein.

37.    Mr. Geer, by reason of the Agreement, was contractually prohibited from negotiating employment with DoubleClick in March, 2005.

38.    Mr. Geer, by reason of the Agreement, was contractually prohibited from accepting said employment in March, 2005.

39.    By working for DoubleClick in the position of Rich Media Project Manager, Mr. Geer is directly engaging in a business that competes with Eyeblaster's business. Further, his duties and activities at DoubleClick, as, upon information and belief, are described by the job description for the position into which he was hired, are substantially similar to those

that he performed at Eyeblaster. Therefore, Mr. Geer, by working for DoubleClick, is in breach of the Non-Competition and Non-Disclosure Agreement.

40.    By working for DoubleClick, an entity that directly competes against the business activities of Eyeblaster, Mr. Geer will use, and is using, confidential business information that Eyeblaster provided to him, or that he obtained during his employment with Eyeblaster. By using and retaining confidential information, Mr. Geer is in breach of the Non-Competition and Non-Disclosure Agreement.

41.    Mr. Geer's breach of his Agreement severely damages Eyeblaster's ability to compete against DoubleClick in the rich media industry. Indeed, Eyeblaster's business activities will be severely impaired if Mr. Geer and DoubleClick are permitted to unfairly compete with Eyeblaster and to misappropriate, and attempt to misappropriate, not only Eyeblaster's customers and prospective customers, but Eyeblaster's confidential business information.

42.    Eyeblaster has suffered and, unless Mr. Geer is enjoined, will continue to suffer irreparable harm and substantial damages as a result of Mr. Geer's breach of the Non-Competition and Non-Disclosure Agreement, including but not limited to misappropriation of proprietary and confidential business information, the use by Mr. Geer and DoubleClick of Eyeblaster's proprietary and confidential business information, and Mr. Geer's and DoubleClick's illegal and unfair competition against Eyeblaster in the rich media business industry.

43.    As a result, Eyeblaster has suffered irreparable and immeasurable harm, as well as monetary damages to be proven later at trial. Eyeblaster is further entitled to injunctive relief to preclude Mr. Geer's further breach of the Agreement.

**COUNT II**
(Misappropriation of Trade Secrets)

44.     Eyeblaster re-alleges paragraphs 1-43 as if set forth fully herein.

45.     Client and customer account information, prospective customers, business techniques, product development and functionality, and marketing and sales strategies to which Mr. Geer had access while employed by Eyeblaster constitute Eyeblaster's trade secrets.

46.     The proprietary, technical, and business information regarding Eyeblaster's rich media product offering were known to only a handful of Eyeblaster's trusted employees.

47.     Eyeblaster has made, and makes, reasonable efforts to preserve and maintain the confidentiality and secrecy of its trade secrets, including the trade secrets acquired by Mr. Geer. Eyeblaster's trade secrets derive independent economic value from being not generally known to the public or to other persons who can obtain economic value from their disclosure.

48.     The trade secrets acquired by Mr. Geer have not been generally available to the public or to Eyeblaster's competitors, including DoubleClick. Upon information and belief, Mr. Geer has used, and is using and/or disclosing, Eyeblaster's trade secrets without license, without Eyeblaster's consent, and in violation of Eyeblaster's rights.

49.     Because of Mr. Geer's ongoing wrongdoing, Eyeblaster has suffered, and continues to suffer, irreparable injury, for which it has no adequate remedy at law.

50.     Because of the foregoing actions, Eyeblaster has suffered substantial injury for which it is entitled to recover compensatory, consequential and punitive damages to be determined at trial.

## COUNT III
(Breach of the Duty of Loyalty)

51.    Eyeblaster re-alleges paragraphs 1-50 as if set forth fully herein.

52.    During his employment with Eyeblaster, Mr. Geer was in a position of trust and confidence, and had a duty to act for Eyeblaster's benefit, while subordinating his personal interests to that of Eyeblaster.

53.    In his employment capacity, Mr. Greer had access to Eyeblaster's trade secrets and other highly confidential, proprietary and sensitive business information, including among other information, detailed information about Eyeblaster's customers, product feature/functions, product development and enhancement, sales, and marketing and sales strategies.

