JOEL L. FINGER
ERIC D. WITKIN
LITTLER MENDELSON
A Professional Corporation
Attorneys for Defendant
    John Abraham
900 Third Avenue, 20th Floor
New York, NY 10022
212.583.9600

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

EYEWONDER, INC.,

                   Plaintiff,

        -against-

JOHN ABRAHAM,

                   Defendant.

---

Civil Action No. 08 CV 3579 (GBD)

**AFFIDAVIT OF ERIC D. WITKIN (1) IN OPPOSITION TO PLAINTIFF'S MOTION TO DISMISS COUNTER-CLAIMS AND (2) IN SUPPORT OF DEFENDANT'S CROSS-MOTION FOR A STAY OF ARBITRATION**

**ECF CASE**

**ORAL ARGUMENT REQUESTED**

---

STATE OF NEW YORK      )
                       ) SS.:
COUNTY OF NEW YORK  )

        ERIC D. WITKIN, being duly sworn, deposes and says:

        1.    I am an attorney admitted to practice in New York and before this Court and Special Counsel to the law firm of Littler Mendelson, P.C., attorneys for Defendant John Abraham ("Defendant" or "Abraham") in the above captioned action. I make this affidavit (1) in opposition to the motion by Plaintiff EyeWonder, Inc. ("Plaintiff" or "EW") to dismiss Defendant's Counterclaims and (2) in support of Defendant's Cross-Motion for a stay of the arbitration Plaintiff initiated against him at the American Arbitration Association ("AAA") in

Atlanta, Georgia, AAA No. 30 116 00331 08 entitled *EyeWonder, Inc. and John Abraham,* ("Arbitration") in which the AAA has scheduled a preliminary hearing for August 4, 2008.

2.    I attach as Exhibit 1 a copy of Plaintiff's "Verified Complaint For Injunctive Relief in Aid of Arbitration" and its Exhibits filed April 14, 2008 in this action.

3.    I attach as Exhibit 2 a copy of Defendant's Amended Answer and Counterclaims filed June 20, 2008 in this action.

4.    I attach as Exhibit 3 a copy of Defendant's May 13, 2008 Declaration filed in this action.

5.    I attach as Exhibit 4 a copy of the AAA's July 31, 2008 letter to counsel for the parties in the Arbitration, scheduling a preliminary hearing for August 4, 2008.

ERIC D. WITKIN

Sworn to before me this
4th day of August, 2008

Notary Public

JOSEPH E. FIELD
Notary Public, State of New York
No. 31-4949589
Qualified in New York County
Commission Expires April 17, 2011

**EXHIBIT 1**

**JUDGE DANIELS**

**08 CV 3579**

KILPATRICK STOCKTON LLP
Lisa Pearson (LP 4916)
31 West 52nd Street, 14th Floor
New York, NY 10019
Telephone: (212) 775-8700
Facsimile: (212) 775-8815

James F. Bogan III
(Application for admission *pro hac vice* to be filed)
Suite 2800, 1100 Peachtree Street
Atlanta, Georgia 30309
Telephone: (404) 815-6467
Facsimile: (404) 541-3133