54.    Because of his employment in a position of trust and confidence, Mr. Greer had a duty to keep confidential all of Eyeblaster's confidential and proprietary business information that he learned and/or obtained during his employment with Eyeblaster.  Mr. Greer's duty of confidentiality survived his termination.

55.    Upon information and belief, Mr. Greer has used and/or disclosed, and unless enjoined, will use and disclose propriety and confidential business information and trade secrets of Eyeblaster in breach of his duty of loyalty to Eyeblaster.

56.    As a result of Mr. Geer's violation of the duty of loyalty, Eyeblaster has suffered, and continues to suffer, substantial injury for which it is entitled to both injunctive and monetary relief.

## COUNT IV
(Breach of Fiduciary Duty)

57.    Eyeblaster re-alleges paragraphs 1-56 as if set forth fully herein.

58.    During his employment with Eyeblaster, Mr. Geer was in a position of trust and confidence, and had a duty to act for Eyeblaster's benefit, while subordinating his personal interests to that of Eyeblaster.

59.    In his employment capacity, Mr. Greer had access to Eyeblaster's trade secrets and other highly confidential, proprietary and sensitive business information, including among other information, detailed information about Eyeblaster's customers, product feature/functions, product development and enhancement, sales, and marketing and sales strategies.

60.    Because of his employment in a position of trust and confidence, Mr. Greer had a duty to keep confidential all of Eyeblaster's confidential and proprietary business information that he learned and/or obtained during his employment with Eyeblaster. Mr. Greer's duty of confidentiality survived his termination.

61.    Upon information and belief, Mr. Greer has used and/or disclosed, and unless enjoined, will use and disclose propriety and confidential business information and trade secrets of Eyeblaster in breach of his fiduciary duty to Eyeblaster.

62.    As a result of Mr. Geer's violation of his fiduciary duty, Eyeblaster has suffered, and continues to suffer, substantial injury for which it is entitled to both injunctive and monetary relief.

## COUNT V
### (Unfair Competition)

63.    Eyeblaster re-alleges paragraphs 1-62 as if set forth fully herein.

64.    In his employment capacity, Mr. Greer had access to Eyeblaster's trade secrets and other highly confidential, proprietary and sensitive business information, including, among other information detailed information about Eyeblaster's customers, product feature/functions, product development and enhancement, sales, and marketing and sales strategies.

65.    Upon information and belief, Mr. Greer has used and/or disclosed, and unless enjoined, will use and disclose propriety and confidential business information and trade secrets of Eyeblaster in breach of his Agreement with Eyeblaster and in violation of his fiduciary duty and duty of loyalty to Eyeblaster in order to compete unfairly with Eyeblaster in the rich media business industry.

66.    As a result of the foregoing, Eyeblaster has suffered, and continues to suffer, substantial injury for which it is entitled to both injunctive and monetary relief.

## PRAYER FOR RELIEF

WHEREFORE, Eyeblaster prays for judgment in its favor and against Mr. Geer for the following relief:

a.    permanently enjoin Mr. Geer from engaging in further employment with, or from providing services either directly or indirectly to, DoubleClick or any of its affiliates or employees for a period of 18 months from March 16, 2005;

b.    permanently enjoin Mr. Geer from engaging in any conduct violating the Non-Competition and Non-Disclosure Agreement;

c.      permanently enjoin Mr. Geer from soliciting any customers or potential customers of Eyeblaster for a period of 18 months from March 16, 2005;

d.      permanently enjoin Mr. Geer from misappropriating Eyeblaster's trade secrets;

e.      direct Mr. Geer to return to Eyeblaster immediately any and all information, documents, software, materials, work product or equipment provided to him by Eyeblaster, or relating to Eyeblaster whether in printed form or otherwise

f.      award Eyeblaster compensatory damages to be determined at trial, but believed to be no less than $25,001;

g.      award Eyeblaster consequential and exemplary damages in an amount to be determined at trial;

h.      awarded Eyeblaster its costs incurred in this litigation, including reasonable counsel fees; and

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

      i.     award Eyeblaster such other and further relief as the Court deems

appropriate.