*Counsel for Plaintiff EyeWonder, Inc.*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
---------------------------------------------------------x
                                              :
EYEWONDER, INC.,                              :
                                              :
                          Plaintiff,          :  08 _____
                                              :
              v.                              :
                                              :
JOHN ABRAHAM,                                 :  VERIFIED COMPLAINT FOR
                                              :  INJUNCTIVE RELIEF IN AID
                          Defendant.          :  OF ARBITRATION
                                              :
---------------------------------------------------------x
```

Plaintiff EyeWonder, Inc. ("EyeWonder"), for its Verified Complaint against Defendant

John Abraham ("Abraham"), alleges as follows:

      1.     EyeWonder and its former employee Abraham are parties to an Employment

Agreement containing covenants by Mr. Abraham not to compete, not to solicit EyeWonder's

customers, and not to disclose EyeWonder's confidential business information for set periods of

time, among others. Upon information and belief, Abraham has recently accepted employment

from one of EyeWonder's direct competitors and has breached, or threatens to breach, these and other covenants, causing irreparable harm to EyeWonder. The Employment Agreement provides for binding arbitration in Atlanta, Georgia of any contractual disputes, but expressly exempts any action for injunctive or other preliminary relief to prevent violation of Mr. Abraham's covenants or to maintain the status quo until final resolution of the dispute. Accordingly, EyeWonder brings this action to obtain equitable relief in aid of arbitration, to prevent Abraham from breaching his covenants, and to maintain the status quo until this dispute is resolved.

## PARTIES, JURISDICTION, AND VENUE

2.      Plaintiff EyeWonder is a privately-held corporation organized and existing under the laws of Delaware. EyeWonder maintains its principal place of business at 233 Peachtree Street, Suite 500, Atlanta, Fulton County, Georgia 30303. EyeWonder also maintains an office at 19 West 44th Street, Suite 1410, New York, NY 10036.

3.      Defendant Abraham is an individual residing at 8328 Stewart Avenue, Los Angeles, California 90045. Pursuant to paragraph 9 of the Employment Agreement between the parties, a copy of which is attached as **Exhibit A** (the "Employment Agreement"), Mr. Abraham has consented to both the jurisdiction and venue of this Court.

4.      This Court has diversity jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332, because the matter in controversy (including, without limitation, EyeWonder's requests for injunctive relief herein), exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

US2000 10770359.3

## FACTS

**EyeWonder**

5.      EyeWonder began doing business in Atlanta, Georgia in 1999.  EyeWonder's

business consists almost exclusively of providing services for creating and delivering video and

other rich media advertisements over the Internet and wireless networks.

**Mr. Abraham's employment with EyeWonder**

6.      On June 1, 2007, Mr. Abraham transmitted to EyeWonder via facsimile a letter

signed by him (a copy of which is attached as **Exhibit B)**, accepting EyeWonder's offer of

employment to be the director of sales for its southwest sales region, consisting of Arizona, New

Mexico, California – south of Big Sur, and the southern halves of Utah and Colorado (the

"Region").  Soon thereafter, EyeWonder and Mr. Abraham entered into the Employment

Agreement **(Exhibit A)**, which is dated as of June 1, 2007, in which he was formally appointed

Regional Vice President of Sales for the Region.

7.      In his capacity as Regional Vice President, Mr. Abraham's primary

responsibilities were to (i) offer and sell EyeWonder's services to customers and prospective

customers, and (ii) supervise EyeWonder's account executives and other supporting sales

personnel in EyeWonder's Los Angeles office.  At all times during his employment with

EyeWonder, Mr. Abraham reported directly to its Senior Vice President of Global Sales, Michael

Rosner, who is based in EyeWonder's principal sales office in New York City.  During such

employment, Mr. Abraham communicated with Mr. Rosner on an almost daily basis, and the

account executives in EyeWonder's Los Angeles sales office worked closely, and collaborated

frequently on sales efforts, with the account executives based in the main sales office in NY.

- 3 -

Territory"). In Section 6(f) of the Employment Agreement, Mr. Abraham expressly acknowledged that "these areas are the primary locations in which [he] performs services for [EyeWonder], and thus the areas in which [his] provision of services in violation of the provisions of this Section 6(f) would cause significant harm to [EyeWonder]." Accordingly, such a restriction is reasonable and necessary to protect EyeWonder's legitimate business interests.

**Non-Solicitation**

13.    Section 6(e) of the Employment Agreement provides that during his employment with EyeWonder and for a period of 12 months after such employment, Mr. Abraham

> shall not solicit, directly or by assisting others, any Customer for the purpose of selling or otherwise providing to such Customer services for delivering video or other rich media advertisements over the Internet or over wireless networks.

Section 6(a)(ii) of the Employment Agreement specifically defines the term "Customer" as "a customer of [EyeWonder] that [Mr. Abraham], during the one-year period before the termination of employment, (i) was solicited or serviced by [Mr. Abraham] or another [EyeWonder] employee supervised by [Mr. Abraham] or (ii) about whom [Mr. Abraham] had Confidential Information."

**Non-Use and Non-Disclosure of Confidential Information**

14.    Section 6(b) of the Employment Agreement prohibits Mr. Abraham from using Confidential Information of EyeWonder except in connection with work for EyeWonder, and prohibits the disclosure of such Confidential Information during his employment and for two years following such employment.

15.    Section 6(a)(i) of the Employment Agreement defines "Confidential Information"

US2000 10770359 3

as

> information relating to Company's customers, operations, finances, and business in any
> form that derives value from not being generally known to other persons or entities,
> including without limitation technical or nontechnical data, formulas, patterns, customer
> purchasing practices and preferences, compilations (including compilations of customer
> information), programs (including computer programs and models), devices (including
> equipment used to manufacture Company's products), methods (including aesthetic and
> functional design and manufacturing methods), techniques (including style and design
> technology and plans), drawings (including product or equipment drawings), processes,
> financial data (including sales forecasts, sales histories, business plans, budgets and other
> forecasts), or lists of actual or potential Customers or suppliers (including identifying
> information about those Customers or suppliers), whether or not reduced to writing.

**Authorization of Injunctive Relief**

16.    Pursuant to Section 8 of the Employment Agreement, EyeWonder intends to

commence an arbitration proceeding in Atlanta, Georgia to adjudicate the merits of this dispute.

EyeWonder has filed this action in aid of arbitration, however, pursuant to Sections 7, 8(c) and 9

of the Agreement.  Section 8(c) of the Agreement expressly authorizes the filing of an action "for

injunctive or other preliminary relief to maintain the status quo until a dispute can be finally

resolved, or any action to prevent any violation or threatened violation of the covenants in

Section 6."

17.    EyeWonder and Mr. Abraham have expressly agreed that injunctive relief is

necessary in the event of a breach or threatened breach of Section 6 of the Employment

Agreement.  In addition to Section 8(c) quoted above, Section 7 of the Employment Agreement

provides that:

> Employee acknowledges that any breach of the terms of **Section 6** would result in
> material damage to Company, although it might be difficult to establish the monetary
> value of the damage.  Employee therefore agrees that Company, in addition to any other
> rights and remedies available to it, shall be entitled to obtain an immediate injunction
> (whether temporary or permanent) from any court of appropriate jurisdiction if any such
> breach, or a threat thereof, occurs which Company in good faith believes will or is likely
> to result in irreparable harm to Company.

- 6 -

18.    Regarding the forum for resolving claims for injunctive relief, Section 9 of the Employment Agreement provides that:

> This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of New York, without regard to its conflict of laws rules. Employee hereby consents to the exclusive jurisdiction of the U.S. District Court or the court of the State of New York for the district or circuit in which New York, NY is located, and hereby waives any objection Employee might otherwise have to jurisdiction and venue in such court if an action is brought in such court to resolve a dispute between the parties related to Employee's employment which is not subject to the arbitration provisions of Section 8.

**Mr. Abraham's Departure from EyeWonder**

19.    On March 21, 2008, Mr. Abraham phoned Jerome Connell, EyeWonder's General Counsel and COO, and stated during the conversation that he had been offered a position with "a wireless startup" and was giving his two weeks notice to terminate his employment with EyeWonder. Shortly thereafter, Mr. Abraham sent an e-mail communication to Mr. Connell which provided, in part, "As I mention. I am going on vacation and have offer for a another play. So I am giving my two weeks." (Typographical and grammatical errors in original.) Attached hereto as **Exhibit C** is a copy of a March 26, 2008 e-mail communication sent by Mr. Connell to Mr. Abraham in response, which includes the text of Mr. Abraham's March 21 e-mail communication described above.

20.    Mr. Abraham, however, has not informed EyeWonder of the identity of the party with which Mr. Abraham has accepted employment, notwithstanding a clear contractual obligation to do so. In this regard, Section 6(h) of the Employment Agreement provides that:

> At any time before, and for 12 months after, the termination or expiration of Employee's employment, Employee shall provide any prospective employer with a copy of this Agreement, and upon accepting any employment with another company, shall provide Company with such company's name and a description of the services Employee will provide to such company.

21.    EyeWonder has learned that Mr. Abraham has accepted, or imminently intends to accept, employment with Eyeblaster, Inc. ("Eyeblaster").  Eyeblaster is a Delaware corporation that maintains its headquarters at 135 West 18th Street, 5th Floor, New York, NY 10011. Eyeblaster is one of a small handful of providers in the world that compete with EyeWonder by offering and selling directly competitive services for delivering video and other rich media advertisements.

22.    Upon information and belief, Mr. Abraham has accepted, or intends to accept an employment position with Eyeblaster in which he will (i) offer and sell to customers and prospective customers Eyeblaster's services for delivering video and other rich media advertisements over the Internet or over wireless networks, and (ii) supervise the sales staff based in Eyeblaster's Los Angeles office, which staff is engaged in offering and selling on behalf of Eyeblaster services for delivering video and other rich media advertisements over the Internet or over wireless networks, all in direct competition with EyeWonder.

23.    Mr. Abraham's acceptance of employment with Eyeblaster clearly would violate Section 6(f) of the Employment Agreement.

24.    In his position as Regional Vice President of sales for the Region, Mr. Abraham's primary responsibilities were to call on and maintain high-level relationships with customers and prospective customers in the Region, which has a primary focus on customers in Southern California, and managing and supervising EyeWonder's account managers for the Region. The services he provided to EyeWonder were unique.  When he joined EyeWonder in June 2007, the Region was assigned billing goals of $1,150,000 for the period ending September 30, 2007 and $1,350,000 for the period of October 1 – December 31, 2007.  Under his supervision, the Region exceeded its goals during both periods, generating a total of $4,059,712 during the combined

- 8 -

period (as compared to $978,360 for the Region during the same period in the prior year). In addition to his monthly base salary of $10,000, Mr. Abraham also received over $70,000 in bonus compensation for the June-December 2007 period, due to the performance of the Region. Also, during 2007, EyeWonder's net income was approximately 12% of its total revenues, which translates to billings from the Region having generated profits of approximately $500,000 during June through December 2007 alone. Mr. Abraham accepting employment with Eyeblaster would jeopardize these profits, especially given his unique position with the company as the supervisor of the Region; his relationships with EyeWonder's customers and prospective customers in the Region, and the account managers that he supervised; and the nature and quality of the Confidential Information to which he was exposed. Therefore, the amount in controversy clearly exceeds the sum or value of $75,000.00, as measured from EyeWonder's perspective.

### FIRST CLAIM FOR RELIEF
#### Breach of Contractual Duty to Disclose Identity of Prospective Employer

25.    EyeWonder incorporates by reference, as if fully set forth herein, the allegations contained in paragraphs 1-24 of this Verified Complaint.

26.    Section 6(h) of the Employment Agreement clearly obligates Mr. Abraham to (a) "provide any prospective employer with a copy of this [Employment] Agreement," and (b) "provide [EyeWonder] with such company's name and a description of the services [Mr. Abraham] will provide to such company."

27.    Upon information and belief, Mr. Abraham has, in fact, accepted employment with Eyeblaster. In such event, Mr. Abraham, by telling Mr. Connell that he would be accepting employment with "a wireless startup" and not disclosing the actual identity of his new employer, has violated his contractual obligation to disclose the identity of his prospective employer to

US2000 10770359.3

EyeWonder and describe the nature of the services he will provide to such employer. EyeWonder also fears that Mr. Abraham has violated his contractual obligation to provide such prospective employer with a copy of the Employment Agreement.

28.    Under the circumstances of this case, EyeWonder is entitled to an order requiring Mr. Abraham to specifically perform his contractual obligations under Section 6(h) of the Employment Agreement, including without limitation an order requiring Mr. Abraham to disclose the identity of his prospective (or current) employer and describe the nature of the services he will provide to that employer.

### SECOND CLAIM FOR RELIEF
### Breach of Non-Competition Provision

29.    EyeWonder incorporates by reference, as if fully set forth herein, the allegations contained in paragraphs 1-28 of this Verified Complaint.

30.    Under Section 6(f) of the Employment Agreement (the "Non-Competition Provision"), Mr. Abraham agreed not to, in the Prohibited Territory, sell or solicit for sale services to deliver video or other rich media advertisements over the Internet or over wireless networks for a period of 12 months after his employment with EyeWonder came to an end.