Dated: New York, New York
       April 22, 2005

                    QUINN EMANUEL URQUHART
                    OLIVER & HEDGES, LLP

                  By:

                    Michael B. Carlinsky
                    335 Madison Avenue 17th Floor
                    New York, New York  10017
                    (212) 702-8100
                    Attorneys for Plaintiffs Eyeblaster, Inc.

Of Counsel:

Larry R. Wood, Jr.
Matthew J. Hank
PEPPER HAMILTON LLP
3000 Two Logan Square
Eighteenth & Arch Streets
Philadelphia, PA 19103-2799
(215) 981-4000

**EXHIBIT A**



# Eyeblaster, Inc.
## NON-COMPETITION AND
## NON-DISCLOSURE AND DEVELOPMENTS AGREEMENT

**AGREEMENT** dated Feb 9, 2004, between Eyeblaster, Inc., a Delaware corporation ("**Company**"), with a place of business at 220 Fifth Avenue, 19th Floor, New York, NY 10001, USA, and the employee named on the signature page hereto ("**Employee**").

**WHEREAS**, the Company develops and sells a proprietary rich media ad serving and management system for use by online publishers and advertisers (the "**Business**"); and:

**WHEREAS**, the Company has developed certain proprietary information in the course of growing its Business; and:

**WHEREAS**, Employee acknowledges the proprietary nature of the Company's information and recognizes that Company would be irreparably damaged if Employee were to disclose or make unauthorized use of any proprietary information; and:

**WHEREAS**, Employee desires to work for the Company:

**NOW, THEREFORE**, in consideration of the commencement of Employee's employment with the Company and the compensation and other benefits Employee will receive as an employee, it is agreed as follows:

1. <u>**Non-competition and Confidential Information:**</u>

    **1.1**    Employee understands and agrees that the Company has in the past and will in the future, continue to expend large sums of money, and apply its unique and special "know-how", and has in the past and will continue in the future, to devote a great effort in building an effective organization by utilization of unique and effective management, sales, service, marketing, finance, and other corporate techniques. Employee further understands and agrees that the Company has gained a unique reputation for its ability to solicit, market, sell, and service high visibility Internet, Web-commerce and Corporate accounts and that this reputation is a major factor in bringing about the sales of same and accounts for the continued success of the Company in the complex and evolving Business in which the Company engages.

-2-

1.2    Employee understands, admits, and agrees that he/she will necessarily become privy to relationships with other employees of the Company, the Company's customers, customer lists, advertisers, advertiser lists, confidential plans and structures, and other confidential information and trade secrets, and that to the extent Employee is directly or indirectly involved in the marketing or sales aspect of the Company's Business, he will necessarily establish a unique and strong personal and professional relationship with the Company's customers during the term of this Agreement, and that the aforesaid information and other information obtained as to customers' and advertisers' methods of doing business, specifications of customers' and advertisers' advertising requirements and capacities, the time, places and other details of when, where, and how to contact and best serve customers and advertisers, customer's and advertisers' bias and prejudice as to various services, information as to other employees or third parties who influence decisions, and the extensive and frequent customer and advertiser contact in the personal relationship acquired with customer and advertiser, all constitute legitimate and protectable business interests of the Company, and are now, and even though same may be enhanced by Employee, will continue to be extremely confidential information and thereby exclusive property of the Company. Employee agrees that he will hold in strictest confidence and not use for his own benefit, or the benefit of any third party, any such confidential information.

1.3    Employee acknowledges, admits and agrees that the Company has a legitimate business interest and right in prohibiting Employee from soliciting or enticing customers or advertisers of the Company after termination of Employee's relationship with the Company, and the restrictions, limitations, and covenants made by Employee herein, specifically within this Section 1, are reasonable and valid and should be strictly enforced and upheld by any court of competent jurisdiction. Thus from the date hereof until eighteen (18) months after the effective date of termination of Employee's employment with the Company (the "Non-competition Period"), Employee absolutely and unconditionally agrees to refrain from, directly or indirectly, soliciting or enticing the Company's customers or advertisers so as to induce them to reduce, cease or leave their business or relationship with the Company.