31.    The Non-Competition Provision protects EyeWonder's legitimate business interests, including, but not limited to, trade secrets and proprietary business information, relationships with prospective or existing customers and clients, customer goodwill associated with ongoing business or professional practice, and specialized training provided at EyeWonder's expense.

32.    The Non-Competition Provision is reasonably limited in time, territorial effect

- 10 -

and scope of prohibited activities, and it is narrowly tailored to protect EyeWonder's legitimate business interests.

33.     Upon information and belief, Mr. Abraham has already materially breached, or imminently will materially breach, the Non-Competition Provision by competing with EyeWonder in the Prohibited Territory. Given Mr. Abraham's concealment of information from EyeWonder, notwithstanding a clear contractual obligation to do so, a factual inference can be made that Mr. Abraham has, in fact, accepted employment with a competitor of EyeWonder. If Mr. Abraham is allowed to offer or sell on behalf of another party in the Prohibited Territory services for delivering video or other rich media advertisements over the Internet or wireless networks, such action will constitute a material breach of Section 6(f) of the Employment Agreement and will cause immediate and irreparable injury to EyeWonder.

34.     EyeWonder has suffered or imminently will suffer irreparable harm as a result of Mr. Abraham's breach of the Employment Agreement, and therefore is entitled to injunctive relief under Sections 6 and 9 thereof.

35.     Under these circumstances, a temporary restraining order and preliminary injunction in aid of arbitration is a necessary and appropriate remedy that will allow EyeWonder to maintain the *status quo* pending a resolution of the merits of the case. Such injunctive relief will also prevent Mr. Abraham from causing irreparable harm to EyeWonder by performing services for Eyeblaster, one of EyeWonder's direct competitors.

### THIRD CLAIM FOR RELIEF
#### Breach of Non-Solicitation Provision

36.     EyeWonder incorporates by reference, as if fully set forth herein, the allegations contained in paragraphs 1-35 of this Verified Complaint.

- 11 -

37.    Under Section 6(f) of the Employment Agreement (the "Non-Solicitation Provision"), Mr. Abraham agreed not to solicit, directly or by assisting others, any Customer (as defined in the Employment Agreement) for the purpose of selling or otherwise providing to such Customer services for delivering video or other rich media advertisements over the Internet or over wireless networks.

38.    The Non-Solicitation Provision is narrowly tailored, prohibiting the solicitation of only those EyeWonder customers with which Mr. Abraham or an individual under his direct supervision had specific contact and dealings, and protects EyeWonder's legitimate business interests, including EyeWonder's goodwill and customer relationships, in which EyeWonder has invested substantial time, money and resources, as well as future transactions and business relationships with existing and former customers.

39.    Upon information and belief, Mr. Abraham has either materially violated or will imminently materially violate the Non-Solicitation Provision.  In particular, if Mr. Abraham is allowed to solicit EyeWonder's Customers, whether directly or through staff acting under his direction, to purchase from another party services for delivering video or other rich media advertisements over the Internet or wireless networks, it will constitute a material breach of Section 6(e) of the Employment Agreement and will cause immediate and irreparable injury to EyeWonder.

40.    Under these circumstances, a temporary restraining order and preliminary injunction in aid of arbitration is a necessary and appropriate remedy that will allow EyeWonder to maintain the *status quo* pending a resolution of the merits of the case and to prevent Mr. Abraham from causing irreparable harm to EyeWonder by soliciting its customers.

- 12 -

## FOURTH CLAIM FOR RELIEF
### Breach of Non-Disclosure Provision

41.    EyeWonder incorporates by reference, as if fully set forth herein, the allegations contained in paragraphs 1-40 of this Verified Complaint.

42.    Under Section 6(b) of the Employment Agreement (the "Non-Disclosure Provision"), Mr. Abraham agreed not to use or disclose to others any of EyeWonder's Confidential Information (as defined in the Employment Agreement) for a period of two years after his employment terminated.

43.    Mr. Abraham has been exposed to extensive EyeWonder Confidential Information, including that relating to EyeWonder's business and pricing plans and strategies, national and regional sales plans (including client assignments, and quarterly and annual sales goals, for each EyeWonder sales employee in the Region), hiring strategies, product developments and rollouts that are underway and under consideration, and strategic plans for developing advantages over its competitors, both in terms of product/service offerings and sales strategies.

44.    EyeWonder's confidentiality policy protects its legitimate business interest in the economic value derived from its Confidential Information.  Any disclosure or use of EyeWonder's Confidential Information outside of the restrictions set in place by EyeWonder will irreparably reduce the value of that information by diminishing the competitive advantages it provides.

45.    Upon information and belief, Mr. Abraham has either materially breached or will imminently materially breach the Non-Disclosure Provision by using or disclosing EyeWonder's Confidential Information and trade secrets.  In particular, if Mr. Abraham is allowed to offer on

- 13 -

behalf of another party services for delivering video or other rich media advertisements over the Internet or over wireless networks, or to direct and supervise others who do so, he will inevitably use or disclose EyeWonder's Confidential Information. Such use and disclosure will constitute a material breach of Section 6(b) of the Employment Agreement and a misappropriation of EyeWonder's Confidential Information and trade secrets, and will cause immediate and irreparable harm to EyeWonder in the form of irrecoverable economic loss in the value of EyeWonder's Confidential Information.

46.    Under these circumstances, a temporary restraining order and preliminary injunction in aid of arbitration is a necessary and appropriate remedy that will allow EyeWonder to maintain the *status quo* pending a resolution of the merits of the case and to prevent Mr. Abraham from causing irreparable harm to EyeWonder by using or disclosing its Confidential Information.

WHEREFORE, Plaintiff EyeWonder, Inc. respectfully prays that this Court ORDER and ADJUDGE as follows:

(a) enter an order directing Mr. Abraham to specifically perform his obligations under Section 6(h) of the Employment Agreement by providing his prospective or current employer with a copy of that agreement and to disclose to EyeWonder such company's name and a description of the services he will provide to such company;

(b) enter an order directing Mr. Abraham to comply with Section 6(f) of the Employment Agreement and thereby preliminarily and permanently enjoin him for a period of twelve (12) months from offering or selling on behalf of any third party within the Prohibited Territory services for delivering video or other rich media advertisements over the Internet or over wireless networks;

- 14 -

US2000 10770359 1

(c) enter an order directing Mr. Abraham to comply with Section 6(e) of the Employment Agreement and thereby preliminarily and permanently enjoin him for a period of twelve (12) months from soliciting EyeWonder's Customers, as defined in the Employment Agreement, to procure such services from any other party;

(d) enter an order directing Mr. Abraham to comply with Section 6(b) of the Employment Agreement and thereby preliminarily and permanently enjoin him for a period of two (2) years from using on behalf of, or disclosing to any other party, EyeWonder's Confidential Information; and

(e) awarding such other and further relief as this Court may deem just and proper.

Dated April 11, 2008.

KILPATRICK STOCKTON LLP

Lisa Pearson (LP 1916)
31 West 52nd Street, 14th Floor
New York, NY 10019
Tel: (212) 775-8700
Fax: (212) 775-8800
(lpearson@kilpatrickstockton.com)

James F. Bogan III
Georgia Bar No.: 065220
1100 Peachtree Street, Suite 2800
Atlanta, GA 30309
(404) 815-6500
(jbogan@kilpatrickstockton.com)

- 15 -

## VERIFICATION

I declare under penalty of perjury that the foregoing is true and correct.

This 11th day of April, 2008.

Jerome F. Connell, Jr.
EyeWonder, Inc. General Counsel and COO

# EXHIBIT A

# EMPLOYMENT AGREEMENT

THIS AGREEMENT is made and entered into as of June 1, 2007 between **EYEWONDER, INC.**, a Delaware corporation ("Company"), and the employee executing this Agreement below ("Employee").

WHEREAS, Company is engaged in the business of creating and delivering rich media advertisements over the Internet and over wireless networks, and providing related services (the "Company Business");

WHEREAS, Employee desires to offer and sell Company's products and services on behalf of Company; and

WHEREAS, the parties hereto desire to enter into an agreement for Company's employment of Employee on the terms and conditions contained herein.

THEREFORE, for and in consideration of the premises and the mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.     **Employment.** Subject to the terms and conditions of this Agreement, Employee shall be employed by Company as Regional Vice President of Sales for the region designated by the Company from time to time as its southwest region (Arizona, New Mexico, California – south of Big Sur, and the southern halves of Utah and Colorado). Employee's title and duties may be changed, and Employee may be promoted to a higher position within Company. Employee acknowledges that he has been informed of and had an opportunity to discuss with Company the specific activities Employee will perform as services, and that Employee understands the scope of the activities constituting services. Employee hereby accepts such employment and agrees to perform such duties as may be assigned to Employee. Employee represents to Company that he: (a) is under no contractual or other restriction or obligation inconsistent with the execution of this Agreement, the performance of duties hereunder, or any other rights of Company hereunder; and (b) is under no physical or mental disability that would hinder Employee's performance of duties hereunder.

2.     **Time Commitment.** Employee shall devote his full business related time and best efforts to accomplishing Employee's duties, at such locations as may be reasonably requested by Company.

3.     **Conflict of Interest.** While employed by Company, Employee shall not engage in any business activities with any other business enterprise without the Company's prior written consent. Without limiting the foregoing, Employee shall not serve as principal, partner, employee, officer or director of, or consultant to, any other business or entity conducting business for profit without the Company's prior written approval. In addition, under no circumstances will Employee have any financial interest in any competitor of Company during the term of employment; provided, that Employee may invest in no more than one percent of the outstanding stock or securities of any competitor, the stock or securities of which are traded on a national stock exchange of any country.

4.     **Term and Termination.** Employee's employment with Company shall continue unless and until terminated by either party in accordance with this Section 4.

(a)    Either party may terminate this Agreement immediately by giving written notice to the other at any time, with or without Cause (defined below).  For purposes of this Agreement, "Cause" means: (i) Employee's conviction of a felony under state or federal law, or Employee's commission of an act of employment discrimination or sexual harassment under state or federal law; (ii) Employee's continued breach of any provision of this Agreement for a period of 30 days after written notice of such breach is given by Company; (iii) Employee's failure to comply with any directive of Company's Vice President of North American Sales (or any successor position with authority for managing Company's sales force) that continues for 10 days after written notice thereof is given to Employee; (iv) Employee's violation of any provision of Section 6; (v) Employee taking actions in conflict of interest with the Company or any of its subsidiaries or affiliates, given Employee's position with the Company; (vi) Employee's usurpation of a corporate opportunity of the Company or any of its subsidiaries of affiliates; (vii) Employee's failure to perform any of his/her duties or responsibilities hereunder; or (viii) Employee's voluntary cessation of employment before the Expiration Date.

(b)    Termination upon Death or Disability.  Employee's employment shall terminate upon Employee's death or Disability.  For purposes of this Agreement, "Disability" means that Employee, because of illness, incapacity or other physical or mental disability, is unable to perform a substantial portion of Employee's duties pursuant to this Agreement and either (i) Company has made a reasonable determination that such circumstances will continue for at least 90 days, considering Employee's physical or mental condition, or (ii) Employee has not performed such duties for a period of 90 consecutive days during any 12-month period during the term of this Agreement.

(c)    Survival of Provisions.  Upon termination of Employee's employment for any reason whatsoever (whether by Employee or by Company), the obligations of Employee pursuant to Section 6 shall survive and remain in effect.

5.    Compensation and Benefits.  During the term of Employee's employment with Company hereunder:

(a)    Salary.  Company shall pay to Employee base salary for services rendered during the term of this Agreement at the annual rate of $120,000, to be earned and payable in accordance with Company's normal payroll practices for similarly situated employees.

(b)    Bonus.  Employee shall be entitled to receive bonuses in accordance with Company's Sales Compensation Plan (the "Plan") then in effect from time to time, based on the total billings credited to the Employee and to the account executives in Employee's sales region.  Attached at Exhibit A are the target billing and bonus amounts for such region for 2007, and a copy of the Plan as in effect as of the date of this Agreement.

(c)    Other Benefits.  Employee shall be entitled to participate in Company's 401(k) savings plan, insurance plans and other benefit plans provided for similarly situated employees in the office where Employee performs services for Company.

(d)    Expenses.  Employee shall be entitled to reimbursement by Company for all reasonable travel, lodging, entertainment and other expenses actually incurred by Employee in connection with performing his/her duties, according to Company policy, such reimbursement to be made against receipts or other appropriate evidence of such expenditures.

(e)    Vacation.  Employee shall be entitled to two weeks of paid vacation annually (with not more than one week being taken consecutively without the prior approval of Company's V.P. North American Sales), subject to and in accordance with Company's standard vacation policy in effect from time to time, as well as specified paid legally recognized holidays pursuant to and in accordance with Company's employee handbook.

2

(f)     Withholding.  All amounts payable to Employee pursuant to this Section 5 shall be subject to required withholdings for taxes and other amounts as well as all deductions authorized or approved by Employee.

6.     Restrictive Covenants.

(a)     Definitions.  As used in this Section 6, the following terms shall have the meanings ascribed to such terms as set forth below.