1.4    Employee further understands and agrees that all customers of the Company at the time of the signing of this Agreement and all such customers of the Company during the term of his employment and during the term of this Agreement are the exclusive customers of the Company and not those of Employee.

1.5    Employee therefore agrees that, in consideration of the commencement of Employee's employment and the compensation Employee is to receive as an employee, the sufficiency of which consideration is hereby acknowledged, during the Non-competition Period, Employee absolutely and unconditionally agrees that he will not directly or indirectly, either for his own account or for the benefit of any person, firm or corporation, engage in any business that is competitive with the Business; i.e. in a business involving the development, solicitation, offering, marketing, sale or service regarding or in connection with rich media ad serving and management system/platform or a like.

-3-

1.6    Employee agrees that during the Non-competition Period, Employee shall not discuss or accept any relationship as a sales or marketing representative, consultant, director, manager, officer, executive, or other employee, or representative with any person, firm or corporation which during the term of this Agreement was or is engaged in business activities which are competitive to the Business, except for any such relationship that would not in any way involve or relate to such activities or businesses.

1.7    During the Non-competition Period, Employee shall not directly or indirectly own or be a shareholder, partner of, or otherwise participate in any company that is engaged in business activities that are competitive to the Business. Notwithstanding, the above, Employee may hold up to a five percent (5%) interest in any such publicly held or traded company and shall have an unlimited right to invest in any mutual fund which is publicly traded or managed by a major financial institution.

1.8    During the Non-competition Period, Employee agrees to refrain from, directly or indirectly, soliciting or enticing the Company's employees or independent agents so as to induce them to leave their employment or relationship with the Company.

1.9    During the Non-competition Period, Employee shall inform any prospective new employer or associate prior to accepting any employment or any business relationship of the existence of this Agreement or provide such new employer with a copy of this Agreement.

1.10    In the event any covenant made in this Agreement shall be more restrictive than permitted by applicable law, it shall be limited to the extent which is so permitted. Nothing in this Agreement shall be construed as preventing the Company from pursuing any and all other remedies available to it for the breach or threatened breach of covenants made in this Agreement, including recovery of money damages or temporary or permanent injunctive relief. Accordingly, Employee acknowledges that the remedy at law for breach of the provisions of this agreement may be inadequate and that, in addition to any other remedy the Company may have, it shall be entitled to an injunction restraining any breach or threatened breach, without any bond or other security being required and without the necessity of showing actual damages.

2.    Employee Work Product

2.1    During the term of Employee's employment with the Company, Employee agrees to work exclusively for the Company.

2.2    Employee agrees to disclose in writing promptly to the Company all ideas, inventions, discoveries, improvements, designs, formulae, processes, production methods and technological innovations ("Intellectual Property"), whether or not patentable, which you may conceive or make, alone or with others, during your employment with the Company, whether or not during working hours, and which directly or indirectly

---

Eyeblaster, Inc.                    Confidential                    Page 3 out of 6 pages

-4-

**2.2.1**  relate to the Business of the Company; or

**2.2.2**  are based on or derived from your knowledge of the actual or planned business activities of the Company; or

**2.2.3**  are aided by the use of materials, facilities or information belonging to the Company.

**2.3**  Employee agrees to assign to the Company (and to bind his heirs, executors and administrators, to assign) all Intellectual Property covered by Section 2.2 of this Agreement.

**2.4**  Without further compensation, but at the Company's expense, Employee agrees to give all testimony and execute all patent applications, rights of priority, assignments and other documents, and in general do all lawful things requested of the Employee by the Company to enable the Company to obtain, maintain and enforce its rights to such Intellectual Property.

**2.5**  Employee also recognizes that any Intellectual Property of the type covered by Section 2.2 of this Agreement which is conceived or made by the Employee within one year of the termination of his employment with the Company is likely to have been conceived in significant part in the course of his employment with the Company. Accordingly, Employee agrees that any such Intellectual Property shall be presumed to have been conceived in the course of his employment with the Company unless and until Employee establishes the contrary by clear and convincing evidence.