(i) "Confidential Information" - information relating to Company's customers, operations, finances, and business in any form that derives value from not being generally known to other persons or entities, including without limitation technical or non-technical data, formulas, patterns, customer purchasing practices and preferences, compilations (including compilations of customer information), programs (including computer programs and models), devices (including equipment used to manufacture Company's products), methods (including aesthetic and functional design and manufacturing methods), techniques (including style and design technology and plans), drawings (including product or equipment drawings), processes, financial data (including sales forecasts, sales histories, business plans, budgets and other forecasts), or lists of actual or potential Customers or suppliers (including identifying information about those Customers or suppliers), whether or not reduced to writing.  Confidential Information does not include information that: was known to or in the possession of Employee before Employee's employment with Company; before or after the time of disclosure becomes a part of the public knowledge or literature other than as a result of any improper action or inaction of Employee; or is independently developed by Employee without any use of the Confidential Information.  Confidential Information not constituting a trade secret under applicable law shall be treated as Confidential Information under this Agreement for two years after the expiration or termination of Employee's employment.

(ii) "Customer" - a customer of Company that, during the one-year period before the termination of employment, (i) was solicited or serviced by Employee or another Company employee supervised by Employee, or (ii) about which Employee had Confidential Information.

(b)     Non-disclosure and Restricted Use.  Employee shall to use his best efforts to protect Confidential Information.  Employee shall not use, except in connection with work for Company, and will not disclose during or two years following Employee's employment, Company's Confidential Information.

(c)     Return of Materials.  Upon the termination for any reason of Employee's employment, or at any time at Company's request, Employee shall deliver promptly to Company all materials, documents, plans, records, notes, computer programs, disks, tapes and codes, other papers or materials, and any copies thereof (in any form) in Employee's possession or control relating in any way to Company's Business, which at all times shall be Company's property.

(d)     Non-solicitation of Company Employees.  During employment, Employee shall not, for him/herself or for or on behalf of any other party, employ or solicit for employment any Company employee.  For 12 months after Employee's employment expires or terminates for any reason,

3

Employee shall not, for him/herself or for or on behalf of any other party, employ or solicit for employment anyone who Company employed during the shorter of the (i) period Employee was employed by Company, or (ii) six-month period immediately before Employee's employment expired or terminated.

(e)    Limitations on Post-Termination Customer Solicitation.  During employment and for 12 months after Employee's employment expires or terminates for any reason, Employee shall not solicit, directly or by assisting others, any Customer for the purpose of selling or otherwise providing to such Customer services for delivering video or other rich media advertisements over the Internet or over wireless networks.

(f)    Limitations on Post-Termination Competition.  During employment and for 12 months after the expiration or termination for any reason (unless Employee is terminated by Company without Cause before the Expiration Date) of Employee's employment, Employee shall not, for or on behalf of any person, firm or entity located within, or within 20 miles of, the city limits of Los Angeles or San Diego, CA sell or solicit for sale services to deliver video or other rich media advertisements over the Internet or over wireless networks.  Employee acknowledges that these areas are the primary locations in which Employee performs services for Company, and thus the areas in which Employee's provision of services in violation of the provisions of this Section 6(f) would cause significant harm to Company

(g)    Disparagement.  Employee shall not at any time make false or misleading statements about Company, including its products, management, employees, customers or suppliers.

(h)    Future Employment Opportunities.  At any time before, and for 12 months after, the termination or expiration of Employee's employment, Employee shall provide any prospective employer with a copy of this Agreement, and upon accepting any employment with another company, shall provide Company with such company's name and a description of the services Employee will provide to such company.

(i)    Work For Hire Acknowledgment; Assignment.  Employee acknowledges that Employee's work on and contributions to documents, programs, and other expressions in any tangible medium (collectively, "Works") are within the scope of Employee's employment and part of Employee's duties and responsibilities.  Employee's work on and contributions to the Works will be rendered and made by Employee for, at the instigation of, and under the overall direction of, Company, and are and at all times shall be regarded, together with the Works, as "work made for hire" as that term is used in the United States copyright laws.  Without limiting this acknowledgment, Employee hereby assigns, grants, and delivers exclusively to Company all rights, titles, and interests in and to any such Works, and all copies and versions, including all copyrights and renewals.  Employee shall execute and deliver to Company, its successors and assigns, any assignments and documents Company requests for the purpose of establishing, evidencing, and enforcing or defending its complete, exclusive, perpetual and worldwide ownership of all rights, titles and interests of every kind and nature, including all copyrights, in and to the Works, and Employee constitutes and appoints Company as Employee's agent to execute and deliver any assignments or documents Employee fails or refuses promptly to execute and deliver, this power and agency being coupled with an interest and being irrevocable.

(j)    Inventions, Ideas and Patents.  Employee shall disclose promptly to Company (which shall receive it in confidence), and only to Company, any invention or idea of Employee (developed alone or with others) conceived or made during Employee's employment by Company, and within six months of the date of termination of employment for whatever reason if such invention or idea

4

relates to the Company Business. Employee hereby assigns to Company any such invention or idea in any way connected with Employee's employment with Company or related to the Company Business, research or development, or demonstrably anticipated research or development, and shall cooperate with Company and sign all documents deemed necessary by Company to enable it to obtain, maintain, protect and defend patents covering such inventions and idea, and to confirm Company's exclusive ownership of all rights in such inventions, ideas and patents. Employee irrevocably appoints Company as Employee's agent to execute and deliver any assignments or documents Employee fails or refuses to execute and deliver promptly, this power and agency being coupled with an interest and being irrevocable. This constitutes Company's written notification that this assignment does not apply to an invention for which no equipment, supplies, facility or trade secret information of Company was used and which was developed entirely on Employee's own time, unless (i) the invention relates (A) directly to the Company Business, or (B) to Company's actual or demonstrably anticipated research or development, or (ii) the invention results from any work performed by Employee for Company.

7. **Injunctive Relief.** Employee acknowledges that any breach of the terms of Section 6 would result in material damage to Company, although it might be difficult to establish the monetary value of the damage. Employee therefore agrees that Company, in addition to any other rights and remedies available to it, shall be entitled to obtain an immediate injunction (whether temporary or permanent) from any court of appropriate jurisdiction if any such breach, or a threat thereof, occurs which Company in good faith believes will or is likely to result in irreparable harm to Company.

8. **Dispute Resolution.** (a) Any controversy or claim arising out of or relating to this Agreement, or the breach thereof, including but not limited to a claim based on or arising from an alleged tort, shall be settled by binding arbitration held in Atlanta, Georgia in accordance with the Commercial Arbitration Rules of the American Arbitration Association (the "AAA") then in effect, and following the law of the State specified in Section 9, and the award rendered by the arbitrator shall be binding between the parties and judgment on such award may be entered in any court having jurisdiction thereof. One arbitrator familiar with commercial contracts shall be appointed by the AAA to conduct such proceeding. Notice of a demand for arbitration of any dispute subject to arbitration by one party shall be filed in writing with the other party and with the AAA. A stenographic record shall be made of all arbitration hearings. The parties shall share all costs of arbitration, but each party shall be responsible for its respective attorneys' costs, fees and expenses, unless the arbitrators otherwise determine. All claims shall be arbitrated individually, and there shall be no consolidation or class treatment of any claim. All statutes of limitation which would otherwise be applicable in a judicial action brought by a party shall apply to any arbitration and shall be given effect by the arbitrators. The arbitrator shall have no authority to award punitive damages or any other damages not measured by the prevailing party's actual damages, nor shall any party seek punitive damages relating to any matter arising from this Agreement in any other forum.

(b) The United States Arbitration Act and federal arbitration law shall govern the interpretation, enforcement and proceedings pursuant to the arbitration clause set forth in this Section 8. Judgment on the award rendered by the arbitrators may be entered in any court having jurisdiction thereof, and by signing and delivering this Agreement, each party accepts for itself and in respect to its property, the jurisdiction of any court having jurisdiction.

(c) Notwithstanding the foregoing, the provisions of this Section 8 shall not apply to any action for injunctive or other preliminary relief to maintain the *status quo* until a dispute can be finally resolved, or any action to prevent any violation or threatened violation of the covenants in Section 6.

9.    **Governing Law.**  This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of New York, without regard to its conflict of laws rules. Employee hereby consents to the exclusive jurisdiction of the U.S. District Court or the court of the State of New York for the district or circuit in which New York, NY is located, and hereby waives any objection Employee might otherwise have to jurisdiction and venue in such court if an action is brought in such court to resolve a dispute between the parties related to Employee's employment which is not subject to the arbitration provisions of Section 8.

10.    **Notices.**  All notices, consents and other communications required or authorized to be given by either party to the other under this Agreement shall be in writing and shall be deemed to have been given or submitted (i) upon actual receipt if delivered in person or by facsimile transmission, (ii) upon the earlier of actual receipt or the expiration of three business days after sending by express courier (such as UPS or Federal Express), and (iii) upon the earlier of actual receipt or the expiration of five days after mailing if sent by registered or certified express mail, postage prepaid, to the parties at the addresses on the signature page to this Agreement. Employee shall be responsible for providing Company with a current address. Either party may change its address or facsimile number for purposes of notices under this Agreement by providing notice to the other party as provided in this Section 10.

11.    **Failure to Enforce.**  The failure of either party hereto at any time, or for any period of time, to enforce any provision of this Agreement shall not be construed as a waiver of such provision or of the right of such party thereafter to enforce each and every such provision.

12.    **Binding Effect.**  This Agreement shall inure to the benefit of, and be binding upon, Company and its successors and assigns, and Employee and his heirs and personal representatives. Any business entity or person succeeding to substantially all of the business of Company by purchase, merger, consolidation, sale of assets or otherwise shall be bound by and shall adopt and assume this Agreement, and Company shall obtain the assumption of this Agreement by such successor if such is not accomplished by operation of law.

13.    **Entire Agreement.**  This Agreement supersedes all prior discussions and agreements between the parties, and constitutes the sole and entire agreement between Company and Employee with respect to the subject matter hereof. This Agreement shall not be modified or amended except pursuant to a written document signed by the parties hereto, which specifically refers to this Agreement.

14.    **Severability.**  The rights and remedies of Company referenced in this Agreement are cumulative and nonexclusive of one another, and Employee's covenants and agreements contained herein are severable and independent of one another. The existence of any claim by Employee against Company, whether predicated on this Agreement or otherwise, shall not constitute a defense to enforcement by Company of any or all of such covenants or agreements of Employee hereunder. If any provision of this Agreement is held to be illegal, invalid or unenforceable by a court of competent jurisdiction, it is the intention of the parties that the remaining provisions shall constitute their agreement with respect to the subject matter hereof, and all such remaining provisions shall continue in full force and effect. Without limiting the foregoing, although the parties hereto have, in good faith, used their best efforts to make the covenants in Section 6 reasonable in all respects and do not anticipate or intend that any court of competent jurisdiction would conclude otherwise or would find it necessary or appropriate to reform any such covenant, if any such covenant is held by a court of competent jurisdiction to be unreasonable, arbitrary or against public policy, such covenant will be considered to be divisible with respect to scope, time and geographic area, and such lesser scope, time, and geographic area, or all of them, as a court of competent jurisdiction may determine to be reasonable, not arbitrary, and not against public policy, will be effective, binding and enforceable against Employee.

6

15.    **Counterparts.**  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

*IN WITNESS WHEREOF,* Company and Employee have executed this Agreement as of the date first above written.

JOHN ABRAHAM

8328 Stewart Avenue
Los Angeles, California 90045

EYEWONDER, INC.

By

Jerome F. Connell, Jr.
General Counsel and COO

233 Peachtree Street
Suite 500
Atlanta, Georgia 30303
Fax: (678) 891-2017
Attention: General Counsel

7

## EXHIBIT A

|  | Q1 | Q2 | Q3* | Q4 |
|---|---|---|---|---|
| Target Billings | N/A | N/A | $1,150,000 | $1,350,000 |
| Target Bonus | N/A | N/A | $30,000 | $40,000 |

*Including June billings