**3.**  <u>Representations and Warranties by Employee.</u>

Employee represents and warrants to the Company that:

**3.1**  this agreement is valid and binding upon, and enforceable against, him in accordance with its terms;

**3.2**  he/she is not bound by or subject to any contractual or other obligation or any law that would be violated by his execution or performance of this agreement; and

**3.3**  he/she is not the subject of any pending or, to the best of his knowledge, threatened, claim, action, judgment, order, or investigation that could adversely affect his ability to perform his obligations under this agreement.

**4.**  <u>Notices.</u>  Any notice or other communication under this agreement shall be in writing and shall be considered given when delivered by hand, when telecopied upon confirmation of receipt, one day after being sent by overnight courier service or four days after being mailed by registered mail, return receipt requested, to the parties at the addresses set forth below (or at such other address as a party may specify by notice to the other in accordance with this provision):

---

-5-

4.1    If to Employee, at the address of the Employee last provided by the Employee to the Company.

4.2    If to the Company:

Eyeblaster, Inc.
220 Fifth Avenue, Floor 19th
New York, NY 10001, USA
Attention: Nir Yaron/COO
niry@eyeblaster.com / info@eyeblaster.com

5.    **Miscellaneous.**

5.1    This agreement may not be changed or terminated orally.

5.2    Employee may not assign any of his rights or delegate any of his duties under this agreement. The Company may assign any or all of its rights under this agreement to any subsequent owner of the Company's business, and the assignee shall have the right to enforce this agreement to the same extent as the Company.

5.3    No waiver of any term or condition of this agreement shall be deemed to be a waiver of any subsequent breach of that term or condition or any breach of any other term or condition of this agreement. Any waiver must be in writing.

5.4    This Agreement does not give Employee any rights to employment by the Company and, unless otherwise provided in another writing, executed by an officer of the Company and the Employee, the Employee's employment at the Company shall be at will by both Employee and the Company.

5.5    If any provision of this agreement would be deemed invalid or unenforceable for any reason, including, without limitation, because of its geographic or business scope or duration, such provision shall be construed in such a way as to make it valid and enforceable to the maximum extent possible. Any invalidity or unenforceability of any provision in this agreement shall not affect or render invalid or unenforceable any other provision of this agreement or any other agreement or instrument.

5.6    This Agreement shall be governed by and interpreted in accordance with the laws of the State of New York without regard to the conflict of laws principles thereof. Each of the Parties hereby consents to the exclusive jurisdiction and venue of the courts located in the State of New York, New York County for any dispute arising out of or related to this Agreement.

-6-

IN WITNESS WHEREOF, the Company has caused this Agreement to be duly executed and Employee has hereunto set his hand as of the date first set forth above.

Eyeblaster, Inc.

By: _____

Name: Nir Yaron

Title: C.O.O

Employee

Walter T. Geer III

## EMPLOYEE ACKNOWLEDGEMENTS:

1. The following is a complete list of inventions relevant to the subject matter of my employment by Eyeblaster, Inc. that have been made or conceived or first reduced to practice by me alone or jointly with others prior to my employment by Eyeblaster, Inc. I desire that such inventions be excepted from the restrictions set forth in this Agreement (check one):

_____ Inventions: _____

_____

_____ Additional Sheets Attached

__✓__ No Inventions

2. I propose to bring to my employment the following materials and documents of a former employer (check one):

__✓__ No materials or documents

_____ Additional Sheets Attached

_____ Inventions: _____

_____

Index No.

## SUPREME COURT OF THE STATE OF NEW YORK
## COUNTY OF NEW YORK

EYEBLASTER, INC.,

Plaintiff,

v.

WALTER GEER,

Defendant.

## COMPLAINT

QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

Michael B. Carlinsky

335 Madison Avenue, 17th Floor
New York, New York 10017
(212) 702-8100

*Attorney for Plaintiff Eyeblaster, Inc.*