## EYEWONDER, INC. SALES COMPENSATION PLAN
### (Effective March 1, 2007)

This *Sales Compensation Plan* (the "Plan") is effective March 1, 2007 for salespersons (each, a "Salesperson") employed by EyeWonder, Inc. ("EW") and continues in effect until modified or replaced. EW will use its best efforts to provide Salespersons at least 30 days notice of any Plan modification or replacement, and no modification or replacement will affect the computation of any bonus or commission earned before the effective date of the change.

**Bonus Amount.** In addition to any base salary payable under his or her employment agreement, each Salesperson in good standing will be entitled to bonus based on the amount of billings for which s/he is credited ("Billings") in each calendar quarter according to the Plan. Unless provided otherwise in the applicable employment agreement, a Salesperson will be assigned a target Billing amount for each quarter and a target bonus amount. If the Salesperson's Billings for the quarter equal his or her target Billing amount for such quarter, s/he will be eligible to receive the full target bonus amount for such quarter. If the Salesperson's Billings equal 85% of his or her target Billing amount, s/he will be eligible to receive 75% of the target bonus amount. If the Salesperson's Billings equal 75% of his or her target Billing amount for such quarter, s/he will be eligible to receive 50% of the target bonus amount for such quarter. Unless provided otherwise in the applicable employment agreement, if a Salesperson is credited for Billings in excess of his or her target amount for any quarter, s/he will be eligible to receive an override equal to 5% of the amount of such excess; if the excess amount is 25% or more of the Salesperson's target amount, the override percentage for that quarter will be 7.5%; if the excess amount is 50% or more of the Salesperson's target amount, the override percentage for that quarter will be 10%.

**Payment.** Each Salesperson who is an EW employee in good standing on the 15th day of a particular calendar month will receive advances equal to 2% of the Billings for which that Salesperson was credited during the preceding calendar month. Each Salesperson who is an EW employee in good standing 30 days after the end of any calendar quarter also will receive (i) any bonus payment attained for his or her Billings for such quarter, less any advances previously made to that Salesperson for Billings during that quarter, and (ii) any override attained for such quarter

**Example.** Assume that for Q1, a Salesperson has a target Billing amount of $25,000 and a target bonus amount of $1,500. Assume that the Salesperson is in good standing at all times through May 1, and that s/he is credited with $10,000 in Billings for each January, February and March. On each of February 15, March 15 and April 15, the Salesperson would receive an advance of $200 (2% of the Billings for the preceding month). On April 30, the Salesperson would receive a bonus payment of $900 (the target amount of $1,500 less the $600 in advances) plus $250 in override (5% of the $5,000 excess of Billings over the target Billing amount).

i

**Uncollected Billings.** If any Billing for which a Salesperson has been credited is not collected by EW within 180 days after the date of invoice, the uncollected amount will be subtracted from the total Billings credited to such Salesperson for the month in which the invoice became 180 days past due, except where, in management's reasonable opinion, nonpayment was due to a bona fide service failure.

**Non-Standard Terms.** Amounts received by EW for services will be credited as Billings only where the rates and charges equal or exceed EW's minimum rate then in effect for the particular service provided. This applies to CPM rates as well as per-campaign minimums. EW's standard rate card and the "no-below" rate card that includes the minimum acceptable rates will be available to all Salespersons at all times and they will be notified in advance of any impending changes. Two exceptions apply: 1) a Salesperson will be given full credit for Billings to an advertising agency at rates below the then-current minimum if such rates are set forth in an approved (by EW's CFO) agreement that has been signed by the paying agency before the launch of the campaign to which such Billings relate, and 2) where Billings to a publisher are at rates below the then-current minimum under an approved (by EW's CFO) agreement that has been signed by the publisher before the launch of the campaign, the Salesperson will be credited for Billings in an amount equal to 50% of the amount billed to that publisher.

**Direct to EW Campaigns.** Billings on campaigns submitted to EW directly from a publisher or advertising network with no meaningful involvement from a Salesperson will not be credited to any Salesperson. For purposes of computing Billing credit, the primary factor in determining whether a Salesperson was meaningfully involved will be the properties on which the campaign is running. If it runs on only properties owned by/included in the submitting publisher or network, the assumption is that there was no Salesperson played a meaningful part in procuring the campaign for EW. A Salesperson is urged to contact his/her supervisor if s/he believes that s/he played a significant part in procuring for EW a campaign submitted to EW by a publisher or network and which is running only on properties owned by/included in the submitting publisher or network. If a campaign submitted by a particular publisher or network also runs on other properties, the Salesperson (if any) responsible for procuring such campaign for EW will receive credit for the Billings for such campaign.

**Departure.** If a Salesperson voluntarily leaves EW's employ or is terminated by EW with cause (as defined in such Salesperson's employment agreement with EW), then such Salesperson will not be entitled to receive any bonus or commission payment that otherwise would have been made to such Salesperson after the date of departure/termination. If a Salesperson is terminated by EW without such cause, then any bonus payment to which such Salesperson would have been entitled to receive had s/he been employed by EW on the date of payment will be made as if employment had not ceased until after the date of payment.

**Interpretation; Administration.** It is not possible to describe here all scenarios where multiple parties may be entitled to, or may claim entitlement to, credit for Billings made with respect to a particular agreement, arrangement or campaign, or whether amounts will be treated as a Salesperson's Billings in the context of a particular transaction. The Vice President of North American Sales will use his/her best efforts to fairly and equitably assign and apportion responsibility (including client responsibility), evaluate entitlement to commissions, and apportion credit or Billings where appropriate. Except in unusual circumstances, determinations ordinarily will be made based upon client assignments, and a review of entries in EW's sales management software program and any status reports required to be submitted by Salespersons. If any dispute or conflict arises regarding interpretation or administration of the Plan, including without limitation account responsibility, or entitlement to or payment of bonus, determinations by the Vice President of North American Sales are final and binding.

# EXHIBIT B

MAY-1-2005  02:43A FROM:                                    TO:16788912055        P.2/2



('Y('WONDER

June 1, 2007

Mr. John Abraham
8328 Stewart Avenue
Los Angeles, California 90045

Re:  Offer of Employment by EyeWonder, Inc.

Dear John:

By this letter, we would like to formally extend to you an offer to become the Sales Director for EyeWonder, Inc. in the Southwest sales region (currently Arizona, New Mexico, California – south of Big Sur, and the southern halves of Utah and Colorado), with your employment beginning immediately.

Your annual base salary will be $120,000 and you will be entitled to bonuses based on the billings generated by your region (i.e., by you and by the account executives under your supervision). Billing targets will be $1,150,000 through the end of Q3 '07 and $1,350,000 for Q4 '07, and your bonuses if those targets are met will be $30,000 and $40,000 respectively. A partial bonus will be paid if at least a minimum percentage of the quarterly target is met – 50% of the full bonus amount for reaching 75% of your target, and 75% of the full bonus amount for reaching 85% of your target. If the target is exceeded for a quarter, you will be entitled to an override equal to 5% of the excess amount. In order to alleviate some of the concern about ramp-up, if the aggregate revenue target for both quarters combined is achieved, then you will be able to recoup any quarterly bonus amount not previously received due to the failure to have met the revenue target for the applicable quarter. Payment of any recouped bonus will be made along with payment of the bonus for billings in Q4 '07.

You will be entitled to health and dental benefits provided under EyeWonder's group plan under the same terms as similarly situated employees, effective July 1, 2007. We have two plans to choose from – under our standard plan (the ANA plan), EyeWonder covers the full cost for the Employee; under the other (the ANC plan – benefits are a bit upgraded), the employee covers the additional cost that we incur (about $30 for an individual). Employees are responsible for the cost of dependent coverage.

The offer is contingent upon you completing and signing EyeWonder's standard form of employment agreement, and acknowledging that you have received and reviewed EyeWonder's Policies and Procedures handbook. We will get a draft of the employment agreement out to you promptly for your review, and we also will get a copy of the handbook to you.

We believe that EyeWonder is building an outstanding reputation for exciting, innovative and quality products and service. Credit for this goes to every one of our employees, John, and we look forward to you accepting our offer.

Sincerely,

Jerome F. Connell, Jr.
General Counsel and COO

Accepted and agreed to:

JOHN ABRAHAM

# EXHIBIT C

**Jerome Connell**

| | |
|---|---|
| From: | Jerome Connell |
| Sent: | Wednesday, March 26, 2008 3:56 PM |
| To: | John Abraham |
| Cc: | Mike Rosner; Felicia Crawford |

Subject: RE: Thank you for the time on the phone.

John, I didn't want to wait too long to reply. I know Roz has been trying to get with you to discuss some details. Apparently, there hasn't been a whole lot of progress on that. When you can get around to it, call me or him when you have a chance to discuss the details of the wind-up. I forwarded your notice to Felicia and Kimberly, so they are aware of the notice and when the two weeks is up. We'll figure out the final check, COBRA and other stuff, and a way to get your stuff from the office to you and our stuff (BB, laptop, keys, etc.) back to us. No need to come back to the office at this point; probably more of a distraction going forward, so just stay on your vacay. Sorry it turned out this way, but I do wish you the best of luck in your new gig.

Romey

Romey Connell | General Counsel and COO
Phone 678.891.2041 | Fax 678.891.2017
romey@eyewonder.com

**EyeWonder**
**Richer Media. Richer Results.**
www.eyewonder.com

From: John Abraham
Sent: Friday, March 21, 2008 2:11 PM
To: Jerome Connell
Subject: Thank you for the time on the phone.

Per our conversation.

Matt and Maria.   Need to have there comp plan address.

As I mention.   I am going on vacation, and have offer for a another play.   So I am giving my two weeks.   I mention my unhappiness
regarding the comp plan as well.

I will let you speak to Mike Rosner.   I called you first – per our agreement I would always call you if I am not happy.

I am on Vacation till Thursday.   I will be on Blackberry. We can see if there is a work around.

I do believe the job I have done here has been appreciated.   Thank you for all the support.
**John Abraham** | Regional Vice President | EyeWonder
**Office 310-907-5951 | Mobile 310-713-5362 | Fax 310-305-8515**
jabraham@eyewonder.com | aim- ewabraham
**EyeWonder**
**Richer Media. Richer Results.**
www.eyewonder.com

# EXHIBIT 2

LITTLER MENDELSON, P.C.
Joel L. Finger
Eric D. Witkin
900 Third Avenue 20th Floor
New York, NY 10022
Telephone: 212-583-9600
Attorneys for Defendant John Abraham

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------ X
EYEWONDER, INC.,                          :
                                          :
              Plaintiff,                  :        No. 08 CV 3579 (GBD)
                                          :           "ECF CASE"
       v.                                 :
                                          : <u>**AMENDED ANSWER AND COUNTERCLAIMS**</u>
JOHN ABRAHAM,                             :
                                          :
              Defendant.                  :
------------------------------------------------------ X

Defendant JOHN ABRAHAM ("Abraham or "Defendant"), by and through his attorneys, Littler Mendelson, P.C., for his Amended Answer to the Complaint herein of Plaintiff EYEWONDER, INC. ("EyeWonder" or "Plaintiff") filed on or about April 14, 2008 ("Complaint" or "Cplt."):

1.     Denies the allegations of Paragraph 1 of the Complaint, except admits that he is a former employee of Plaintiff and is party to an Employment Agreement with Plaintiff (Cplt. Exhibit A), which speaks for itself.

### PARTIES, JURISDICTION, AND VENUE

2.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 2 of the Complaint and therefore denies same.

1

3.      Admits the allegations of the first sentence of Paragraph 3 of the Complaint and notes that the second sentence of said Paragraph calls for a legal conclusion to which no response is required, except refers to Cplt. Exhibit A, which speaks for itself.

4.      Denies knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 4 of the Complaint and therefore denies same and notes that said Paragraph asserts a legal conclusion to which no response is required.

## FACTS

**EyeWonder**

5.      Denies knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 5 of the Complaint and therefore denies same, except admits that Plaintiff's business consists almost exclusively of providing services for creating and delivering video and other rich media advertisements over the Internet.

**Mr. Abraham's employment with EyeWonder**

6.      Denies the allegations of Paragraph 6 of the Complaint, except admits that he signed and transmitted a facsimile of a copy of Cplt. Exhibit B accepting Plaintiff's offer of employment, which speaks for itself, and that he subsequently signed an Employment Agreement with Plaintiff of which Cplt. Exhibit A is a copy.

7.      Denies the allegations of the last sentence of Paragraph 7 of the Complaint and admits the allegations of the first two sentences of said Paragraph.

8.      Denies the allegations of Paragraph 8 of the Complaint.

2

**Terms of the Employment Agreement**

**Non-Competition**

9.      Admits that the Employment Agreement Section 6(f) (Cplt. Exhibit A) includes the words quoted in Paragraph 9 of the Complaint, which speaks for itself, except asserts that before Abraham signed the Employment Agreement, Plaintiff's General Counsel told Abraham that, notwithstanding anything to the contrary in the Employment Agreement, the restrictive covenants of its Section 6 would not apply to or be enforceable against Abraham because of his California residence and employment.

10.     Denies the allegations of Paragraph 10 of the Complaint.

11.     Denies the allegations of Paragraph 11 of the Complaint.

12.     Denies the allegations of Paragraph 12 of the Complaint.

**Non-Solicitation**

13.     Admits that the Employment Agreement Sections 6(e) and 6(a)(ii) (Cplt. Exhibit A) include the words in the quotations in Paragraph 13 of the Complaint but asserts that before Abraham signed the Employment Agreement, Plaintiff's General Counsel told Abraham that, notwithstanding anything to the contrary in the Employment Agreement, the restrictive covenants of its Section 6 would not apply to or be enforceable against Abraham because of his California residence and employment.

**Non-Use and Non-Disclosure of Confidential Information**

14.     Denies the allegations of Paragraph 14 of the Complaint, except refers to Section 6(b) of the Employment Agreement (Cplt. Exhibit A), which speaks for itself.

15.     Admits that the Employment Agreement Section 6(a)(i) (Cplt. Ex. A) includes a definition of "Confidential Information," which speaks for itself.

**Authorization of Injunctive Relief**

16.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 16 of the Complaint and therefore denies same, except admits that Section 8(c) of the Employment Agreement (Cplt. Ex. A) speaks for itself, but affirmatively asserts that before Abraham signed the Employment Agreement, Plaintiff's General Counsel told Abraham that, notwithstanding anything to the contrary in the Employment Agreement, the restrictive covenants of its Section 6 would not apply to or be enforceable against Abraham because of his California residence and employment.

17.    Denies the allegations of Paragraph 17 of the Complaint, except admits that Section 7 of the Employment Agreement (Cplt. Ex. A) speaks for itself, but affirmatively asserts that before Abraham signed the Employment Agreement, Plaintiff's General Counsel told Abraham that, notwithstanding anything to the contrary in the Employment Agreement, the restrictive covenants of its Section 6 would not apply to or be enforceable against Abraham because of his California residence and employment.

18.    Denies the allegations of Paragraph 18 of the Complaint, except admits that Section 9 of the Employment Agreement (Cplt. Ex. A) speaks for itself, but affirmatively asserts that before Abraham signed the Employment Agreement, Plaintiff's General Counsel told Abraham that, notwithstanding anything to the contrary in the Employment Agreement, California law would govern Abraham's employment with Plaintiff, since Abraham was a California resident working in California.

**Mr. Abraham's Departure from EyeWonder**

19.    Denies the allegations of Paragraph 19 of the Complaint, except admits sending the email communication quoted in that Paragraph and included in Cplt. Exhibit C.

4

20.    Denies the allegations of Paragraph 20 of the Complaint.

21.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 21 of the Complaint, and therefore denies same, except admits that Abraham accepted employment with Eyeblaster, Inc. ("Eyeblaster"), which has a headquarters in New York City.

22.    Denies the allegations of Paragraph 22 of the Complaint, except admits that Abraham accepted employment with Eyeblaster, Inc. and that some of his duties are supposed to include selling services for delivering video and other rich media advertisements over the Internet and supervising sales staff in Los Angeles who sell such services.

23.    Denies the allegations of Paragraph 23 of the Complaint and asserts that before Abraham signed the Employment Agreement, Plaintiff's General Counsel told Abraham that Section 6(f) of that Agreement would not be enforceable against Abraham.

24.    Denies the allegations of Paragraph 24 of the Complaint, except admits that the performance of the Region during Abraham's employment exceeded billing goals previously set for that period.

## FIRST CLAIM FOR RELIEF

### Breach of Contractual Duty to Disclose Identity of Prospective Employer

25.    Defendant repeats and re-alleges each and every response in this Answer to the allegations of the Complaint.

26.    Denies the allegations of Paragraph 26 of the Complaint, except admits that Section 6(h) of the Employment Agreement (Cplt. Ex. A) speaks for itself.

27.    Denies the allegations of Paragraph 27 of the Complaint, except admits that Abraham accepted employment with Eyeblaster.

28.    Denies the allegations of Paragraph 28 of the Complaint.

## SECOND CLAIM FOR RELIEF

### Breach of Non-Competition Provision

29.    Defendant repeats and re-alleges each and every response in this Answer to the allegations of the Complaint.

30.    Denies the allegations of Paragraph 30 of the Complaint, except admits that Section 6(f) of the Employment Agreement speaks for itself and asserts that, before Abraham signed the Employment Agreement, Plaintiff's General Counsel told Abraham that said Section 6(f) was not enforceable against Abraham.

31.    Denies the allegations of Paragraph 31 of the Complaint.

32.    Denies the allegations of Paragraph 32 of the Complaint.

33.    Denies the allegations of Paragraph 33 of the Complaint.

34.    Denies the allegations of Paragraph 34 of the Complaint.

35.    Denies the allegations of Paragraph 35 of the Complaint.

## THIRD CLAIM FOR RELIEF

### Breach of Non-Solicitation Provision

36.    Defendant repeats and re-alleges each and every response in this Answer to the allegations of the Complaint.

37.    Denies the allegations of Paragraph 37 of the Complaint, except admits that Section 6(f) of the Employment Agreement speaks for itself and asserts that, before Abraham signed the Employment Agreement, Plaintiff's General Counsel told Abraham that said Section 6(f) was not enforceable against Abraham.

38.    Denies the allegations of Paragraph 38 of the Complaint.

6

39.    Denies the allegations of Paragraph 39 of the Complaint.

40.    Denies the allegations of Paragraph 40 of the Complaint.

## FOURTH CLAIM FOR RELIEF

### Breach of Non-Disclosure Provision

41.    Defendant repeats and re-alleges each and every response in this Answer to the allegations of the Complaint.

42.    Denies the allegations of Paragraph 42 of the Complaint, except admits that Section 6(b) of the Employment Agreement (Cplt. Ex. A) speaks for itself.

43.    Denies the allegations of Paragraph 43 of the Complaint.

44.    Denies the allegations of Paragraph 44 of the Complaint.

45.    Denies the allegations of Paragraph 45 of the Complaint.

46.    Denies the allegations of Paragraph 46 of the Complaint.

47.    Denies the allegations of the "WHEREFORE" Paragraph of the Complaint and all of its subdivisions.

## DEFENSES

### FIRST DEFENSE

48.    The Complaint fails to state a claim against Defendant upon which relief can be granted.

### SECOND DEFENSE

49.    On or about June 1, 2007, in California, Abraham accepted an offer of employment from Plaintiff, which did not mention that Abraham would be required to agree to any restrictive covenants or non-competition agreements as a condition of that employment (Cplt. Ex. B).

50.     After Abraham had accepted Plaintiff's job offer and started employment, he was flown to Atlanta, Georgia and presented with the "standard form" Employment Agreement (Cplt. Ex. A) at which time he expressed to Plaintiff's General Counsel his concern that the restrictive covenants of its Section 6, including the non-compete provisions, appeared to be very one-sided in favor of Plaintiff, to which Plaintiff's General Counsel replied "Don't worry, you're in California.  It's a right-to-work state."  That statement by Plaintiff's General Counsel confirmed to Abraham the correctness of his understanding that under California law the non-competes and restrictive covenants in the Employment Agreement were unenforceable against him as a California resident employed in California.

51.     As Abraham had already left his previous employment and started his employment with Plaintiff, and as he was not an attorney and had no attorney to advise him in regard to the Employment Agreement, he did not negotiate the terms of the "standard form" Employment Agreement and relied on the above statement of Plaintiff's General Counsel in deciding to sign the Employment Agreement, notwithstanding the restrictive covenants of its Section 6, because, based on the above statement of Plaintiff's General Counsel, Abraham believed that the restrictive covenants were unenforceable against him and that in any event Plaintiff would not attempt to enforce them in light of the above-referenced statement by its General Counsel.

52.     But for the aforesaid representation of Plaintiff's General Counsel, Abraham would not have signed the Employment Agreement.

53.     Had Abraham known that Plaintiff was going to require him to agree to the restrictive covenants in Section 6 of the Employment Agreement as a condition of his

employment, he would not have left his previous employment and accepted employment with Plaintiff.

54.    The Employment Agreement is null, void or voidable in its entirety, including but not limited to its restrictive covenants in its Section 6 and its dispute resolution and arbitration provisions in its Section 8.

### THIRD DEFENSE

55.    Defendant repeats and re-alleges all of the allegations of this Answer.

56.    Insofar as Plaintiff seeks to enforce the restrictive covenants of Section 6 of the Employment Agreement (Cplt. Ex. A), Plaintiff is equitably estopped and/or barred from doing so because it induced Defendant Abraham to sign the Employment Agreement by its General Counsel's representations to Abraham, before he signed it, that said provisions were not enforceable against him.

### FOURTH DEFENSE

57.    Defendant repeats and re-alleges all of the allegations of this Answer.

58.    The Employment Agreement (Cplt. Ex. A) should be rescinded and Plaintiff should be barred from seeking to enforce it against Defendant.

### FIFTH DEFENSE

59.    Defendant repeats and re-alleges all of the allegations of this Answer.

60.    The claims in the Complaint are barred by the doctrine of promissory estoppel.

### SIXTH DEFENSE

61.    Defendant repeats and re-alleges all of the allegations of this Answer.

62.    The claims in the Complaint are barred because Plaintiff fraudulently induced Defendant to sign the Employment Agreement (Cplt. Ex. A) here sought to be enforced.

## SEVENTH DEFENSE

63.     Defendant repeats and re-alleges all of the allegations of this Answer.

64.     Insofar as the injuries alleged by Plaintiff were caused by its own conduct, it is estopped from claiming that they were caused by Defendant.

## EIGHTH DEFENSE

65.     Defendant repeats and re-alleges all of the allegations of this Answer.

66.     Plaintiff's claims are barred, in whole or in part, by the doctrine of unclean hands.

## NINTH DEFENSE

67.     Defendant repeats and re-alleges all of the allegations of this Answer.

68.     The restrictive covenants in Section 6 of the Employment Agreement (Cplt. Ex. A) are void, unenforceable and against public policy.

## TENTH DEFENSE

69.     Defendant repeats and re-alleges all of the allegations of this Answer.

70.     The restrictive covenants in Section 6 of the Employment Agreement (Cplt. Ex. A) are unreasonable, unenforceable and against public policy.

## ELEVENTH DEFENSE

71.     Defendant repeats and re-alleges all of the allegations of this Answer.

72.     The restrictive covenants in Section 6 of the Employment Agreement (Cplt. Ex. A) are overbroad, unenforceable and against public policy.

## TWELFTH DEFENSE

73.     Defendant repeats and re-alleges all of the allegations of this Answer.

74.     Insofar as Plaintiff seeks to enforce the restrictive covenants of Section 6 of the Employment Agreement (Cplt. Ex. A) by application of New York law, Plaintiff is equitably

estopped and/or barred from doing so because it induced Defendant Abraham to sign the Employment Agreement by its General Counsel's representations to Abraham, before he signed it, that said provisions were not enforceable against him because he was a California resident employed in California and that California law governed the terms and conditions of his employment.

### THIRTEENTH DEFENSE

75.    Defendant repeats and re-alleges all of the allegations of this Answer.

76.    The claims in the Complaint are barred because Plaintiff waived any right to enforce against Defendant the provisions of Section 6 of the Employment Agreement.

### FOURTEENTH DEFENSE

77.    Defendant repeats and re-alleges all of the allegations of this Answer.

78.    If Plaintiff suffered any damages as a result of any alleged action by Defendant, upon information and belief, it had a duty to mitigate damages and failed to mitigate them.

### FIFTEENTH DEFENSE

79.    Defendant repeats and re-alleges all of the allegations of this Answer.

80.    If Plaintiff sustained any injuries, they were caused, in whole or in part, by Plaintiff's negligence and/or culpable conduct.

### SIXTEENTH DEFENSE

81.    Defendant repeats and re-alleges all of the allegations of this Answer.

82.    As Plaintiff's claims are frivolous, unreasonable and groundless, Defendant should recover all his costs and attorneys' fees incurred herein.

11

## SEVENTEENTH DEFENSE

83.    Defendant reserves the right to raise any and all other defenses that may become evident during discovery and during any other proceeding in this action.

## EIGHTEENTH DEFENSE

84.    Defendant repeats and re-alleges all of the allegations of this Answer.

85.    The arbitration provisions of the Employment Agreement (Cplt. Ex. A) are invalid and unenforceable because, *inter alia,* the Employment Agreement is an adhesive contract and its arbitration provisions are both procedurally and substantively unconscionable as a matter of law.

## AS AND FOR A FIRST COUNTERCLAIM

### Unfair Competition

86.    Defendant repeats and re-alleges al of the allegations of this Answer and Counterclaims.

87.    The non-competition and other restrictive covenants contained in Section 6 of the Employment Agreement (Cplt. Ex. A), which Plaintiff forced Defendant to execute as a condition of employment, and which it is now trying to enforce in this action, are illegal pursuant to California Business and Professions Code sections 16600 and 17200.   Said provisions constitute an unfair restraint of trade for the following, non-exclusive reasons: they illegally purport to restrict the job mobility of Defendant, they illegally purport to restrict Defendant from seeking other gainful employment, they illegally purport to restrict the use of public information, and they specifically purport to prevent or deter Defendant from accepting or holding any lawful employment within the State of California or elsewhere other than with Plaintiff.

12

88.    The Employment Agreement (Cplt. Ex. A) was a contract of adhesion and was procedurally unconscionable because, among other things, Defendant was required to sign it as a condition of his employment with no negotiations allowed, it was presented to him on a preprinted form and on a take-it-or-leave-it basis, he was not allowed to thoroughly review or consider its terms, he was not permitted to review it overnight, he was not provided with the opportunity to consult his own counsel prior to executing it, and it was never thoroughly and completely explained to him.

89.    Because of its onerous, unfair, unlawful and one-sided provisions, which are surprising, grossly unfair and shock the conscience, the Employment Agreement is substantively unconscionable.

90.    Because it is both procedurally and substantively unconscionable, the Employment Agreement is unenforceable.    Moreover, the Employment Agreement is so permeated by unconscionability that the unlawful provisions cannot be severed.

91.    Due to Plaintiff's fraudulent and/or negligent misrepresentation of the terms contained within the Employment Agreement, Defendant did not discover, and would not reasonably have discovered, that the Employment Agreement, as Plaintiff attempted to enforce it, was unconscionable and unlawful until Plaintiff instituted this action against him to attempt to enforce the Employment Agreement, in approximately April 2008.

92.    Even though the restrictive covenants of the Employment Agreement are not enforceable, Defendant is informed and believes and based thereon alleges that Plaintiff is utilizing these provisions to restrain the business opportunities, both within and outside the State of California, otherwise available to Defendant.

13

93.    Defendant is informed and believes and based thereon alleges that, in effect, through its wrongful acts, Plaintiff is able to create for itself an unfair competitive advantage along with other benefits at the expense of Defendant.

94.    Plaintiff's unlawful conduct in requiring Defendant to sign the Employment Agreement with unlawful provisions as a term and condition of employment or continued employment, and then threatening to enforce such unlawful provisions, constitutes unfair competition and an unfair business practice in violation of the California Business and Professions Code sections 16600 and 17200 *et seq.* and under common law.

95.    As a proximate result of such unlawful acts and/or unfair business acts and practices, Defendant has suffered actual damages, and Plaintiff has enjoyed unlawful profits, in a sum not yet fully ascertained but in excess of the jurisdictional limits of this Court. Furthermore, Defendant seeks injunctive relief pursuant to the Business and Professions Code section 17203, barring Plaintiff from continuing to engage in such unlawful and unfair business practices, and the remedies of disgorgement and restitution for illicit profits obtained by Plaintiff from its unlawful and/or unfair business acts and practices pursuant to Business and Professions Code section 17204.

96.    In addition, as a result of the illegal and wrongful conduct alleged above, in the absence of injunctive relief prohibiting Plaintiff from continuing to engage in unfair competition, Defendant has been and will be irreparably harmed.

97.    For these reasons, Defendant requests permanent injunctive relief prohibiting Plaintiff from continuing to engage in unfair competition by threatening and attempting to enforce illegal non-compete and restrictive covenant agreements against Defendant.

14

## AS AND FOR A SECOND COUNTERCLAIM

### Rescission

98.    Defendant repeats and re-alleges all of the allegations of this Answer and Counterclaims.

99.    Defendant's consent to the Employment Agreement (Cplt. Ex. A) was given due to a mistake or obtained through duress, menace and/or fraud.

100.    The Employment Agreement (Cplt. Ex. A) is unlawful and unconscionable, due to the fault not of Defendant but of Plaintiff, which exclusively drafted the Employment Agreement's unlawful and unconscionable terms.

101.    Due to Plaintiff's fraudulent misrepresentation and /or concealment of the terms contained within the Employment Agreement, Defendant did not discover, and would not reasonably be expected to discover, that the Agreement was unconscionable and unlawful until Plaintiff instituted this action against him to attempt to enforce the Employment Agreement, in approximately April 2008.

102.    The public interest will be prejudiced by permitting the Employment Agreement to stand.

103.    By filing of this Counterclaim, Defendant hereby gives notice to Plaintiff that he seeks rescission of the Employment Agreement, and further offers to restore to Plaintiff all consideration and everything of value which he received from Plaintiff under the Employment Agreement, upon condition that Plaintiff does likewise.

104.    Defendant therefore requests that the Court rescind the Employment Agreement in its entirety.

15

## AS AND FOR A THIRD COUNTERCLAIM

### Fraud

105.    Defendant repeats and re-alleges all of the allegations of this Answer and Counterclaims.

106.    Plaintiff required Defendant to execute the Employment Agreement (Cplt Ex. A) without disclosing to him its true import and terms.

107.    Having drafted the Employment Agreement and all the oppressive and unfair and onerous terms contained therein, Plaintiff was of course aware of the contents of the Employment Agreement and its import.

108.    Due to Plaintiff's concealment of its interpretation of the force and effect of the Employment Agreement from Defendant, he did not discover that the Employment Agreement was unconscionable and unlawful until Plaintiff instituted this action against him to attempt to enforce the Employment Agreement in late April 2008.

109.    In so failing to disclose to Defendant the true meaning of the terms and the purported legal effect of the Employment Agreement, and Plaintiff's intent to attempt to enforce it with regard to work he did while not employed by Plaintiff, Plaintiff misrepresented and suppressed the nature of the Employment Agreement, and in doing so, committed actual fraud against Defendant.

110.    Because of its malicious, oppressive and/or fraudulent conduct, Plaintiff is subject to punitive damages in an amount necessary and appropriate to punish and deter it and others from engaging in similar conduct in the future.

16

## AS AND FOR A FOURTH COUNTERCLAIM

### Declaratory Relief

111.    Defendant repeats and re-alleges all of the allegations of this Answer and Counterclaims.

112.    Plaintiff's unlawful conduct in requiring Defendant to sign the Employment Agreement (Cplt. Ex. A) with its unlawful provisions as a term and condition of his employment or continued employment and then threatening to enforce such unlawful provisions and eventually filing a lawsuit to enforce such provisions against Defendant constitutes unfair competition and unfair business practices in violation of the California Business and Professions Code sections 16600 and 17200 *et seq.* and under the common law.

113.    Moreover, the Employment Agreement is both procedurally and substantively unconscionable.

114.    Through this lawsuit against Defendant and its demand for arbitral relief requiring Defendant to comply with the Employment Agreement, Plaintiff has demonstrated that a controversy exists concerning the enforceability of the Employment Agreement and its terms.

115.    Defendant therefore requests declaratory relief stating that the Employment Agreement is unlawful and unenforceable.

## AS AND FOR A FIFTH COUNTERCLAIM

### Intentional Interference With Prospective Economic Advantage

116.    Defendant repeats and re-alleges all of the allegations of this Answer and Counterclaims.

117.    Plaintiff engaged in intentional conduct, and is presently engaging in conduct, that has had an adverse effect upon the relationship Defendant has with his employer, Eyeblaster, and

17

intentionally disrupted and interfered with Defendant's ability to secure his prospective economic advantage through the lawful relationships with Eyeblaster, and to realize the potential economic benefits through the business opportunities misappropriated and usurped by Plaintiff.

118.    The conduct of Plaintiff was wrongful by some legal measure beyond merely interfering with Defendant's business relationships in that, among other things, Plaintiff violated California Business & Professions Code sections 16600 and 17200.

119.    As a direct, proximate and foreseeable result of the conduct of Plaintiff, Defendant has suffered and continues to suffer damage and substantial losses in an amount to be determined at trial.

120.    Plaintiff committed the acts alleged herein maliciously, fraudulently, and with the wrongful and deliberate intention of injuring Defendant and benefiting Plaintiff and acted with an improper motive amounting to malice and conscious disregard of Defendant's rights. Accordingly, Defendant is entitled to receive punitive and exemplary damages from Plaintiff.

121.    Plaintiff's wrongful conduct will, unless and until enjoined and restrained by order of this Court, cause great and irreparable injury to Defendant's employment opportunities in that it will enable Plaintiff to interfere with his employment relationship with Eyeblaster.

122.    Defendant has no adequate remedy at law for these injuries. The damage to Defendant and to fair and free competition, and the loss of employment and business opportunities cannot be adequately compensated by money damages. Unless and until enjoined by this Court, Plaintiff will continue to engage in unlawful and unfair business practices, and will further harm Defendant and the free market system, and interfere with the employment and business opportunities enjoyed by Defendant in California. Unless restrained by this Court,

18

Plaintiff will cause irreparable harm and injury to the free market system and to the right of Defendant to seek and hold employment in his chosen profession free of illegal restraints.

WHEREFORE, Defendant Abraham demands judgment and relief as follows:

A.      For an order dismissing the Complaint in its entirety with prejudice;

B.      For restitution, disgorgement, compensatory damages, punitive damages and full relief on his Counterclaims including damages incurred by the issuance of the May 14, 2008 temporary restraining order and the June 9, 2008 preliminary injunction in this action, and the costs of defending this action and the arbitration proceeding brought by Plaintiff pursuant to the Employment Agreement;

C.      For an order permanently enjoining and barring Plaintiff from attempting to enforce the restrictive covenants of the Employment Agreement, and prohibiting Plaintiff from threatening and attempting to enforce such agreements or restrictions against Defendant;

D.      For an order declaring that the Employment Agreement between Plaintiff and Defendant (Cplt. Ex. A) is void, unenforceable and unconscionable;

E.      For an order rescinding the Employment Agreement;

F.      For declaratory relief stating that the Employment Agreement is unlawful and unenforceable;

G.      For an order awarding to Defendant the costs and disbursements of this action, including but not limited to Defendant's attorneys' fees where applicable, including but not limited to the private attorneys general statutes; and

H.    For an order awarding to Defendant such other and further relief as may be just

and proper.

Dated: New York, New York
       June 20, 2008

                                    LITTLER MENDELSON P.C.

                                    By: _____
                                           Joel L. Finger
                                           Eric D. Witkin
                                    900 Third Avenue, 20th Floor
                                    New York, NY 10022
                                    (212) 583-9600
                                    Attorneys for Defendant John Abraham

DEMAND FOR A TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Defendant John

Abraham hereby demands that the causes in this matter be tried by a jury to the extent provided

for by law.

Dated: New York, New York
      June 20, 2008

LITTLER MENDELSON P.C.

By: _____
        Joel L. Finger
        Eric D. Witkin
900 Third Avenue, 20th Floor
New York, NY 10022
(212) 583-9600
Attorneys for Defendant John Abraham

21

**EXHIBIT 3**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

EYEWONDER, INC.,                          :
                                          :
                        Plaintiff,        :        Index No. 08 CV 3579 (GBD)
                                          :
            v.                            :
                                          :        **DECLARATION OF**
JOHN ABRAHAM,                             :        **JOHN ABRAHAM**
                                          :
                        Defendant.        :
                                          :
                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

JOHN ABRAHAM, pursuant to 28 U.S.C. § 1746, declares:

1.      I am the defendant in this action. I make this declaration in opposition to plaintiff

EyeWonder, Inc.'s ("EWI") motion for a preliminary injunction seeking to impose anti-

competitive restrictions on my ability to pursue my livelihood in California, some of which

exceed even the restrictive covenants contained in my employment contract with EWI, which I

believe, as confirmed by EWI's General Counsel, are unenforceable under California law.

2.      In early 2007, when I was employed in Los Angeles as publisher of National

Lampoon's on-line magazine, I was personally solicited by Michael Rosner ("Rosner"), Vice

President of Global Sales for EWI, to become director of sales for EWI's Southwest region,

which included Southern California. Rosner told me the EWI needed someone to replace its

current sales director in the Los Angeles market.

3.      Rosner and I had known each other previously and had both been in the Internet

sales business for some time. In early 2007, I had over ten (10) years' experience in Internet

advertising and sales, having worked for a number of different companies in the Internet advertising industry in the State of California. Over the course of my career to that point, I had worked with, nurtured and maintained relationships with a great number of Internet advertising agencies, major studios (such as Sony and Universal) and Internet publishers.

4.     EWI is one of a number of companies engaged in the business of providing video streaming and "rich media" services to advertisers.  Rich media technology adds video streaming, animation, interactive features and other enhancements to Internet advertising to increase and improve advertisers' brand awareness and connection to Internet users and consumers.

5.     Upon information and belief, Rosner sought to hire me to supervise EWI's sales force in Southern California because of my prior experience and expertise, including my relationships and contacts with advertising agencies, studios and Internet publishers, all of whom were clients or potential clients of EWI.  EWI wanted to benefit from my reputation, contacts and relationships.

6.     There are a number of companies in addition to EWI that sell video streaming and rich media services.  The vast majority of the potential customers for such services -- advertising agencies, studios and smaller creative shops -- use a number of different companies to provide such services to them, depending on price, service, project goals and other variables.  In my experience, very few of the customers for such services use just one rich media provider exclusively.

7.     I am a lifelong California resident. I was a resident of California throughout my pre-employment discussions with Rosner and my subsequent 8½-month employment with EWI.

-2-

8.      Rosner and I discussed the terms of my employment with EWI over the telephone and in person in May 2007. When we spoke on the telephone, I was always in California. Upon information and belief, during these telephone conversations Rosner was in New York or another of EWI's sales offices. In May 2007, Rosner flew to California and met me in Marina del Rey, near Los Angeles, to negotiate the final details of my employment and compensation. I never traveled to New York to negotiate the terms of my employment with EWI. All the terms of my employment with EWI were negotiated with me while I was in California.

9.      On or about June 1, 2007, I received via e-mail in California an offer letter (the "offer letter") from Jerome Connell ("Connell"), the General Counsel of EWI. Upon information and belief, Connell signed the offer letter in and sent it from EWI's headquarters in Atlanta, Georgia.

10.     The offer letter set forth the terms of my employment and compensation as EWI's Sales Director for the Southwest Region, as per my negotiations with Rosner. The offer letter also stated that I would have to sign EWI's "standard form of employment agreement" as a condition of my employment. The offer letter did not mention that I would be required to agree to any restrictive covenants or non-competition agreements as a condition of employment. A copy of the offer letter is appended to plaintiff's Verified Complaint ("Complaint") as Exhibit B.

11.     On or about June 1, 2007, I signed the offer letter in Los Angeles, California and e-mailed it back to Connell. I thereupon commenced employment with EWI.

12.     In or around June 2007, after I had accepted EWI's job offer and started employment, EWI flew me to Atlanta to meet its executive officers, including Connell. I was presented with EWI's "standard form of employment agreement," which included broad

-3-

covenants not to compete or solicit customers within 20 miles of Los Angeles or San Diego, which is where the great bulk of the Internet industry is located.

13.    While in Atlanta, I discussed EWI's "standard form of employment agreement" with Connell.  Before signing EWI's "standard form" agreement, I expressed my concern to Connell that the restrictive covenants, including the non-compete provisions, appeared to be very one-sided in EWI's favor.  Connell replied to me, "Don't worry, you're in California. It's a right-to-work state."

14.    I am not a lawyer and did not have a lawyer to advise me in regard to my hiring by EWI or the "standard form of employment agreement" that I was required to sign as a condition of employment.  It was and remains my understanding as a lifelong resident of California who has always been employed in California that non-competes and restrictive covenants such as those contained in EWI's "standard form" agreement are unenforceable under California law. Connell's statement to me that I should not worry about the restrictive covenants because I was working in California, a "right-to-work state," confirmed to me the correctness of my understanding of California law and EWI's concurrence.

15.    I did not negotiate the terms of EWI's "standard form of employment agreement" with Rosner, Connell or anyone else at EWI. I signed the "standard form" agreement in Atlanta in June 2007 after I had already commenced employment with EWI.  A copy of the "standard form of employment agreement" is appended to the Complaint as Exhibit A.

16.    In or around June 2007, after meeting EWI's executive officers in Atlanta, I was flown from Atlanta to New York to visit EWI's sales office in New York City, where Rosner's office was located.  That visit was the only time I was in New York on EWI business during the

-4-

whole 9 months of my employment with EWI. I did not negotiate any of the terms of my employment, which has already commenced, while in New York. After leaving New York, I returned to California.

17.    In late 2007, I was given additional responsibility for EWI's rich media sales in the Northwest as well as the Southwest regions and the new title of Regional Vice President, West Region. In November 2007, EWI issued a press release announcing my hiring as Regional Vice President, West Region. In its press release, EWI touted me as an "Internet veteran" with "more than a decade of experience in the industry" and as possessing significant "advertising, media and publisher expertise" based upon my pre-EWI experience. A copy of EWI's press release dated November 19, 2007 is attached hereto as Exhibit A.

18.    As Regional VP, West Region, my primary responsibility was to sell EWI's rich media services to advertising agencies, studios and smaller creative shops. I supervised four sales assistants in Los Angeles and two in San Francisco, as well as three secretaries.

19.    Although I had the title of Regional Vice President for the final few months of my employment, I was not considered part of EWI's executive management. Rosner told me that I was not part of EWI's executive management and that I was not part of EWI's strategic team.

20.    I had no ownership interest in EWI, was not a partner or shareholder, and had no options or other interest in EWI. I was considered by EWI to be part of its West Coast middle management.

21.    I performed virtually all of my duties for EWI in California. Occasionally, I traveled to other states on the West Coast for business purposes, but almost all of my duties were

-5-

performed from EWI's Los Angeles and San Francisco sales offices. I never traveled to New York on EWI business, with the sole exception of my initial visit there in June 2007.

22.    During the course of my employment with EWI, I reported to Rosner and spoke with him by telephone from California once or twice a week to update him on West Coast sales activities and related matters. I never traveled to New York to meet with Rosner, with the sole exception of my initial visit in June 2007.

23.    I also compiled and maintained a list of West Coast sales targets ("target list"), which I updated and e-mailed to Rosner from Los Angeles on a monthly basis. Some of the companies on the target list were not customers of EWI but from which I had hoped to obtain business; others were current EWI customers, as well as customers of other rich media companies, from which I hoped to develop more business for EWI. My decision to place a company on the target list did not indicate that the company necessarily had a significant, potential or any relationship with EWI; only that I thought we should direct some of our sales efforts at that company. I never prepared any business plans during my employment with EWI.

24.    I had no involvement in the technological side of EWI's business. I did not develop any new products, was not involved in software engineering, and did not write or have access to EWI's computer codes or programs.

25.    In early 2008, Rosner presented me with a new compensation plan for 2008, which unilaterally set higher sales and billing targets and offered lower payouts. In effect, I was expected to work harder for less money under EWI's 2008 compensation plan. I was required to sign the new 2008 compensation plan as a condition of continued employment with EWI, but I declined to do so.

-6-

26.     Instead, I looked for other employment where I could use the skills, expertise, knowledge and contacts I had developed over the decade prior to my nine (9) months' employment with EWI.  Ultimately, I accepted an offer with Eyeblaster, Inc. ("Eyeblaster"), a competitor of EWI, in March 2008 and tendered my resignation to EWI.

27.     I am employed by Eyeblaster as director of sales in Los Angeles, where I utilize my skills, expertise, knowledge and contacts developed over the years prior to my employment with EWI.

28.     I am not in possession of any of EWI's documents, files, lists or records, or any proprietary or confidential information of EWI, and I have not and do not intend to use or disclose any proprietary or confidential information to any third party.  I am not in possession of any trade secrets of EWI.

29.     I have not solicited and do not intend to solicit on Eyeblaster's behalf any customers I first met or had contact with while employed by EWI which are not customers of Eyeblaster.

30.     I also do not intend to solicit any employees of EWI to work for Eyeblaster or any other third party.

31.     Subsequent to the commencement of this action against me by EWI, my prior counsel contacted me and informed me that EWI's attorney, James Bogan, had provided her with a list of 52 studios, advertising agencies, and smaller creative shops that EWI contended were its customers and with which EWI wanted me to agree not to have any contact (the "Bogan list"). She read the list to me over the telephone; I did not obtain or make a copy.

-7-

32.    It is my understanding that Bogan had represented to my former counsel that the list was "confidential."  The identities of many of EWI's clients are neither confidential nor a trade secret and are commonly known in the industry.  Indeed, many of the names on the Bogan list have been disclosed by EWI to its competitors and the general public by means of press releases, articles and trade publications, including many that are reproduced and linked on EWI's own website (*www.eyewonder.com*).

33.    About half of the companies on the Bogan list were already customers of Eyeblaster prior to my employment with Eyeblaster.  Thus, they were not exclusive customers of either Eyeblaster or EWI, as is typical in the Internet industry.

34.    Other companies on the Bogan list were companies with which I have had relationships and contact, pre-dating my employment with EWI.

35.    I see no reason to agree to cease any contact with existing Eyeblaster customers or with companies with which I have maintained relationships before my relatively brief period of employment with EWI.  Such demands by EWI are unreasonable, unnecessary to protect any possible legitimate concern it might have regarding the termination of my employment, and exceed even the restrictions contained in EWI's "standard form" agreement that I was required to sign.

36.    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: Dallas, Texas
        May 13, 2008

_____
John Abraham

**EXHIBIT A**


eye**WONDER.**

**FOR IMMEDIATE RELEASE**

---

## CONTACT:

**For EyeWonder:**
Kathleen Zakrzewski or Scott Gleeson Blue
Zer0 to 5ive
Phone: 610.934.7563 or 610.934.7560
Mobile: 215.939.5709 or 215.356.7423
Email: kathleen@0to5.com or scott@0to5.com

### EyeWonder Announces Appointment of Three Regional Vice Presidents, and Opens New Office in Dallas

*Driven by increased demand for its offerings nationwide, EyeWonder expands its sales coverage and leadership team*

**ATLANTA – November 19, 2007 –** EyeWonder, Inc., rich media and digital video advertising's fastest-growing innovator, today announced that it has appointed regional sales executives throughout the United States and opened a new office in Dallas as a result of the nationwide increased demand for its offerings. It also follows EyeWonder's recent growth in Europe, with its acquisition of Cologne, Germany-based vendi interactive, and its expansion of its existing presence in the UK and Ireland.

"Our remarkable and consistent growth is a result of our strong leadership and innovation in the rich media and digital video advertising arena," said John Vincent, CEO, EyeWonder. "Our new Dallas office and team of new regional vice presidents represent two more exciting milestones in our continuing growth. They will allow us to better serve our customers capitalizing on the limitless creative and richer results that only EyeWonder can deliver."

**EyeWonder Opens Dallas Office**
EyeWonder recently opened a new office in Dallas, Texas, as a result of increased client demand in the region. Ryan Manchee, who has held several positions within EyeWonder since 2003, most recently as Director of Creative Services, will act as the office's Director of Sales to lead business development initiatives and advance existing advertiser and agency relationships in this region.

**Additional Leadership Added Throughout U.S.**
EyeWonder has recently named three new regional vice presidents of sales who will be responsible for leading sales growth and management of the sales expansion in their respective regions:

- The Regional Vice President, Southeast/Midwest position will be held by former Director of Sales, Ali Ruyan. Since joining EyeWonder in 2005, Ruyan has assisted in overseeing and managing U.S. operations as well as playing a key role in establishing the company's campaign management team, which has been instrumental in strengthening client relationships and fueling EyeWonder's growth through unparalleled experience, service and support. Ruyan's strong agency experience will continue to create value for clients throughout the Southeast and Midwest region.
- The Regional Vice President, West Region position will be held by Internet veteran John Abraham. Bringing more than a decade of experience in the industry, including co-founding Perfect Circle Media, later acquired by Interop Interactive, and more recently re-launching sites for National Lampoon and the Humor Network, Abraham will use his advertising, media and publisher expertise to further enhance sales in these regions.
- The Regional Vice President, Northeast Region is now led by former founder and president of Endemic Media, Frank Morgano. With more than 15 years of advertising experience with global



**FOR IMMEDIATE RELEASE**

brands and top interactive Internet companies, including playing an integral role in advertising sales at Cox Interactive Sales, New York Times Digital and DoubleClick (where he co-managed sales relationships with Ogilvy, Ameritrade and IBM), Morgano brings strategic insight and experience that will be a tremendous asset to the region.

Since 2005, EyeWonder has experienced more than 140 percent in compounding revenue growth annually, which represents 575 percent total revenue growth during the period – doubling industry growth. EyeWonder's innovative technology solutions have ignited this expansion, as the company continues to serve 80 of the top 100 global advertising agencies, work with every top publisher and partner with industry leading technology companies including Adobe, Akamai and Mediaplex.

**About EyeWonder, Inc.**
EyeWonder, Inc. is rich media and video advertising's fastest-growing innovator, empowering brands and advertisers to leverage the industry's most comprehensive creative capabilities for online campaigns that are proven to deliver richer results. Headquartered in Atlanta, the company's pioneering technology enables advertisers and agencies to focus their time and energy on producing the strongest interactive ad campaigns that reach across more of today's top browsers and operating systems while eliminating inefficiencies that limit creativity and slow workflow and purchasing processes. Moreover, EyeWonder delivers results. A 2006 Dynamic Logic study found that the EyeWonder-powered campaigns generate a 65 percent increase in aided brand awareness and a 34 percent increase in message association, and that EyeWonder leads all other top rich media providers in generating increased lift in three out of four core brand metrics.

EyeWonder services the world's top agencies and brands, and its rich media and video ad products are accepted by more than a thousand online publishers, including Yahoo!, AOL, and MSN. For more information on Richer Media and Richer Results, please visit http://www.eyewonder.com.

# # #

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                            :

EYEWONDER, INC.,                     :
                                            :   No. 08 CV 3579 (GBD)
                  Plaintiff,      :
                                              :   ECF Case
        v.                           :
                                              :   **CERTIFICATE OF**
JOHN ABRAHAM,               :   **SERVICE**
                                              :
                 Defendant.     :
                                              :
                                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

        I hereby certify that on May 13, 2008, I served the foregoing Declaration of John Abraham by filing it electronically with the Clerk of the above-captioned Court using its CM/ECF systems, upon:

Lisa Pearson
Kilpatrick Stockton LLP
31 West 52nd Street, 14th Floor
New York, NY 10019

and

James F. Bogan, III
Kilpatrick Stockton LLP (GA)
1100 Peachtree Street, Suite 2800
Atlanta, GA 30309

Attorneys for Plaintiff.

        I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

        Executed this 13th day of May 2008, in New York, New York

                                   /s/ Anna Maria Loiacono
                                   Anna Maria Loiacono

# EXHIBIT 4

 **American Arbitration Association**
*Dispute Resolution Services Worldwide*

*Southeast Case Management Center*
John M. Bishop
Vice President
Linda Beyea
Assistant Vice President

July 31, 2008

2200 Century Parkway, Suite 300, Atlanta, GA 30345
telephone: 404-325-0101 facsimile: 404-325-8034
internet: http://www.adr.org/

VIA E-MAIL

Allen Garrett
1100 Peachtree Street
Suite 2800
Atlanta, GA  30309

James F. Bogan
Kilpatrick Stockton LLP
Suite 2800
1100 Peachtree Street
Atanta, GA  30309-4530

Joel L. Finger
Littler Mendelson, P.C.
900 Third Avenue
New York, NY  10022

Jerry C. Newsome
Littler Mendelson, P.C.
3348 Peachtree Road, NE
Suite 1100
Atlanta, GA  30326-1008

Re: 30 116 00331 08
     EyeWonder, Inc.
     and
     John Abraham

Dear Parties:

The preliminary hearing  previously set for July 2, 2008 at 10:00 AM has been re-scheduled for August 4, 2008 at 11:30 AM (EST).

Please dial in to the conference call by using the following telephone number and passcode:

|  |  |
|---|---|
| Telephone: | 888-537-7715 |
| Passcode: | 76294558# |

Sincerely,

*Kai Sullivan*

Kai Sullivan
Case Manager
877-320-5140
SullivanK@adr.org

*Supervisor Information: Lauryn A. Hall, 888 320 3518, HallL@adr.org*

Encl.

cc:      Mark C. Travis, Esq.